# SUPERIOR COURT.

## GRAFTON, NOVEMBER TERM, 1817.[1]

### THE TRUSTEES OF DARTMOUTH COLLEGE *v.* WILLIAM H. WOODWARD.

The corporation of *Dartmouth College* is a public corporation.

An act of the legislature adding new members to such a corporation without the consent of the old corporation is not repugnant to the constitution of this state.

The charter of the king creating the corporation of *Dartmouth College,* is not a contract within the meaning of that clause in the constitution of the *United States* which prohibits states from passing laws impairing the obligations of contracts.

This was an action of trover for sundry articles alleged to be the property of the plaintiffs. The cause was submitted to the decision of the court upon a statement of facts, but as the facts are all stated in the opinion of the court, it is deemed unnecessary to detail them here. And it was agreed that if either party should desire it, the statement of facts should be turned into a special verdict, in order that the case might be carried to the supreme court of the *United States* upon a writ of error.

The cause was argued in this county at the last term of this court, by *Mason* and *Smith* for the plaintiffs, and by the attorney-general for the defendant, and was continued nisi, for further argument, in Rockingham county on the next circuit.

At the September term in Rockingham county, present all the Judges, *viz.,*

HON. WILLIAM M. RICHARDSON, CHIEF JUSTICE.
HON. SAMUEL BELL, ⎰
HON. LEVI WOODBURY, ⎱ JUSTICES.

*The cause came on to be again argued.*

Mr. MASON.—By the charter of 1769 a corporation is created, by the name of "The Trustees of Dartmouth College." The charter recites, that much expense and great labour had been bestowed, in erecting and supporting a charity school, which had become highly useful; and that individuals, as well in England as in this country, were disposed to make donations, for its enlarge-

---

[1] The original report of this case omits the arguments of counsel. The case is again reported in order to preserve these arguments and render them accessible. The present publication is intended to be an exact reprint of the case and arguments as printed in 1819 in Farrar's Report and 1 N. H. 111.

ment, and more liberal endowment; and that the king, "willing to encourage the laudable and charitable design," established the corporation. Twelve persons are appointed under the name of *trustees*, to constitute the corporation, and it is expressly provided, that it shall forever thereafter consist of twelve trustees, and no more. To them is granted the right to acquire, and hold real and personal estate, and to dispose of the same for the use of the college; and to appoint future trustees to fill vacancies in their board; and also to appoint the necessary officers of the college, and to assign them their duties and salaries; and to make laws and regulations for the proper government of the institution, together with all the usual powers of such corporations. " *To have and hold .all and singular the privileges, advantages, liberties and immunities*, and all other the premises, herein and hereby, granted and given, or which are meant, mentioned, or intended to be given and granted unto them, the said trustees of Dartmouth College, *and their successors forever*."

The first act (of 27th of June 1816) makes the twelve trustees, under the charter, and nine individuals, to be appointed by the Governour and Council, a corporation, by the name of "the trustees of Dartmouth University;" and transfers to them all "*the property, rights, powers, liberties and privileges*" of the old corporation, with power to establish *new colleges* and *an Institute;*—subject to the controul of a board, of twenty-five overseers, to be appointed by the Governour and Council.

The second act makes provision for obviating certain difficulties, which had occurred in attempting to execute the first. And the last act authorizes the defendant, who was the Plaintiffs' treasurer, to retain and hold for a certain time, all their property against their will; and subjects them to heavy penalties, should they impede or hinder the execution of the acts.

Under colour of these acts, the defendant claims to hold the property mentioned in the declaration.

The question is whether the acts are obligatory, and binding on the plaintiffs; they never having accepted or assented to them.

By the necessary construction of these acts, the old corporation is abolished, if they are valid; and a new one established. The first act does, in fact, create a new corporation; and transfers to it all the property and privileges of the old. The old corporation can, in no sense, be said to continue, when its property and privileges, of every kind, are thus taken away, and transferred to another corporation. The trustees and overseers of Dartmouth University constitute a corporation, if the acts are effectual for any purpose; and that corporation is, essentially, different, from the corporation of the trustees of Dartmouth College, as established by the charter.

The two corporations are different in their corporate names; in the natural persons that compose them; in the form and manner

of their organizations; and in their rights and privileges. The old corporation consists of twelve trustees; the new of twenty one trustees, and twenty five overseers. In the old corporation the trustees, by filling vacancies, as they happened, appointed their own successors, and enjoyed and exercised all the privileges, granted by their charter, and were subject to no controul, but that of the law of the land. In the new corporation, the trustees, in their most important acts and doings, are subject to the controul of a board of overseers, dependent for their appointments on the Governour and Council. Subject to this controul, the new trustees have all the rights and powers of the old; and they have also other most important rights and powers, which the old trustees never had, nor claimed. Of course, new duties are incurred, correspondent to the newly granted rights.

In the first act it is provided, that "they (i. e. the new trustees) and their successors, in that capacity, *as hereby constituted*, shall respectively forever have, hold, use, exercise and enjoy all the powers, authorities, rights, property, liberties, privileges and immunities, *which have hitherto* been possessed, enjoyed and used by the trustees of Dartmouth College;—*except so far as the same may be varied or limited by the provisions of this act.* And they shall have power (among other things) to organize colleges in the University; to establish an Institute, and elect fellows and members thereof;—and to arrange, invest and employ the funds of the University." What other or more appropriate language could have been used, if the old trustees had surrendered their charter, and the legislature had intended to establish a new institution, to supply the place, and enjoy all the property and privileges of the old corporation? In an act for that purpose, terms could not have been used more significant and appropriate, than those contained in this act. They are in substance, that the corporation, *as hereby established*, shall have and enjoy all the property and rights, *which have hitherto* been held and enjoyed by the old corporation; —except so far as the same may be varied or limited by this act.

It is true, the act purports to include the old trustees, in the new corporation, but they have not accepted the act, nor consented to become members of the new corporation, and consequently they are not members. For they can neither be compelled to become members of the new corporation, against their will; nor to exercise new powers, or submit to new restrictions, in the old corporation. It was neither expected, nor desired that the old trustees should unite with the new ones. The intention doubtless was, in this indirect way to abolish the old corporation, and get rid of the trustees. The manner, in which the injury was inflicted, does not lessen the grievance.

But if it should be held, that the old corporation is not, absolutely, abolished, it could avail nothing, in support of the validity of the acts. For the legislature is no more competent to change,

and essentially alter the rights of the plaintiffs, than to abolish them. And it cannot be denied, that the acts do, in many particulars, essentially, affect and alter both the corporate, and individual rights and powers of the old trustees. That alterations and new limitations are imposed is admitted, by the ,very terms of the first act. The new trustees are to enjoy and exercise all the property, and privileges, which had been enjoyed and exercised by the old trustees,—*except so far as the same may be varied or limited by the provisions of that act.*

Before the passing of the acts, the plaintiffs were sole owners of all the property, acquired under their charter, and were, alone, entitled to exercise all the privileges, granted by it. By the acts, others are admitted, against their will, to become joint owners with them, of the property, and to a joint participation, of all the privileges. This forcible intrusion, under pretence of joint ownership, violates the plaintiffs' rights, as essentially, as would an entire ouster.

The whole organization of the corporation is changed.—Instead of one board, consisting of twelve members, there are two boards, —one of twenty one members,—the other of twenty five. By the charter, the trustees had the right of making all suitable regulations, for the institution, subject to no appeal. By the acts, all the votes, and doings of the trustees may be negatived by the overseers; in whose appointment, the corporation has no agency.

Not only are new trustees forced in, to participate with the old ones, but new trusts, and new duties are created.—An Institute and new colleges are to be established, and the funds, acquired under the charter, may be applied to their establishment and support.

The President of the College, a member of the old corporation, held his office and salary, dependent on the twelve trustees alone. The tenure of his office is changed, and he is now dependent on others, who have already attempted to remove him.

If the legislature can, at pleasure, make such alterations and changes, in the rights and privileges of the Plaintiffs, it may take them away entirely. If a part may be destroyed or taken away by one act, the rest may, by an other. The same power, that can do one, can do the other.

I shall contend for the Plaintiffs that these acts are not obligatory:

I. Because they are not within the general scope of legislative power:

II. Because they violate certain provisions of the constitution of this State, restraining the legislative power:

III. Because they violate the constitution of the United States:

On the first point, the attempt will be to show, that the legislature would not have been competent to pass these acts, and make

them binding on the plaintiffs, without their assent, even if there were no special restrictions on the power of the legislature, either in the constitution of this state, or of the United States.

Numerous instances have occurred, where it has been the duty of the courts of law, in this state, as well as in most other states of the union, to examine into the legality of the doings of their respective legislatures. And the cases, in which the courts have been obliged to declare legislative acts unconstitutional and void, are vastly more numerous, than judging from the theory of our governments, was to have been expected. As the constitutions attempt to define, with exactness, the powers granted to each department of government, it might have been expected, had not experience shown the contrary, that each department would have carefully confined itself, within its prescribed limits.

The celebrated maxim that the legislative, executive, and judicial powers of government, ought to be kept separate and distinct, and be vested in different departments, was well understood, and duly appreciated, at the time of forming the constitution of this state ; and is recognized and adopted in the 37th article of the bill of rights. The due observance of this principle, according to the opinion of the most celebrated statesmen, and political writers, is essential to the preservation of a free government. " There can be no liberty, where the legislative and executive powers are united in the same person, or body of magistracy :" or, " if the power of judging be not separated from the legislative and executive powers " (1). Mr. Madison, speaking of this principle, says, " no political truth is certainly of greater intrinsick value, or is stamped with the authority of more enlightened patrons of liberty." " The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny " (2).

In compliance with this fundamental principle of all free governments, our constitution has erected the three departments, and given to each its proper powers.

The chief labour and difficulty has always been, to keep the legislative power, within its limits : and to protect the other departments from its encroachments. The legislature is too numerous to be restrained by considerations of individual responsibility. Confident in its influence with the people, it acts with a boldness and intrepidity, of which the other departments are incapable. This is the united opinion of the most able judges, after a critical examination of the course and tendency of our governments. " The legislative department is every where, extending the sphere of its activity, and drawing all power into its impetuous vortex." " It is against the enterprizing ambition of this department, that the people ought

(1) Montesq. spirit of Laws, B. 11. C. 6. 1 Vol. 181.
(2) 47th No. of Federalist.

to indulge all their jealousy, and exhaust all their precautions " (3). Mr. Hamilton on the same subject says, " we have seen, that the tendency of republican governments is, to an aggrandizement of the legislative, at the expense of the other departments " (4). " They (the legislature) have accordingly, in many instances, decided rights, which should have been left to judiciary controversy " (5).

Legislative bodies seem to consider themselves as representing, exclusively, the sovereignty of the people, and as having the right to exercise any power, that they may deem expedient, unless specially prohibited. It is often gravely contended, that the legislature, thus representing the people, is superior to the other branches of the government, and that it may, of right, exert a general controuling power over them. Such a doctrine is entirely inconsistent with that vital principle of all free governments, that the three great powers should be kept separate and independent.

This axiom requires, that each department should confine itself to the powers granted to it, and not interfere with, nor exercise those, granted to the other departments. No interference whatever ought to be permitted, except where there is, by the constitution, a plain delegation of power; as in the instance of the qualified negative, of the acts of the legislature, by the Governour. The different departments are co-ordinate, independent, and equally the depositaries of sovereign power. Each has what was delegated to it, by the people, the great source of all power, and neither has more. Each of the three powers is, in its nature, sovereign, within its proper sphere of action. Within the limits, prescribed for it, the judiciary department is as substantially sovereign, as the legislative is within its limits. And the Courts of justice have as much right, to enact and promulgate new laws, as the legislature has to decide private controversies. For there is no more ground for a pretence, that power is given, by the constitution, either directly, or by inference, to the legislature to decide on matters of private right, than that power is given to the Courts, to enact general statutes. And one department, whenever it shall attempt to act, beyond the limits of its authority, is entitled to no more obedience or respect, than an other would be, when making a similar attempt.

The Constitution of this State, and that of the United States, apparently jealous of the encroaching tendency of the legislative power, have not only defined it, with caution and exactness, but have also, in many instances, where from former experience, the greatest danger was apprehended, guarded it with special prohibitions. But these " parchment barriers " will have little effect, unless carefully guarded, and firmly defended by the judiciary. The powers are divided, and granted to separate and independent

(3) 48th No. of Federalist.
(4) 49th No. of Federalist.
(5) Jefferson's notes on Virginia, 195.

departments, to the end, that each may, in its turn, be checked and restrained, in any attempt, to exercise powers not granted to it. To restrain the legislative department, from overleaping its boundary, the chief reliance is placed on the Judiciary.

That the Courts of law, not only have the right, but are bound to entertain questions, and decide, on the constitutionality of acts of the legislature, though formerly doubted, seems to be now, almost universally, admitted. But an erroneous opinion still prevails, to a considerable extent, that the courts, in the discharge of this great and important duty, ought to act, not only with more than ordinary deliberation, but even with a degree of cautious timidity. The idea is, that these are dangerous subjects for Courts, and that they ought not to declare acts of the legislature unconstitutional, unless they come to their conclusion, with absolute certainty, like that of mathematical demonstration; and where the reasons are so manifest, that none can doubt. A Court of law, when examining the doings of a co-ordinate branch of the government, will always treat it, with great decorum. This is proper in itself, and necessary to preserve an harmonious understanding, between independent departments. So also, it ought to be, after the most careful deliberation only, that a proceeding of such co-ordinate branch should be pronounced void. Because the result is always important. But the examination is to be pursued with firmness, and the final decision, as in other cases, must be according to the unbiased dictate of the understanding.

An act of the legislature must, necessarily, have the sanction of the opinion of a majority, of a numerous body of men. It cannot therefore be supposed, that the reasons, against the validity of such an act, will ordinarily be so plain and obvious, as to leave no manner of doubt. To require then, that Courts shall abstain, from declaring acts of the legislature invalid, while a scruple of doubt remains, is nothing less, than to demand a surrender of their jurisdiction in this particular; in the due exercise of which consists the chief, if not only efficient security, for the great and fundamental principle of our free governments. Experience shows, that legislatures are in the constant habit, of exerting their power to its utmost extent. They intentionally act up to the very verge of their authority: and are seldom restrained by doubts or timidity. If the Courts, fearing a conflict, adopt a course directly opposite, by abandoning their jurisdiction, and retiring, whenever a plausible ground of doubt can be suggested, the time cannot be distant, when the legislative department "will draw all power into its impetuous vortex."

The constitution of this State gives to the Legislature all legislative power, and no other, that has any relation to the matter, under consideration. If therefore the passing of the acts, in question, be not within the general scope of the legislative power, they cannot be valid.

The acts are predicated on no previous proceedings against the plaintiffs, showing any misconduct; but the attempt is, by a mere declaration of the sovereign will of the legislature, to take from the plaintiffs the whole, or a part, (and it makes no difference which) of their property and privileges; and to transfer them to others. That cannot be done by the exercise of the legislative power. That power is confined to the enacting of laws, and providing the proper ways and means for their execution, and finds there a sufficiently broad field of operation. Whenever a legislature rightfully performs other functions, it must be by virtue of special power, delegated for the purpose. A legislature can never, by virtue of its general legislative power, interfere in questions of private right. A legislature within its proper sphere of action, is governed by its discretion alone; it can have no other guide. But private rights are not held by the uncertain tenure of arbitrary discretion.—" An elective despotism was not the government we fought for "(6).

The security of private rights is the only valuable and important advantage, which a free government has over a despotick one. If the rights of individuals must be liable to be violated by despotick power, it matters not, whether that power rests in the hands of one, or many. Numbers impose no restraint, and afford no security. Experience has shown, where all the powers of government have been united, that their being exercised by a numerous assembly, has afforded to private rights, no security against the grossest acts of violence and injustice.

The Legislature can make laws, by which private rights may become forfeited. But the Courts of justice are alone competent to adjudge and declare the forfeiture. While the legislative and judicial powers are kept separate, it can never be competent for the legislature, under any pretence whatever, to take property from one, and give it to another, or in any way infringe private rights. Were that permitted, all questions of private right might be speedily determined by legislative orders and decrees; and there would be no occasion for Courts of law.

The deciding on matters of private right appertains, plainly and manifestly, to the judiciary department. It constitutes the chief labour of Courts of justice. As then one department cannot exercise the powers belonging to another, it follows, that the legislature cannot, rightfully, assume any part of this jurisdiction, thus belonging to the judiciary department. The province of the legislature is to provide laws, and that of the Courts to decide rights, according to the laws. Were the Courts to assume the power of making the laws, by which they are to decide, their judgments would be arbitrary. Because, in making the laws, they could have no other rule than their own discretion. So when the legislature,

(6) Jefferson's notes on Virginia, page 195.

whose right it is to make the law, assumes the power of adjudicating, the separate powers of government become united, and a despotism is created.    And accordingly, it will be generally found, that where legislatures have attempted to interfere with private rights, they have decided with little or no regard to existing laws, but according to their own arbitrary discretion; or in other words, by the exercise of despotick power.

The general principle may be safely asserted, that no vested right whatever can be devested, and taken away from one, and transferred to another, by force of a legislative act, and without the agency of a Court of justice.    This principle is clearly established, in the case of *Vanhorne* vs. *Dorsance.* 2 Dal. 304.    A vested right is a right, acquired and possessed according to existing laws. Mr. Justice Ashurst calls it " a *legal right*, properly vested in a third person, or an interest *legally vested* "(7).    All rights, legally acquired, are alike protected.    The right to possess any peculiar privilege, or incorporeal hereditament, is entitled to the same protection, as the right of visible property.    And it makes no difference, whether the property or privilege was obtained, by a grant from the State, or a private individual.    The legislature cannot revoke its own grants.    Thus land granted by a legislature becomes private property, and the grantee has immediately all the rights of ownership.    And the agency of the legislature, in making the grant, gives it no authority to interfere with any rights, which the grantee derives from his grant(8).    So the grant, by the legislature to an individual, of a particular privilege, gives a vested right to the enjoyment of that privilege.    It has been decided by the Supreme Court of the United States, that a grant, from a State, of a privilege or immunity, that certain land should be free from taxation, confers a right on the owner, which the legislature cannot infringe(9).    Of the same nature are grants of the privileges of keeping publick ferries, or erecting bridges and receiving certain tolls therefor, and also patents for new and useful inventions, all which create legal or vested rights, which cannot be taken away or infringed by the legislature.

If then legal rights, vested in individuals, cannot be taken away, or infringed by legislative acts, the next enquiry is whether the Plaintiffs have any such rights, which can be affected by the acts; in question.

The Plaintiffs claim to have legal rights, both in their corporate, and individual capacities.    In their corporate capacity, they claim the franchise of being, and continuing to be, a corporation, and the right to possess and enjoy all the privileges, granted and assured to them, by their charter; and among others, the right to the property, acquired under it.    In their individual capacities,

(7) King vs. Amory, 2. T. R. 569.—3 Dal. 391.
(8) Fletcher vs. Peck, 6. Cranch 135.
(9) State of New-Jersey vs. Wilson, 7 Cranch 164.

they claim the right to be members of the corporation, and to enjoy all the privileges, accruing to them from being members.

That many corporations have legal rights, and which of course cannot be abolished or infringed by the Legislature, cannot be doubted. It will not, as is believed be contended, that the Legislature can abolish incorporated Banks and insurance companies, and dispose of their property, at pleasure. Such corporations clearly have vested rights, with which the legislature cannot interfere.

There are corporations of different kinds, and with different incidents, which are all very exactly defined by law. To ascertain what are the rights of the corporation, under consideration, it must be seen, to what species or class of corporations, it belongs, and what are the incidents, and rights of that species or class.

The only division of corporations, material to the present enquiry, is that of civil and eleemosynary.

Civil corporations are constituted for the purpose of government; or for the encouragement of trade, and commerce, or such like purposes (10). Some of them may be, with propriety, and often are called publick corporations. The division of a state, into counties and towns, for the purpose of civil government, creates publick corporations. These sections or districts are organized, for the purpose of exercising certain functions of civil government. And over these, the legislature may without doubt exercise a controuling power, to a certain extent. Other civil corporations, established for the promotion of commerce, or the more convenient management of pecuniary concerns, are private, and with them the legislature has no power to interfere.

The general division of a state into counties and towns, as is done in this, and the other states of New-England, creates corporations of a peculiar kind, having a few only of the ordinary incidents of corporations. In this State, the corporate privileges of towns, with few exceptions, are conferred and limited by general laws, extending equally to all. A town, like a county, may be established without the consent of the inhabitants, who may be compelled, against their wills, to become members of the corporation. In this, there is nothing unjust or arbitrary, as a like provision extends to all the inhabitants of the state, who must be members of some town, and County Corporation. Although the privileges of such corporations may, in a certain degree be subject to legislative controul, it by no means follows, that the legislature can, rightfully, take from any such corporation its property, and transfer it to another.

Somewhat similar to these, are incorporated cities, where all within certain limits, are included, and made members of the corporation. But where there is a special grant of peculiar privileges, the legislative power to new-model, or controul them, if admitted at all, must be with great limitation. The legislature

(10) 1 Wood. 482.

cannot abolish such corporations, or do anything equivalent to it. As far as the privileges are peculiar, and such as cannot be affected by a general law, applicable to all, it is not easy to see on what principles they can be essentially changed or altered, by a special act of the legislature. But however that may be, if the legislature have a controuling power, over such corporations, it must be, because they are created, for the purpose of civil government, and are publick corporations. And consequently if it were admitted, that such power could be exercised over these corporations, it would not follow, that it might be so exercised over corporations of a different kind, and established for different purposes.

An eleemosynary corporation is always for charitable purposes. Its design is, to secure the applications of donations to charitable uses, according to the directions of the donors. It has no concern with the civil government of the State, either general, or local; nor in the promotion of commerce, or any other branch of business, which are the objects of civil corporations. It originates in private bounty, and its privileges are granted, for the purpose of perpetuating, and securing the application of the bounty, to the objects intended. And it is always a private, in contradistinction to publick corporations. All hospitals are eleemosynary and private corporations; and with them incorporated Colleges and Schools are always classed (11).

Hospitals and colleges or schools are always classed together, and alone constitute eleemosynary corporations. Professor Woodeson says, "all eleemosynary corporations may I believe be included, under the name of hospitals, colleges or schools; in respect of visitation there seems no discrimination between Colleges and Hospitals" (12). Colleges established, for securing the means of instruction, and for the promotion of learning, are eleemosynary, and private corporations, in the same sense, that Hospitals are, which are established, for securing the means of subsistence for the sick and poor. The object of eleemosynary corporations is to execute the wills of donors. He, who gives to a charity, may surely direct the uses, to which his bounty shall be applied.

A striking mark of distinction, between civil and eleemosynary corporations, is, that the former is not, and the latter is subject to visitation. There can be no private visitors of civil corporations. Their disputes are determined, and the performance of their duties enforced, in courts of law. But all eleemosynary corporations have visitors, whose right and duty it is, to enforce the due observance of the regulations of the institution. To all colleges and schools for the purpose of instruction, visitation is a necessary incident, as it is also to Hospitals. This is laid down as an acknowledged principle, by all elementary writers, and appears to

(11) 1 Black. 471.—1 Kyd 25.
(12) 1 Wood. 474.

be universally admitted in the cases, where the rights of such corporations were in question " (13).

" When governours are appointed, to superintend a charity, *they are in all cases visitors of the objects of the charity ;* when the application of the revenues is not immediately entrusted to them, they are also visitors, as to the application of the revenues; and the Court of chancery has no jurisdiction over them ; but when the management of, and application of the revenues is immediately entrusted to them, then as to these they are subject to the controul of that Court " (14).    This is the manner, in which the plaintiffs are incorporated.    They are therefore themselves visitors of the corporation, as to the objects of the charity, and may be compelled faithfully to apply the revenues to those objects.

According to well established principles then, there can be no doubt, to which class of corporations, the one in question belongs. It is clearly an eleemosynary corporation, and of consequence, a private corporation.    It may be safely asserted, that not even the semblance of an authority can be produced to support a contrary opinion.    It differs from civil and publick corporations, in all those particulars, which are supposed to give the legislature a right, to interfere in their concerns.

This being a private corporation, the plaintiffs have legal rights, and interests, which cannot be taken away or infringed, at the discretion of the legislature.    The rights of private corporations are entitled to the same protection as the rights of individuals. A corporation is created for the purpose of securing and perpetuating rights.    It is admitted that corporate rights must originate, in a grant from the state; they are nevertheless legal rights.    It is not pretended, that the legislature can resume its grants, to an individual, of either property or privileges.    What better right has it, to resume its grants, to a private corporation, established to administer private charity?    It is true, the expectation of publick benefit was the inducement, to create the corporation.    And in the present case that expectation has not been disappointed. The funds have been duly applied to the objects designed, or if not, that duty can be enforced, by the Courts of Justice.    The expectation of publick benefit is always the inducement, for erecting corporations of every kind.    Of course, if they answer the ends, for which they are established, the state derives advantages from them.    But it does not follow, that all their property and privileges are held in trust for the publick, and that the legislature may dispose of them, among the other publick property, at pleasure.    The state is entitled, to all the benefits and advantages, stipulated for, in the grant of incorporation, and to nothing more.    The state has an interest, that the property and privileges of an individual should be used, in such a manner as to be beneficial to the

(13) Phillips vs. Bury, 1 Lord Ray. 5.—1 Burr. 200.—1 Black. 482.
(14) 2 Kyd 195.

publick. Is the individual therefore a trustee for the publick, and may the legislature, on that ground, take his privileges, into their own hands? They have no better right to interfere, with private corporations, under pretence of their being publick trusts.

An eleemosynary corporation is the means, devised by the policy of the law, to secure the fulfilment of the will of a charitable donor. The corporation is nothing more, than the means used to obtain an object; and can the law be justly charged, with the absurdity of converting the means, it has thus devised into an engine to defeat the object? Who would found an eleemosynary corporation, or give it property, for the purpose of securing it, for a special charitable use, knowing, that he thereby, subjected his property to any use, that a legislature, under the influence of momentary passion, or prejudice, might prefer? Very different is the protection, which the law affords to property, given to charitable uses, which it guards, at all points, with the most vigilant caution. It will carry into effect devises and conveyances, for charitable uses, under circumstances, which would render them void, if for any other purpose.

The circumstance, that this state has made donations to the corporation, does not alter its nature, nor lessen or destroy the plaintiffs' rights. The state, like other donors, gave on such conditions, as it pleased; and like other donors, it can enforce the fulfilment of the conditions. The state of Vermont also made donations, and would thereby seem to have as much power, on that ground, to interfere with the concerns of the corporation, as this state has. In the case of *Terrett & al.* vs. *Taylor, & al.* where the attempt was, by a legislative act, to take away the property of the episcopal churches, in Virginia, and apply it to other uses, Judge Story, in delivering the opinion of the Court, says, " Had the property thus acquired, been originally granted by the State, or the King, there might have been some colour, *and it would have been but a colour, for such an extraordinary pretension* " (15).

It is impossible, without disregarding all established principles and authorities, on this subject, to consider a private eleemosynary corporation, a publick trust, and its members, publick officers of the state, and therefore incapable of having any rights, of the character of private rights.

In most eleemosynary corporations, the objects of the charity, that is those who are individually to receive the benefit of it, are admitted and constituted members of the corporation. In a hospital, incorporated on that plan, the poor and sick to enjoy the benefit of the charity, must be admitted members of the corporation. Can they be said, to hold the property and privileges of the corporation, in trust for the publick, and to be all publick officers of the state? It has never been supposed, that the rights of a corporation so con-

(15) 9 Cranch 49.

stituted were, in relation to the publick, different from those of a corporation, constituted as ours is.

It is admitted, the plaintiffs are trustees of the revenues of the corporation, and bound to apply them to the objects intended to be provided for, and that this trust may be enforced against them. But this is a private, not a publick trust. So also the corporate privileges are held in trust, partly for individual members of the corporation, but chiefly for those, who, though not members, are to receive the ultimate benefit of the charity. But although the plaintiffs hold the property and privileges in trust, they are still the legal owners, and have all the legal rights thereto appertaining. When a trustee asserts, in a Court of law, his right to property, conveyed to him in trust, it is surely no sufficient answer, to tell him the property is designed for the use and benefit of others, and that he individually suffers no injury, and therefore is entitled to no remedy. The chief design, of conveying property in trust, is to constitute the trustee a legal protector of it; because the *cestui que trust* is generally incompetent. A benefit to the trustee personally is not designed.

The true principle is, that a trustee, having the legal right, is entitled to all its remedies; and Courts of justice, instead of restraining him, often compel him to exert them. Were the law otherwise, all trust property would lie at the mercy of every invader. The *cestui que trust* cannot protect it, because not the legal owner; and if the trustee may not, it is without protection. In no case is the propriety and necessity, of allowing legal protection to property, in the hands of trustees, more apparent, than in that of corporations, like the present, for charitable purposes. For it is most manifest, the charity can, in no other way, be protected. To hold that trustees, on the ground of a supposed want of interest, are incompetent to protect the subject matter of the trust, would destroy, not only all charitable corporations, where trustees are introduced, but all trusts whatever.

In corporations, for the promotion of commerce, or the management of mere money concerns, it is not necessary, nor always the case, that those, who contribute the funds, and participate in the profits, should be members of the corporation. Persons, having no interest in the funds, may be members of the corporation, and hold them in trust for those who are entitled to the profits. The trustees, in such a corporation, would unquestionably be competent in law, to protect all its rights.

There is then no ground, for raising such an interest in the state, or such a trust for those, to be benefited by the institution, as shall defeat the plaintiffs' rights. This is a private corporation, and of that kind the most favoured in law. And it has legal rights, if any corporation can have such rights. Any principle, which can be assumed, to deprive this corporation of legal rights, will be equally applicable to every other corporation, of whatso-

ever kind.   The most private corporation, that can be established for the purpose of trade, or the management of money concerns, can make out no better claim to legal rights.   A corporation, for the most charitable and benevolent purposes, surely has, both by legal principles, and according to the common opinion of mankind, rights, as inviolable, as those of a corporation, for the purpose of commerce and traffick.   If these acts of the legislature can be supported, they can pass similar acts, in relation to any and every corporation.   It is then for the defendant boldly to maintain, that no corporation has legal rights ; but that all their property, and pretended privileges are held, at the mercy of the legislature.

Corporations must claim all their rights, by virtue of grants from the state ; but they are not, for that reason, less secure or inviolable, than similar rights of individuals, derived from the same source.   Peculiar privileges, granted by the state to individuals, although intended to promote the publick interest, become vested rights, and cannot be resumed.   On what ground rests the distinction between these, and similar privileges, granted to private corporations ?   There is no secret or implied condition, to a grant, or charter of incorporation, that it may be revoked or annulled by the legislature, whenever it pleases.

The British Parliament can, as it is held, abolish corporations. So it can pass acts of attainder, and of pains and penalties.   But neither can be done, by virtue of the ordinary and legitimate legislative power, which belongs to our legislature.   According to the theory of the British government, the Parliament is omnipotent.   "A corporation may be dissolved by act of Parliament which is *boundless*, in its operations " (16).   In modern times however, the exercise of these extraordinary powers, which are entirely incompatible with the existence of private rights of any kind, has been seldom resorted to.

The attempt was made, by the Bill introduced into Parliament, in the year 1783, by Mr. Fox, for new modelling the charter of the East India Company.   The attempt was resisted and defeated. The city of London, in their petition against the bill assert " that it was not only *a high and dangerous violation* of the charters of the Company, but a total subversion of all the principles of the law and constitution of that country."   Lord Thurlow termed it " a most atrocious violation of private property, which cut every Englishman to the bone."   Mr. Pitt opposed it, as being " a daring violation of the chartered rights of the Company " (17).   The bill did not pass.   But the attempt was so strongly denounced, by publick opinion, that it ruined the party, which made it.   In times of the greatest excess of arbitrary power in England, resort was seldom had to this unlimited power of Parliament.   The great attempt to destroy, or controul the corporations, in the reign of

(16) 1 Black. 484.
(17) Parliamentary Register 1783, 4.

Charles II. was made by the oppressive use of judicial proceeding, through the servility of dependent judges. The charters of the city of London, and of the colonies of Massachusetts and Connecticut, were declared forfeited on information of *quo warranto.*

But whatever be the extent of this undefined and arbitrary power, of the British Parliament, I trust it will not be contended, that it has descended to our legislature. The taking away of the colonial charters, under colour of that power, is justly classed among the grievous oppressions, which led to our independence. " Chartered rights " were then deemed, of too sacred a nature, to be voted away, as the passions or caprice of a legislature might incline. Will it now be asserted, that the British Parliament or King, or both united, were competent to abolish, or new model the colonial Charters ? If it could be done, by legislative power alone, they might; for they possessed the whole legislative power over that subject matter.

In the opinion of the Supreme Court of the United States, in the case of *Terrett & al.* vs. *Taylor & al.* before mentioned, it is said, " The title was indefeasibly vested in the churches, or rather in their legal agents. It was not in the power of the crown to seize or assume it, nor of the Parliament, unless by the exercise of a power the most arbitrary, oppressive, and unjust, and endured, only because it could not be resisted." "The dissolution of the form of government did not involve in it a dissolution of civil rights, or an abolition of the common law, under which the inheritances of every man in the state were held. The State itself succeeded only to the rights of the crown " (18). If the plaintiffs forfeited none of these rights, by the revolution in government, the legislature had no more power over their rights, than previously existed, in the hands of some depository of power. The Parliament of Great Britain had no rightful power whatever over this corporation. The legislature of this state succeeded to all the power, which the King, who granted the charter had, and to no more.

In England the creating of corporations appertains to the King, and he has all the legitimate power, that exists for dissolving them ; except what is vested in the judicial Courts (19). He can institute proceedings in the Courts, and for just cause obtain a forfeiture of all corporate rights and privileges; and then regrant them, as he pleases. He may also grant charters, to old corporations, with new modifications, which, if accepted, are binding. All this may the legislature of this state do.

But the King cannot abolish a corporation, or give it a new organization, or alter any of its powers or privileges, without its consent. This is the well established, and acknowledged doctrine of the common law (20). On the ground that the King cannot

(18) 9 Cranch 50.        (19) 1 Black. 3. 472.
(20) King vs. Amory, 2 T. R. 515. King vs. Pasmore, 3 T. R. 240. King vs. Vice-Chancellor of Cam. 3 Burr. 16. 56.

resume the grant of a corporate privilege, it is held that the grant of a franchise, already granted, is void (21). The King's grants, of corporate rights, bind him, as much as his grants of land. When therefore he has granted such rights, he cannot resume and regrant them, till it has been determined by due trial, in a Court of law, that they have become forfeited.

The remedy for the King, in such case, was a writ of quo warranto : in place of which, in latter times, the information of quo warranto has been used, as being more convenient. " A writ of quo warranto (says Judge Blackstone) is in the nature of a writ of right, for the King against him, who claims or usurps any office, franchise, or liberty; to enquire by what authority he supports his claim, in order to determine the right. It lies also, in the case of the non-user, or long neglect of a franchise, or misuser or abuse of it." " The judgment, on a writ of quo warranto being in the nature of a writ of right, is final and conclusive even against the crown "(22). So far then from resuming his grants of corporate rights, at pleasure, the King was obliged to try his claim, for a forfeiture, like any other person, and if the determination was against him, the corporation was secured in the quiet enjoyment of them.

Corporations forfeit their rights, by non user or misuser, and are to be vacated by trial and judgment(23). Their powers cannot be newly modified, or altered, without their consent. In case of the offer of a new charter, to an old corporation, it may be accepted or rejected, as the corporation pleases ; or part may be accepted, and part rejected(24). " During the violent proceedings, that took place in the latter end of the reign of Charles the II. it was among other things, thought expedient to new model most of the corporation towns, in the kingdom; for which purpose, many of those bodies were persuaded to surrender their charters, and informations in the nature of quo warranto were brought against others, upon a supposed or frequently a real forfeiture of their franchises, by neglect or abuse of them "(25). Would the King, in those violent times have taken the trouble, of resorting to the Courts of law, if it had been supposed, that he might have resumed his grants, at pleasure. There was no pretence, that he could of his own authority, and without the agency of the Courts, lawfully interfere with, or controul any of the rights of corporations.

As successors to the King, then, the legislature have no power, to pass the acts in question. And it may be safely asserted, that before the change in the form of government, the plaintiffs could not have been rightfully deprived of their property or privileges, without a trial in due course of law. Do they now hold their

(21) 2 Black. 37.—2 T. R. 509.
(22) 3 Black. 262. 3. 2 Ins. 282.
(23) Thing vs. Pasmore, 3 T. R. 244.—9 Cranch 51.
(24) 3 Burr. 1656.—3 T. R. 240. 246.
(25) 3 Black. 263.

rights by a tenure less secure, and more subject to arbitrary controul, than they did before the revolution? If the legislature may annul or repeal grants of corporate privileges, what shall restrain them from doing the same with grants of land? What are to be the limits of this newly discovered authority? Should the royal grants of land, made before the revolution, be examined, more instances of heedless extravagance will be found, than in any grants of corporate privileges. If one may be resumed, so may the other, for they both rest on the same principles for security.

We know from experience, that the legislative power is of an encroaching nature. Permit the legislature, in this instance, to abolish a charter of corporate privileges, and there will be no ground left, on which they can be restrained, from abolishing patents or grants of land. . The great principle of security, for private property, will be destroyed. And let it be remembered that the attempt to vacate legal rights and titles, vested in individuals, has, in fact, been made by the legislatures of more than one of the states, in the Union. The only means of security is to abide by settled principles, and firmly resist the first attempt at encroachment. The law affords the same security and protection, for the enjoyment of franchises or privileges, as it does for other rights. An action for a disturbance of a franchise or privilege, is well known in law, and may be as easily maintained, either by an individual, or a corporation, as for any other injury.

As then a grant of privileges, to an individual creates legal rights, which cannot be infringed by legislative acts; and as there is no distinction, known in law, as to the effect of such a grant, when made to an individual, and when made to a private corporation, it follows, that the grant to the plaintiffs created legal rights, that were duly vested, and which of course cannot be infringed by the legislative acts in question. It is of no consequence, as it respects the right, whether the privileges, granted to the plaintiffs by their charter, are valuable, in a pecuniary point of view, or otherwise. They are essentially of the nature of private property, and consequently entitled to protection, like other private property.

The plaintiffs, in their aggregate capacity, are entitled to the franchise of being a corporation, and of enjoying all the privileges contained in their charter, according to its provisions. The President of the College is entitled to the quiet enjoyment of his office, with all the privileges and perquisites incident to it. And so also, the other members of the corporation are, individually, entitled to enjoy their respective privileges. In *Miller* vs. *Spateman,*(26) it is held, "That the law takes notice, that the natural members of the corporation, of whom the corporation consists, are not strangers to the corporation, but are the parties interested in all the revenues and privileges of the corporation, of which they are mem-

(26) 1 Saund. 344.

bers."   A corporation may take a grant for the benefit of their particular members."   In the celebrated case of *Ashby* vs. *White*, where an individual member of the corporation sued for an infringement of his right of suffrage, to which he was entitled, as a corporator, among the reasons assigned by the House of Lords for their judgment, it is said; "The inheritance of this privilege is in the corporation aggregate ; but the benefit, possession, and exercise is in the persons of those who, by the constitutions of those charters are appointed to elect.  And in all cases, where a corporation hath such a privilege, the members thereof, in their private capacity, have the benefit and enjoyment thereof.   It appears by other instances, that it is usual and proper for corporations to have interests granted them, which inure to the advantage of the members, in their private capacities "(27).   Many cases are there stated of actions being maintained for the violation of such rights (28).

Besides the right of the President to his office and emoluments, each individual trustee has the privilege of being a member, and of acting according to the provision of the charter, in all matters, relating to the government of the corporation, and in the management of its property, and in the conducting of all its concerns. These privileges, that the members of the corporation hold, in their private capacities, constitute vested rights, which are subject to no controul, but that of the law of the land.

It is not a new doctrine, that in a free government, the legislative power, without any direct and express restriction, is incompetent to abolish, or take away vested rights.   It results from the very nature and design of a free government.   This is plainly and forcibly asserted by Judge Chase, in delivering his opinion, in the case of *Calder* vs. *Bull*.   "The purposes for which men enter into society, will determine the nature and terms of the social compact; and as they are the foundation of the legislative power, they will decide what are the proper objects of it.   *The nature and ends of legislative power will limit the exercise of it.*   An act of the legislature, (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered as a rightful exercise of legislative authority.   The obligation of a law, in governments, established on express compact, and on republican principles, must be determined by the nature of the power, on which it is founded."   "A law that destroys or impairs the lawful private contracts of citizens ; a law that makes a man judge in his own cause ; or a law that takes property from A. and gives it to B. it is against all reason and justice for a people to entrust a legislature with such powers ; and therefore it cannot be presumed that they have done it.   The genius, the nature, and the spirit of our state governments amount to a prohibition of such acts of legis-

(27) 3 Hatsell's precedents, 221.
(28) Walter vs. Hanger. Moore. 882.—Brooks Abr. Corporation, 85.

lation; and the general principles of law and reason forbid them. The legislature cannot change innocence into guilt, or punish innocence as a crime; *or violate the right of an antecedent lawful private contract; or the right of private property. To maintain that our federal, or state legislature possesses such powers, if they had not been expressly restrained would, in my opinion, be a political heresy, altogether inadmissible,* in our free republican governments "(29).

If then a correct view has been taken of the powers of the legislature and of the rights of the plaintiffs, it would not have been competent for the legislature to pass these acts, if there had been no special restrictions on the legislative power; because they are not within the general scope of that power, and consequently void.

II. There are special restrictions, on the power of the legislature, in the constitution of this state, which these acts violate.

They violate that part of the 15th article of the bill of rights, which provides, "that no subject shall be arrested, imprisoned, despoiled, *or deprived of his property, immunities, or privileges,* put out of the protection of the law, exiled, or deprived of his life, liberty, or estate; but by judgment of his peers, or the law of the land." If these acts are valid, the plaintiffs are deprived of their property, and of the "immunities and privileges," granted to them by their charter, by other means, than the judgment of their peers, or the law of the land. The acts of the legislature take away their rights and privileges, without any trial whatever.

This provision of the Bill of rights was unquestionably designed to restrain the legislature, as well as the other branches of government, from all arbitrary interference with private rights. It was adopted from magna charta, and was justly considered by our forefathers, long before the formation of our constitution, as constituting the most efficient security of their rights and liberties.

Lord Coke, in his commentary on magna charta, explains the phrase "by the law of the land" to mean "*by due course and process of law.*" That is, no subject shall be deprived of his property, immunities, or privileges, but by judgment of his peers, or by due course and process of law. This then surely cannot be done by special act of the legislature, without judgment of peers, and without any process of law. To make his meaning still more plain, if possible, that Parliament was bound by this provision of magna charta, Lord Coke says, "*against this ancient and fundamental law, and in the face thereof,* I find an act of Parliament made, &c. (30) directing certain summary and arbitrary proceedings, *by colour of which act, shaking this fundamental law,* it is not credible what horrible oppressions and exactions, to the undoing of infinite numbers of people, were committed by Sir Richard Empson and Edmund Dudley." "and the ill success thereof, and the fearful ends

(29) 3 Dall. 383.
(30) Stat. 11, Hén. 7.

of these two oppressors, should deter others from committing the like; and should admonish Parliaments, that instead of this *ordinary and precious trial per legem terrae,* they bring not in absolute and partial trials, by discretion " (31).

It is sufficiently apparent, that Lord Coke understood this provision to extend to, and bind Parliament. Hence his complaint that Parliament had in that instance violated it, by dispensing with trials according to the law of the land; and authorizing, in certain cases, the exaction of forfeitures, on trials by the arbitrary discretion of magistrates. For even that act of Parliament, so justly denounced for its "horrible oppressions," did not, like the present acts of our legislature, attempt to devest, and take away private rights, without any trial at all. The construction of the provision has always been according to Lord Coke's opinion. It has never been doubted, that Parliament was morally bound by it. But the difficulty in England has been that Parliament, being omnipotent, in all matters of civil institution, is too powerful for the constitution, and cannot be restrained.

The same construction has been uniformly given to this provision, in the Courts of the different states of the Union. The Superior Court of South Carolina, in the case of *Bowman* vs. *Middleton,* decided that an act of the colonial legislature of 1712, taking property from one, and vesting it in another, without trial by jury, was void; because it infringed this provision of magna charta, which bound the legislature. They say, "that the plaintiffs can claim no title, under the act in question, as it was against common right, as well as against magna charta, to take away the freehold of one man, and vest it in another: and that too to the prejudice of third persons, without any compensation, or even a trial, by the jury of the country, to determine the right in question. That the act was therefore, ipso facto, void. That no length of time could give it validity, being originally founded on erroneous principles " (32). In a subsequent case, in the same Court, Waties, J. said he had gone into a long investigation of the technical import of the words *lex terrae,* "that they meant the common law, and ancient statutes, down to the time of Edward II. which were considered, as part of the common law. That this was the true construction, given to them, by all the commentators on magna charta, from whence they were adopted by the constitution of South Carolina. If the *lex terrae* meant any law, which the legislature might pass, the legislature would be authorized by the constitution, to destroy the right, which the constitution had expressly declared should forever be inviolably preserved. This is too absurd a construction to be the true one. He understood therefore the constitution to mean, that no freeman shall be deprived of his property, but by such means, as are authorized by the ancient common law of the land.

(31) 2 Inst. 51.
(32) 1 Bay. 252.

According to this construction the right of property is held under the constitution, and *not at the will of the legislature* " (33). Of the same import is the opinion of the Supreme Court of Massachusetts. " If this (an act of the legislature) is to be construed a disposal, by the legislature, of lands owned by that proprietary, (under which the plaintiff claimed) or by any individual, claiming by their grant or allotment, it militates directly, with a well known provision of magna charta, revived and enforced in the bill of rights, prefixed to the constitution of government, for this Commonwealth; that no subject shall be deprived of his property, but by the judgment of his peers, or the law of the land; *not any private and special statute, for the purpose, but that law, which affects alike, under the same circumstances, the whole territory and community* " (34).

This provision of magna charta is introduced into the 5th article of the amendments of the constitution of the United States. The terms, in which it is there expressed, show conclusively that it was understood in the same sense, that we contend it always has been understood. They are, that " no person shall be deprived of life, liberty, or property, *without due process of law.*" This is manifestly designed to secure a trial, according to the established laws of the land; and it certainly restrains the legislature, from depriving an individual of his life, liberty, and property, without such trial. The two phrases " law of the land " and " due process of law," as used in the two constitutions, doubtless have the same meaning. If otherwise, however, the result will be the same. For the legislature of this state is as much bound by this provision, in the constitution of the United States, as they would be, were it contained in our own constitution. If the plaintiffs are deprived of their property by the acts in question, it certainly has not been done by due process of law. The law provides no such summary process, by which individuals may, without trial be deprived of their rights.

Thus has this provision been always understood, as imposing a restraint on the legislative power, from the time it was first introduced into magna charta, down to the present time. It has been incorporated into the constitution of most of the states of the Union, and it is believed, that not a single judge, or commentator, either before, or since it was introduced into our constitution, has attempted to give it a different meaning. The terms used are general, embracing the legislature, equally with the other departments of government; and any reason, which can be assigned, for excepting the legislature from this restraint, may, with equal force, be applied, for excepting either, or both the other departments. Indeed if this provision were not applicable to the legislature, it would be idle and useless. The previous part of this article of the bill of rights, together with others, regulating the manner of trials, are

(33) 2 Bay. 59.
(34) Little vs. Frost, 3 Mass. R. 117.

more especially designed, to restrain the judiciary.   This seems to be the only provision, to be found in the constitution of this state, against the legislature's passing special acts, for the regulation of individual cases.   It restrains the legislature, from passing acts, which spend their force on one, or more individuals, and are not to apply to others, under similar circumstances.   The law of the land is applicable to the community at large.

The greatest if not only effectual, security, against legislative oppression, is, that the law must be general, embracing all under like circumstances, and including the legislators among the rest. An oppressive law, applicable to the whole community, will soon be repealed.   But if the legislature, under the influence of prejudice, or passion, to which all bodies of men, however constituted or selected, are occasionally subject, can pass acts, having the force of laws, to apply to a solitary individual only, he may be destroyed, before publick sympathy can be excited, for his relief. A law, according to any just definition, that ever has, or can be given of it, must be general in its operation.   It is a rule of conduct, for all, within the principle it establishes.   An act of the legislature, prescribing a particular rule, for the government of one or more individuals, therein named, would not have the force of law, but would be void(35).   This principle is not inconsistent with the power of the legislature to pass private statutes.   Such statutes, instead of taking away, confer privileges; and whatever regulations are imposed, in consideration of the privileges granted, become binding, by the assent of the parties, at whose application, the statutes are passed.

If this construction, which has always hitherto been put on the article of the bill of rights, under consideration, is to be still abided by, it is conclusive in favour of the plaintiffs.   Their charter grants them certain "immunities and privileges."   This article provides, in effect, that they shall not be deprived of these "immunities and privileges," but by due trial, and according to the well known general laws of the land, which are binding on the whole community.   The acts of the legislature, which are made for the purpose of depriving them of their immunities and privileges, without any trial whatever, must therefore be declared to be void.

These acts violate also the 23d article of the bill of rights, which provides that, "retrospective laws are highly injurious, oppressive and unjust.   No such laws therefore should be made, either for the decision of civil causes, or the punishment of offences."

There can be no ground for dispute, as to what constitutes a retrospective law.   In the case *Calder* vs. *Bull*, Judge Chase says, " every law, that takes away, or impairs rights, vested agreeably to existing laws, is retrospective " (36).   The correctness of this

(35) Holden vs. James, 11 Mass. Rep. 396.
(36) 3 Dall. 391.

definition of retrospective laws has never been disputed, as is known. It was adopted, and made the ground of decision, in the case of the *Society* vs. *Wheeler*, in the Circuit Court of the United States, in this District. In the very able opinion there delivered, it is said, "upon principle, every statute, which takes away, or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective; and this doctrine seems fully supported by authorities"(37). It is not only against natural justice, but utterly inconsistent with every correct idea of a law, that it should be made to operate retrospectively on past actions, and vested rights(38).

This article prohibits the passing of retrospective laws of any kind, as well such as affect the rights of property, and individual privileges, as those, made for the punishing crimes. The latter, which are generally called *ex post facto* laws, and which are no more unjust than the former, have been denounced, by a most respectable authority, as being a more unreasonable, and cruel method of ensnaring people to their ruin, than that adopted, by the worst of the Roman emperors, who wrote his laws in a small character and hung them up on high pillars, to prevent their being read(39).

It is hoped, that it has been already sufficiently shown, that the plaintiffs have vested rights, acquired under existing laws. If so, these acts, which infringe their rights, are retrospective, and void. The plaintiff's rights were perfect and complete. They were in the full enjoyment of their property and privileges, and by no existing law, could they have been ousted or molested. If this article does not protect such rights, it is not easy to perceive what rights are protected by it.

The 37th article provides, that the three essential powers of government "ought to be kept, as separate from, and independent of each other, as the nature of a free government will admit, or as is consistent with that chain of connection, which binds the whole fabrick of the constitution in one indissoluble bond of union and amity." This article has already been noticed, as bearing on the general powers of the legislature. It may also, with propriety, be considered as imposing a special restraint against the legislature's exercising judicial power. The limitation, with which this great elementary principle is adopted, does not, in any degree, lessen its force, in relation to the question under consideration. The bill of rights establishes general principles, by which the constitution of government was formed, and according to which, it is to be construed. The three departments of government are connected together, and in certain particulars, dependent on each other. The

(37) 2 Gall. 105.
(38) Dash vs. Van Kleeck, 7 John. R. 477.
(39) 1 Black. 46.

constitution declares the extent of this connection and dependence. Powers are, in certain cases and for special purposes, given to one department, which partake of the nature of the general powers of another department.   This qualification was necessary to preserve consistency in the different parts of the constitution.   For the conducting of impeachments, for instance, the legislature is vested with judicial power.   It would therefore have been absurd, after this express grant of judicial power, in that case, to have declared, without qualification, that the legislature should exercise no judicial power.

By the proper construction of this article, each department is restrained, from exercising any of the general powers of another department, except in cases, where it is especially authorized by the constitution.   A construction that should leave each department at liberty, to exercise the powers of another, whenever it might deem it expedient, would render the provision of the article useless.   Indeed the language admits of no other construction than that before stated.   The substance is, that the three powers of government shall be kept, as separate and independent, as is consistent, with the nature of a free government, and the provisions of the constitution.   The free government, here meant, is doubtless one, where the rulers have no powers, other than what are delegated to them, by the people.   Is it inconsistent with the nature of such a government, or with the provisions of our constitution, that the legislature should abstain from the exercise of judicial power, in cases where that power is not granted to them, but is granted to another department?   We have already seen, that no free government can exist, without such a restraint on the legislative power.

Under the first point, it was shown, that the general legislative power did not extend, to the devesting of private rights, and that the passing of these acts which take from the plaintiffs their rights, and give them to others, was substantially an exercise of judicial power. That the legislature did not examine witnesses, and hear the parties, before they decided on their rights, shows only the extent of the oppression, and the total incompetency of the legislature to exercise judicial power, in such cases.   As then no special authority is given to the legislature, to exercise judicial power, in this or similar cases, the acts violate also this article of the constitution.

III. It is contended that the acts violate the 10th section of the 1st article of the constitution of the United States, which provides that " no state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

This comprehensive provision was intended as well to supply the omissions and deficiencies, in the constitutions of the several states, as to afford an additional and uniform security, for private rights throughout the United States (40).

(40) 44 No. of Fed.

The charter of 1769 is a contract, within the true meaning of that term, as used in the constitution of the United States. Every grant, whether from a private individual, or from a state, is a contract. A grant from a state being necessarily made, with great deliberation and formality, constitutes a contract of the most solemn nature. It is of familiar knowledge, that a grant from one individual to another, either of lands, or of incorporeal rights, amounts in legal estimation to a contract. In like manner, a similar grant, from a state to an individual, constitutes a contract. A state incurs the same obligation from its grant, as a private individual does; and it has no more power to abolish its grants, or discharge itself from their obligation, than a private individual has. No just government can desire to possess such power.

That a grant of land, by a state to an individual, is a contract, within this provision of the constitution, and consequently cannot be annulled, or infringed, by any act of the legislature of the state, has been expressly decided, by the Supreme Court of the United States, in the case of *Fletcher* vs. *Peck* (41). And that a grant of privileges and immunities, by a state to an individual, constitutes a contract, has been as expressly decided, by the same Court, in the case of *New-Jersey* vs. *Wilson* (42). In the latter case, the state of 'New-Jersey had before the revolution made a grant of certain lands, with the special immunity or privilege, that they should forever remain free from taxation. The state had lately taxed the lands. The decision was, that the grant, as it respected this immunity, or privilege, constituted a contract, within the protection of the constitution, and that the state of New-Jersey could not, in violation of their contract, tax the lands. That Court having the right to determine, in the last resort, the construction of the constitution of the United States, its decisions must be conclusive, and binding on all other Courts.

So patents for new inventions, grants of tolls, and of all such like rights, conferring immunities and privileges, constitute contracts, within the meaning of the constitution of the United States. If there be any question remaining, on this point, it is whether a grant of the privilege of being a corporation differs so essentially from grants of other privileges, as to form an exception, in this respect. No foundation for any such distinction is perceived.

In the case of *Terrett* vs. *Taylor*, (42) it is held, that the legislature of a state cannot repeal statutes creating private corporations. This must be on the principle, that such statutes constitute contracts; for otherwise they might be repealed. The abolishing of the original grant of incorporation, and the abolishing of the grants of property, or new privileges, subsequently made to the

(41) 6 Cranch 87.
(42) 7 Cranch 164.
(42) 9 Cranch 43.

corporation, are in that case, supposed to be alike out of the power of the legislature, and for the same reasons.    Because all such grants are contracts.    It makes no difference, whether they are in the form of statutes, or charters.

That a grant of land, to a private corporation, is as much a contract, as a similar grant to an individual, will hardly be doubted. A corporation is a person in law, capable of contracting ; and if such grant, when made to a natural person, constitutes a contract, no reason can be assigned, why it should not, when made. to a corporation.

The legislature of this state has granted certain lands to the corporation, under consideration, which they cannot take away; because the grant constitutes a contract, and is therefore protected, by the constitution of the United States.    Would it not be then grossly absurd to hold, that the grant of the franchise, or privilege of being a corporation does not constitute a contract, and consequently, that the legislature may, at pleasure, abolish the corporation ; and then take to themselves not only the lands, they have granted to it, but also all the other property, and privileges of the corporation.

The charter, constituting the plaintiffs a corporation, and granting them certain immunities and privileges, is as complete a contract, as a grant of land to them would have been.    It contains all the common, and necessary ingredients, and qualities of a contract executed.    It is an agreement of competent parties, on a sufficient consideration.

There can be no doubt that there were competent parties to the contract : the King of one side, and the Trustees named in the charter of the other.

There was also an agreement of parties.    The granting of the charter by one party, and the acceptance of it by the other, affords ample evidence of an agreement of the parties.    The trustees, by accepting it, agreed to the provisions and stipulations of the charter, as effectually as the King did, by granting it.    Unless accepted by the grantees, it could have had no effect or operation.    A grant or charter of incorporation, till accepted is a nullity.    That acceptance is necessary to give it effect is too well established, to admit of any manner of doubt.    "As the intention of the grant of incorporation is to confer some benefit on the grantees, which however may be counterbalanced, by some conditions, with which, it is accompanied, it has become *an established rule*, that the grant must be accepted, by the voluntary consent of a majority of those, whom it is intended to incorporate, *otherwise the grant will be void* " (43).    The same doctrine may be found in the reports of cases, where this point has been incidentally discussed.    For it seems never to have been seriously contended, that a private cor-

(43) 1 Kyd 65.

poration could be established, without the voluntary consent of the corporators (44).

The acceptance is always averred in pleading, when a right is derived under a charter; and issue may be taken on the fact of acceptance, as is done in the case of the *King* vs. *Pasmore* (45). So the non acceptance may be averred, to defeat the operation of a charter (46). This shows conclusively that the grant is a contract, and not a law, to be repealed at the pleasure of the legislature. Judge Blackstone in pointing out the difference, between a contract and a law, says " In compacts, we ourselves. determine, and promise what shall be done, before we are obliged to do it; in laws we are obliged to act, without ourselves determining, or promising any thing at all " (47).

That the contract was made on a sufficient consideration, or motive, is apparent, from the recital in the charter of the benefits and advantages expected. The trustees, by accepting the charter, completed the contract, and incurred an obligation, which, they say, they have faithfully performed. If they have not, the law affords an ample remedy.

It is impossible to have any just or correct idea of a corporation, without considering the creation of it, as resting in a contract. In the case of the *King* vs. *Pasmore*, Judge Buller says " The question referred by the jury, for the opinion of the Court, is whether the letters patent were or were not duly accepted by the persons, to whom they were granted " "And I do not know how to reason on this point better, than in the manner urged by one of the relators' council; who considered the grant of incorporation to be *a compact between the crown and a certain number of individuals*" (48). A grant, by one party, and an acceptance of it by the other, necessarily involves the idea of a contract; and without considering it as a contract, there can be no reasoning about it. There can be no question, whether a charter of incorporation, be of the nature of a contract, that cannot be repealed, or of a law, that may be repealed. If a law, whence the necessity or propriety of acceptance by the grantees? Must a law, after it is duly enacted, be accepted or assented to by an individual, in order to make it binding on him?

So a charter of incorporation may be surrendered, and by the surrender, the grantees are released from all obligations arising under it. Can individuals, in that manner refease themselves, from the obligations imposed on them by a law?

If then the charter, creating this corporation, must according to

(44) Rex vs. Vice Chancellor of Cambridge, 3 Burr. 1656.—Newling vs. Francis, 3 Term R. 197.—King vs. Pasmore, 3 Term R. 240.—Ellis vs. Marshall, 2 Mass. R. 269.
(45) 3 T. R. 200.
(46) Ibid.
(47) 1 Black. 45.
(48) 3 Term R. 245.

established principles, be held to be a contract, within the meaning of the constitution of the United States, the plaintiffs are still entitled to enjoy all the privileges and immunities, thereby assured to them.  And consequently the acts of the legislature, which so manifestly impair the obligation of that contract, by violating those privileges and immunities, is unconstitutional and void.

It is not easy to foresee all the consequences, of adopting new and untried principles.  It might be worth while to consider, for a moment what is to become of the property of a private corporation, abolished by a legislative act.—The doctrine of the law is, that the lands of a corporation, in case of a dissolution, by whatever means, revert to the grantors.  If the old corporation is abolished, what shall prevent the grantors or their heirs from asserting their claims to the lands, which have been granted it?  Their right would, in that event, seem to be unquestionable.  Is then another strain to be made, on the principles of the constitution, by taking away from the grantors their right, to the reversion of the lands, for the sake of vesting them, in the new corporation, according to the design of the acts in question ?  But it must be remembered, that a part of the landed property of the old corporation, and that not the least valuable, is situated under a jurisdiction, over which the legislature of this state, has no controul.  Is it to be expected, that the state of Vermont will, without an effort to assert its rights, permit lands, lying within its own jurisdiction, which it gave to Dartmouth College, for certain uses, to be transferred to another institution, and converted to other uses?

If these acts are held to be valid not only this College, but every other literary and charitable institution must become subject to the varying, and often capricious will, of the legislatures.  Their revenues will be blended with the publick revenues, and liable to be applied to any use, which the emergency of occasions may, in the opinion of the legislatures, require.  The liberal and benevolent, when disposed to aid such institutions, can have no security, that their donations will be applied, to the objects intended.  A striking instance of this has already occurred.  The individual, at whose solicitation, these acts were passed, in a devise of property, for the support of certain professorships, in the newly established *University*, fearing that some future legislature would apply his donation, to other purposes, has expressly provided, in case these acts shall be *" rendered nugatory, be altered or repealed, unless by the consent of the new trustees, as now constituted,"* that his devise shall thereby become void ; and the property be transferred to other uses.  This idle attempt, to restrain the power of a future legislature, so as to prevent its following the example, now set, shows not only the fears, that donations will be misapplied ; but also the impossibility of securing them to any certain use, while subject to the arbitrary controul of a legislature.

The attempted innovation would affect the character of our

literary institutions, not less than their revenues. To be useful and respectable, they must be stable and independent. So obvious is this, that in most countries, under arbitrary governments, the universities and literary establishments, of the higher order, have been permitted to enjoy great privileges, with as much independence. as could consist with the nature of such governments. If our seminaries of learning are to be reduced, to a state of servile dependence on the legislatures, and are to be new modelled, to answer the occasional purposes of prevailing political parties, all hopes of their future usefulness must be abandoned.

In the early settlement of New-England, the establishment of Colleges was among the chief cares of the wisest and best men of that period. They have remained to the present time, substantially on the same ancient model; and with scanty means have been eminently useful. The present bold experiment, if carried into effect, will probably terminate in their final destruction.

---

MR. SULLIVAN.—The case, presented to the consideration of the Court, is not that of a *private* corporation, complaining that the legislature had oppressively and without a trial seized on property held to its own use; it is not the case of a *private* corporation complaining that the legislature had wantonly deprived it of any *means* of acquiring property, which had, at any time, been granted to it; but it is the case of a *publick* corporation, created expressly —created exclusively for the publick interest, complaining that the legislature, the guardians of that interest, have undertaken, without consent, to alter and amend its charter.

Are the acts to amend the charter, and to enlarge and improve the corporation of Dartmouth College, constitutional? This is the question to be decided by the Court.

The right of the Court to declare those acts of the legislature, which are repugnant to the constitution, to be unconstitutional and void, is not denied. If, for example, the legislature should pass an ex post facto law, making that act a crime, which was innocent at the time of its being done, it would be not only right, but the duty of the Court to pronounce it void. When the constitution prohibits the passing of particular laws, and the legislature does pass them, the safety of the people requires, that the Court should interpose and prevent their operation. While it is agreed, that the Court has power to declare every act of the legislature, which violates the constitution, to be unconstitutional and void; it must also be agreed, that it is a power, which ought never to be exercised, but with the greatest caution. It is important to the peace and happiness of the community, that the most perfect harmony should exist between the different departments of government. The judicial department should never pronounce an act, deliberately passed by the legislature, to be unconstitutional in a case of a doubtful nature; its repugnancy to the constitution

should be plain, palpable, indisputable, in order to justify such a decision. Courts will presume, that every act, which is passed, comes within the constitutional powers of the legislature.

I shall attempt, in the first place, to show, that the Corporation of Dartmouth College was a *publick* corporation. If it was, no doubt can be entertained, as to the right of the General Court to alter and amend its charter; in such a manner as, in their judgment, would best promote the publick welfare.

Whether this corporation was publick or private, is not to be determined by considering, whether it was founded or endowed by the bounty of the government or by that of an individual.—It is said by Lord Hardwicke, that "it is the *extensiveness* of the objects to be benefited, that constitutes a charity a publick or a private one" (1). With equal propriety it may be asserted, that it is the *extensiveness* of the objects or persons, for whose benefit a corporation is created, that shows it to be of the one description or the other. A corporation, erected for the benefit of its own members, holding property and exercising its powers and franchises, for their use and advantage only, is private; so also, is a corporation, holding property in trust for a number of individuals, and exercising its powers and franchises for the advantage of those individuals alone: but a corporation, created for the benefit of the inhabitants of a whole State or Province; holding property for their use, and exercising all its powers and franchises for their advantage is a *publick* corporation. For whose benefit was this corporation erected? For the benefit of the persons composing it, or, for that of the publick? Let the charter answer the questions. The language of the charter is, " That we considering the premises, and being willing to encourage the laudable and charitable design of spreading Christian knowledge among the savages of our American wilderness, and also, that the best means of education be established in our Province of New-Hampshire *for the benefit of said Province*, do of our special grace, certain knowledge, and mere motion, by and with the advice of our Council for said Province, by these presents will, ordain, grant, and constitute, that there be a College, erected in our said Province of New-Hampshire, by the name of Dartmouth College, for the education and instruction of youth of the Indian tribes in this land in reading, writing, and all parts of learning, which shall appear necessary and expedient for civilizing and christianizing children of pagans, as well as in all liberal arts and sciences; and also of English youth and any others. And the Trustees of said College may and shall be one body corporate and politick in deed, action, and name, and shall be called, named, and distinguished by the name of the Trustees of Dartmouth College." This corporation, then, as its charter shows, was established, not for the advantage of the corporators; not for the advantage of a small number of individuals;

(1) 2 Atkyns. 89.

but for the benefit of the whole people of the Province of New-Hampshire.

As the, end, for which private corporations are established, is the benefit of individuals; and as all the rights, privileges, and franchises, conferred on them, are granted with this view; individuals have always a direct, a beneficial interest in the property held by such .corporations; an interest which they may transfer to others—which may be taken for their debts—and which, in the event of ,their death, descends to their representatives. But as the end, for which this corporation. was erected, was to promote the welfare of the whole community; as all its rights, privileges, and franchises were granted for this purpose, neither the corporators themselves, nor any other individuals had any beneficial interest in the property held by the corporation; they had no interest that could be transferred to others; none that could be taken for. their debts; none that could descend to their representatives in case of their death. The corporation was a mere instrument to effect the important publick purposes, for which it was instituted.

A *publick* corporation, by force of the term, whether it has the government or an individual for its founder, must mean a corporation erected for the *publick* benefit.

It appears from the charter, that the corporation of Dartmouth College was established for the express, the avowed purpose of promoting the welfare of a whole Province. It was an instrument, formed to attain objects, in which no individual had a particular interest, but in which the community had a deep one. It was vested with power to hold property in trust for the publick, but it could hold none for the use of the corporators. It was clothed with various powers, capacities, and franchises, all of which were to be exercised for the benefit of the publick, but not one of them for the advantage of its own members, or of any individuals whatever. In short, it was created—it existed only for publick purposes. If a corporation of this description be not a publick one, then, in my opinion, no publick corporation ever did, or ever can exist.

If this corporation was a publick one, the right of the General Court to alter and amend its charter must be clear. All English writers who treat of corporations, agree, that they may be dissolved by an act of the government (2). If the legislature have power to dissolve corporations, they may, without doubt, alter and amend their charters. Judge Swift in his system of the laws of Connecticut observes, "It is manifest that the legislature have power to dissolve or alter all corporations of a publick nature " (3). In this and in other states of the Union, publick corporations have been altered, modified, enlarged, and restrained in almost numberless instances, and the right of the legislatures to do this cannot

(2) 1 Black. Com. 485.—2 Kyd on Corporations, 447.
(3) 1 Vol. 228.

justly be questioned.   In the case of town corporations, whose
limits are fixed by charter, the General Court has repeatedly
altered them.   Towns have been divided; their limits have been
contracted or enlarged, at the pleasure of the legislature, against
the will and the remonstrances of the towns interested.   The
limits of the towns of Stratham and Newmarket were extended,
from the banks to the channel of Exeter river, in order to subject
them to a heavy burthen, while the towns were opposing the
extension with their utmost might.   The town of Pembroke
affords another example of the exercise of this power.   It will be
proper to mention the circumstances of this case, because the right
of the legislature to extend the limits of towns was considered by
the Court.—Pembroke was indicted for not repairing a bridge
over a certain river.   Their defence was, that the bridge was not
within their limits, as fixed by their act of incorporation, and, of
course, that they were not bound to repair it.   The bridge, as it
appeared from the evidence, was over a river between the towns
of Pembroke and Allenstown, but no part of it was within the
limits of either.   The jury gave a verdict for the town.   Applica-
tion was then made to the General Court, to extend the limits of
Pembroke so far as to include the bridge.   This was done.   The
town was again indicted for not repairing the bridge.   It was con-
tended on their part, that the act of the General Court, extending
their limits, was unconstitutional, as it was passed not only with-
out their consent, but against it; and in order to subject them to
the burthen of repairing the bridge.   But the Court decided the
act to be constitutional.

The limits of parishes have been frequently altered.   Particular
individuals with their estates in one parish have been disannexed
and annexed to another, thereby constituting a poll parish.   This,
as the Supreme Court in Massachusetts say, in the case of *Colburn*
against *Ellis & al.* (4) " Is in fact a permanent alteration of the
limits of the parish, so far as to include the lands, owned by the
persons disannexed; " and the Court recognize the authority of
the legislature to make such alterations.—Rights and privileges,
which had long been exercised and enjoyed by towns and parishes,
have, by acts of the General Court, been taken from them; new
duties and new burthens have been imposed; while no one sus-
pected, that the legislature transcended their constitutional pow-
ers.   It is apparent, that by the division of a town, or by extend-
ing its limits, very serious evils may be suffered.   By a division,
it becomes less able to perform many of its corporate duties; by
extending its limits, it may often become liable to heavy burthens,
not contemplated at the time of its incorporation.   When the lim-
its of parishes are altered, they must always be subjected to incon-
veniences.   But no injury whatever can possibly arise to the mem-

(4) 7 Mass. Rep. 89.

bers of the corporation of Dartmouth College by an alteration of its charter.

If this corporation was a *private* one, I shall contend that the legislature had a right to alter its charter, so far as the publick good required.

In this country the supreme object, for which government was instituted, was to secure the happiness of the people. To effect an end so important, the interest of individuals and of corporations must yield to that of the publick. On this principle, the legislalature often take the property of individuals, when the publick good requires it; they often deprive individuals of some of their natural rights, when the exercise of them would prove detrimental. Why may they not, with equal right, take the property of corporations, when the publick welfare demands it? Why may they not, with equal propriety, deprive corporations of some of their rights and privileges, when the exercise of them would produce mischief to the Commonwealth? Does the law guard the property of corporations, with more vigilance, than that of individuals? Are the rights of the former more sacred than those of the latter? Shall we see, with approbation, the property and rights of individuals taken, when the good of society requires it, and shall we regard it as sacrilege, to take, under any circumstances, the property or the rights of corporations? The law does not protect the property or the rights and privileges of corporations, with more solicitude, than those of individuals. Neither law nor justice regards the rights and privileges of the latter, as less sacred than those of the former. Suppose the lands of a private corporation are wanted for a fortification or an arsenal, may they not be taken? Suppose they are wanted for a highway or for any important publick purpose, may they not be taken? Without a power in the government to take the property and the rights of private corporations, as well as those of individuals, its operations would often be obstructed, and the safety of society might be endangered.— When the property of private corporations is required by the good of the community ; when the exercise of their rights proves injurious to society; to deny to the legislature the power of taking their property and of limiting or depriving them of their rights, is to depart from that principle, which has been mentioned, and which is the foundation of every free government: it is to sacrifice " the good of the many to that of the few "—the interest of the publick to that of every little corporation.

The legislatures of many of the states, perhaps of all of them, have taken from private corporations some of their rights and privileges, when the welfare of the community has required it. In this state it has often been done.—The New-Hampshire Bank made some of its bills payable in Philadelphia. The General Court passed an act, declaring that after a certain day " It should be unlawful for any Banking company in this state, by themselves,

their directors, or agents to issue any bank bill or bank note payable at any other place, than at the Bank from which it is issued "(5).   Every Banking company, that acted in violation of this law, was subjected to a penalty of one hundred dollars for each offence.    The New-Hampshire Bank had a right, by its charter, to make its bills payable in Philadelphia, or New York, or at any place whatever.    The act prohibiting this, was an alteration of its charter, as much as if it had been entitled, an act to alter and amend the charter of the New-Hampshire Bank.    Yet it has never been suggested, that the legislature had not power, by the constitution, to pass the law.    In many other instances, the General Court has deprived Banks of rights conferred on them, and in effect, altered their charters.    By an act passed in June 1807,(6) Banks were forbidden to issue bills, which were not payable on demand and to bearer; or which were subject to any condition.    Every Bank, existing in the state at the time when this law was passed, had a right by its charter to make its bills payable at a future day—to order—and subject to conditions. The law, depriving Banks of these rights, has never been considered as repugnant to the constitution.    It has not unfrequently happened, that the legislatures of those states, in which Banks have been established, have prohibited their passing bills under certain denominations.    Thus, the General Court of Massachusetts in June 1799, made a law, that no Bank, incorporated by the legislature of that Commonwealth, except the Nantucket Bank, should issue any notes for a less sum than five dollars(7).    By their charters they had a right to issue bills of any denomination.    This law deprived them of that right.

The General Court have not only imposed new duties on Banks, but have added heavy penalties, to enforce the performance of them.    By an act, passed in June 1814, the Directors of the several Banks in this state are obliged to make returns of the situation of their respective Banks, annually, to the Governour and Council; and in case of neglect or refusal, the Banks are subjected to a penalty of one thousand dollars.

The General Court of Massachusetts passed a law, by which all the Banks within the Commonwealth were subjected to a penalty of two per cent. a month, on the amount of those of their bills, which should not be paid, when presented for payment.    An action was commenced against the Penobscot Bank to recover the amount of certain bills, presented for payment, but which were not paid; and also to recover two per cent. a month on that amount.    It was contended on the part of the Bank, that the law was unconstitutional.    But the Court recognized the authority of the legislature to make it.    It was, say the Court, " A duty incumbent

(5)  State Laws, 283.
(6)  State Laws, 283.
(7)  Mass. Laws, 884.

on the legislature to pass the law, and this the rather, as these corporations derive all their powers from legislative grants "(8). In this case the Court recognize the authority of the legislature, to superintend corporations of a private nature, and to impose penalties upon them for not performing those duties, the neglect of which produces mischief to society.—They hold, that as these corporations derive all their powers from legislative grants, it is not only the right, but the duty of the legislature to see that the Commonwealth receives no detriment.

It would be easy to multiply instances, in which the legislature of this state, and those of other states, have limited the powers and taken the rights of private corporations, when required by the welfare of the community.

While I contend that the General Court has power, to take the property, the rights, and privileges of private corporations, I agree that it is a power, which ought never to be exercised, but for the strongest and most important reasons. It will, however, be at once perceived, that the reasons, which require such extreme caution on the part of the legislature, with respect to private corporations, do not exist in this case. The interest of the legislature is not the same with that of private corporations; their interests are always separate and distinct, and may sometimes be opposite. The legislature may pass a law, which, by depriving such corporations of their rights and privileges, does them an essential injury; while it does no injury whatever to the legislature. But no law can be made, to alter the charter of Dartmouth College, that will not produce as much mischief to the legislature that make it, if the law prove injurious at all, as to the members of the corporation. In this case, therefore, there can be no danger that the legislature will ever abuse their power.

It is alleged that these acts violate the constitution of the United States. When a charter of incorporation is granted, there is always, it is said, an implied contract on the part of the government, that the charter shall not be altered without the consent of the corporation; that the constitution of the United States provides, that no state shall pass any law impairing the obligation of contracts; that to alter the charter of a corporation without consent would impair the obligation of a contract, into which the government had entered, and would, consequently, be a violation of the constitution.

The idea, that when a charter of incorporation is granted, there is an implied contract on the part of government, that the charter shall never be altered without consent, is wholly unfounded—it is visionary. In what cases does the law imply a contract? In those cases and in those only, in which reason and justice are so strongly in favour of it, that the law presumes the contract has been made. Does reason or does justice say, that the interests of a

(8) 8 Mass. Rep. 445.

whole community shall suffer, for the benfit of a small number of individuals, whose charter of incorporation proves injurious? Suppose a number of individuals should say to the legislature, we wish you to grant us an act of incorporation, and to enter into a contract, that however prejudicial the charter may be to the welfare of the publick, it shall never be altered without our consent, would the legislature incorporate them on such terms? It is impossible to believe it. Nothing can be more unreasonable than to assert, that the law implies such a contract, when every man must perceive that the legislature, if expressly requested, would never make such an one. It is far more reasonable to say, that where a number of individuals are incorporated, there is an implied agreement on their part, that their charter may be altered whenever the publick good requires it; than that the government makes a contract, that it never shall be altered, whatever injuries it may produce to society.

If there be such a contract, as is alleged, that the legislature shall never alter the charter of this corporation without its consent, with whom was that contract made? With the King of Great Britain. It will not be pretended, that the King had more power to restrain the legislature by his contract from making such an alteration, than one legislature has to restrain by its contract all succeeding legislatures. If it were possible for the General Court to be so forgetful of their duty, so regardless of the welfare of their constituents, as to make an *express* contract of such a nature as the one said to exist in this case, it would be unconstitutional and void; because it would contravene a principle, which is the very basis of our government. No legislature has power to agree, that the interests of a corporation shall be preferred to those of the publick. One legislature has no authority to agree with a corporation, that no succeeding legislature shall take its property, its rights, or its privileges, although the taking of them may be loudly demanded by the good of the community. The legislature have no more power to make a contract with a corporation, that it shall be forever exempt from all legislative controul, than they have to make such an one with an individual.

If a charter of incorporation be a contract, it certainly is not such a contract, as comes within the spirit and meaning of that article in the constitution, that has been mentioned. In order to determine this, it will only be necessary to enquire, what was the design of this article? What were the evils that it was intended to prevent? Before the formation of the general government, the legislatures of several of the states passed tender acts, instalment laws, &c. Where individuals had made contracts to pay debts in specie, laws were enacted, enabling them to pay in depreciated paper; a tender of such paper discharged the debts. In some of the states, laws were passed providing, that if debtors should tender to their creditors any articles of personal property, and the

creditors should refuse to accept them, such tender should operate as an extinguishment of the debt to the amount of the property tendered.. Such proceedings were unjust; they were violations of the principles of moral obligation and of social justice.   These evils, as well as those arising from instalment laws, were full in the view of the framers of the constitution.   Apprehensive that the state legislatures might, at some future period, be actuated by the same illiberal and unjust spirit, that led to the passing of these laws, they determined to impose such checks and restrictions, as should effectually prevent the recurrence of these evils.   For this purpose, they made the provision, that no state should pass any law impairing the obligation of contracts.   The Supreme Court in Massachusetts have said, that this was the design of the provision. " The article respecting the obligation of contracts (say the Court) as we all know, was provided against paper money, instalment laws, &c.(9).

I am aware, that the Supreme Court of the United States has decided, that contracts, made by a state as well as those made by individuals, are within the meaning of this article.   But the cases, in which they have so decided, bear no analogy to the present. The case of Fletcher against Peck (10) was not .the case of an implied, but of an express contract.  The legislature of the state of Georgia, in consideration of a large sum of money, sold lands to certain individuals; the court decided, that a succeeding legis-lature had no right to repeal the law by which these lands were conveyed.—The case of the state of New-Jersey against Wilson (11) is unlike this.. The legislature of New-Jersey were desirous of extinguishing the claims of the Indians, to certain lands lying within the state.   For this purpose, they agreed to purchase other lands and to convey them to the Indians; they passed an act, declaring that the lands so purchased, should never be subject to any tax.  In consideration of this the Indians released their claims. The act, exempting the lands from the payment of taxes, was repealed, and the lands were taxed.   The court decided, that the repealing act violated this article in the constitution.   These cases only show, that if a state makes a grant of lands for a valuable consideration, the legislature of such state cannot pass an act to repeal the law by which the lands themselves or any privileges annexed to them are granted.   Neither of them has the remotest tendency to show, that a charter of incorporation is a contract within the meaning of the constitution.   No court has ever so decided.

If, when a charter of incorporation is granted, any alteration of it, without the consent of the corporation, impairs the obligation of a contract within the meaning of the constitution of the United

(9)  9 Mass. Rep. 360.
(10)  6 Cranch 87.
(11)  7 Cranch 164.

States, then the state legislatures have no power to alter the limits of a county—or a town—or a parish. Not a single new burthen— not a single new duty, can they impose upon either. All the laws of this state°and of other states of the Union, limiting the powers and taking the rights of Banks; imposing new duties upon them, and subjecting them to penalties for not performing those duties, are void. Little did the makers of these laws imagine, that if they deprived corporations of a single right or privilege—if they limited any one of their powers, to prevent the publick from suffering serious and distressing evils, that they violated the constitution of the United States.—The most sharp sighted adversary of the constitution did not perceive, that this article would ever prevent the state legislatures, from passing such laws as they thought proper, in relation to the civil institutions existing within the states. If this be the true construction of the article, and it had been so understood, when the constitution was proposed to the consideration of the people, it would have given a death blow to the instrument.

"A constitution is the form of government delineated by the mighty hand of the people." It is the solemn expression of their will. Their intention should always guide in its construction. If Courts should extend its operation beyond that intention, they would substitute their own will, in the place of the will of the people. They might in this way, convert a wise and salutary provision in the constitution, into an instrument of injustice and oppression.

In order to ascertain the true meaning of this article then, we should always keep in view the intention of the people—the particular evils contemplated by them, and against which they designed to guard. This is the polar-star, that should direct us in its construction. Without this rule to guide us, such an extended interpretation may be given to this provision, as to despoil the state legislatures of most of their powers. They may be left, indeed, with the empty name of sovereign, but with scarcely an attribute of sovereignty. If this rule be disregarded, the time may come, and that time may not be distant, when it will be denied that the state legislatures have power to pass any law for the limitation of actions founded on contracts. It might be contended, that they have no authority to pass such a limitation act, with far more plausibility, than that they have no authority to alter the charter of a corporation. It might be said, that a limitation act violates the constitution of the United States, because it not only impairs, but destroys the obligation of contracts. It is suggested, that there is a distinction between the *obligation* of a contract, and the *remedy* given by the legislature to enforce that obligation; that the remedy may be modified, as the legislature may think proper, without impairing the obligation of the contract. Precarious indeed is the right of the state legislatures to

pass such laws, if that right has no better foundation, than the suggestion that has been mentioned. This suggestion, that a limitation act is only the modification of a remedy and does not impair the obligation of contracts, is entirely unfounded.• It is manifest, that the obligation of one party to perform his contract can exist only in consequence of the remedy of the other party to enforce its performance. Take from one party his remedy to compel the performance of a contract, and the other party is not *obliged* to perform it—his *obligation* is destroyed. A limitation act takes away all remedy.

It is further said, that a limitation act does not take away the remedy of the creditor, but only establishes, that certain circumstances shall be evidence that the contract has been performed. This suggestion is as unfounded as the other. Courts of law say expressly, that the debt exists notwithstanding the statute of limitations, but that the creditor is deprived by it of his remedy (12). But what circumstances does the law establish, as evidence of the performance of the contract? There can be no circumstance from which performance can be inferred, but the acquiesence of the creditor beyond the period of limitation. If this be evidence of performance, then, if a man bring an action upon a note of more than six years standing, the defendant plead the general issue, and a verdict pass against him; he may move in arrest of judgment and prevail in his motion; because the acquiesence of the plaintiff, which is proof of payment, appears on the record. But all the authorities agree, that a motion in arrest of judgment in such a case could not prevail.

In order that the estates of deceased persons may be settled, in a reasonable time, the legislatures of the different states have enacted laws, that creditors, who do not exhibit their claims against such estates, within limited periods, shall be barred from recovering them. These laws impair the obligation of contracts. They furnish no evidence, that the contracts have been performed, but merely take away the remedy of those creditors, who neglect to exhibit their claims.

The legislatures of the different states are constantly making laws on the subject of contracts. The welfare of the people requires them to exercise this power. The laws, thus passed by them, frequently affect existing contracts, and impair their obligation. But these laws must all be regarded, as repugnant to this provision in the constitution, unless its construction be limited by considering the intention of the people; the particular evils they had in view, and which it was their design to prevent.

This charter, it is said, is a grant; but it is only a grant of powers for publick purposes. The trustees were publick agents. If the legislature should, by an act or resolve, appoint a number

(12) 1 Saunder's Rep. 283. a 2.—2 Saun. 63. c.—.—2 Peere Williams 375. 4 Gwil. Bac. 484.—5 Burr. 2630.

of individuals as agents, for the purpose of effecting some important object of a publick nature, every one would say, that they might take from these agents any powers or authorities, that had been granted, or might confer any new ones at their pleasure. Suppose the legislature should think proper, to make them a corporation, for the sole purpose of better promoting the object in view, they would be agents of the publick still, and as much under legislative controul after their incorporation as before.  To believe the contrary is to suppose, that there is some magick in the charter, that instantly makes the deputy superior to his principal; that raises the servant above his master.  If the trustees were publick agents, and the General Court could not limit, or take any powers that had been conferred on them without violating the constitution of the United States, then they have no right to limit or take any powers, granted to any of the publick servants, without a violation of that instrument.

It is remarked by Judge Johnson in the case of *Fletcher* vs. *Peck*, that the state legislatures pass laws, impairing the obligation of contracts; yet, that these laws appear to be within the most correct limits of legislative powers, and certainly could not have been intended to be affected by this constitutional provision.  If there be any contracts, the obligation of which may be impaired by laws made by a state, without violating this provision, the present is unquestionably of the number.—It may be safely affirmed, that this article in the constitution was never intended to restrain the state legislatures from passing laws, impairing the obligation of any contracts, except those where the interests of the contracting parties were entirely separate and distinct; so that a law might be passed by the legislature of a state, which would operate in favour of one of the parties to the contract, while it operated injuriously and oppressively toward the other.  But no such evil can possibly exist in this case.  Here, the government and the trustees have no separate, no distinct interests to guard—their interests are precisely the same.  The purposes of this incorporation were the spreading of christianity and the diffusion of knowledge among the people.  The legislature have as much concern in these important purposes, and in the prosperity of the corporation itself, as the mean of obtaining them, as the trustees themselves. No ill-judged law, altering the charter of this corporation—and doing it an injury, can do more mischief to the trustees, than to the legislature that make it.  How, in such a case, could restrictions, on the legislatures of the states be contemplated?  The people had all the security, that could be required or afforded.  Constitutions written on parchment or on paper may be disregarded; oaths may be forgotten; responsibility to constituents may prove insufficient to restrain legislators from abusing their power; but, when the interests of legislators are united with those of the objects of their laws : when bad laws will produce as much injury

to those, who make them, as to those, on whom they are intended to operate, there is the most perfect security that such laws never will be made. To have required restrictions on the legislatures of the states, in such a case, would have betrayed a species of delirious jealousy, never entertained by the reflecting and enlightened people of this country.

It is objected, that these acts are repugnant to that article in our bill of rights, which declares, "that no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or by the law of the land." The trustees complain that they have been deprived of their property. But what property was this article intended to protect? It was unquestionably that property, in which a man has a direct, a beneficial interest; property which he holds to his own use; and for which he is entitled to a compensation, when taken from him. If the property, held by the trustees, has been taken from them, which is denied, they had no beneficial interest in it; they did not hold it to their own use: they were entitled to no compensation for its loss. Have these acts made the trustees poorer than they were? This cannot be pretended, without accusing them of a breach of trust—of appropriating to their own use property belonging to the publick. I entertain too high a respect for the character of the trustees to suggest or to believe this. Will the trustees avow, that they believe themselves to be entitled to a compensation for this property? I am confident they will not. So far then, as respects the taking of property, they complain where no injury has been sustained.—But how far does this article protect property, in which a man has a *beneficial* interest? So far, that it cannot be taken from him, but by the judgment of his peers or by the law of the land. Surely, if the property of a corporation or of an individual be taken by an act of the legislature, it is taken by a law of the land. Every government has power to take private property, when required by the publick good. This power is clearly recognized by the twelfth article in our bill of rights. It is there said, "That no part of a man's property shall be taken from him or applied to publick uses, without his own consent, or that of the representative body of the people." It has been the practice of the General Court, ever since the adoption of the constitution, to pass laws to authorize the taking of private property for the purpose of making highways, turnpike roads, canals, &c. and their right to do it has been uniformly recognized by our courts of law.

But it is said, that the General Court has no power to authorize the taking of a man's property by a *private* act; that it can be done only by public, standing laws, which must operate equally on all the citizens of the state. This is extremely incorrect. The act to regulate the extinguishing of fires, passed in April 1781,

authorizing the firewards of the town of Portsmouth to pull down, blow up, or remove houses or other buildings, is private. All our acts, creating turnpike corporations, canal companies, &c. and authorizing them to take the property of individuals, are private.  Our courts have always regarded them as laws of the land.  In these . cases, property is taken from the owners not by publick, standing laws, operating on all the citizens of the state, but by private acts operating òn a small number of individuals.  The legislature and the courts of this state are countenanced by the legislatures and the courts of other states, in considering such private acts as have been mentioned, as laws of the land.  The constitution of Massachusetts has precisely the same provision, as that mentioned in our bill of rights.  Yet the General Court of that Commonwealth has, in frequent instances, created turnpike corporations, canal companies, &c. and authorized them to take the property of individuals. Their courts, as well as the legislature, have always considered these acts, as laws of the land within the meaning of the constitution.  They have been considered in other states also as laws of the land.

It is objected, that these acts are retrospective, because they deprived the trustees of vested rights, and are, therefore, void. Rules are often adopted in relation to government, which appear plausible in theory and are indeed true to a certain extent, but which can never be carried into effect, according to the terms, in which they are expressed.  No political axiom is more frequently repeated than this, that the legislative, executive, and judicial departments of government must be kept separate and distinct.  Yet the states, that have adopted this maxim in its most extensive terms, have blended, in some degree, the authorities of these different departments.  They have given to the governour, a qualified negative on the legislature, which is an exercise of legislative power; they have made the senate a court for the trial of impeachments, which is an exercise of judicial authority.  They have even vested in the legislature the executive power of pardoning offences (13).  In the same manner, those states, that have adopted the maxim that retrospective laws are oppressive and unjust, and have prohibited their being passed, have, in many instances, departed from it, and passed laws of this description.  Our bill of rights declares, that retrospective laws *should* not be made for the trial of civil actions or the punishment of offences.  This seems to be the language of caution rather than of prohibition.  It shews, that there was in the minds of the framers of our bill of rights "a conflict between jealousy and conviction;"—a dread of retrospective laws in general without any restraint, and a conviction that in some cases they must be passed.  Laws are frequently made, that, strictly speaking, are retrospective—they deprive the citizens of vested rights; yet they are allowed to be constitutional.  The

(13) See 47th Number of the Federalist, by Mr. Madison.

limitation act, operating on demands, that existed before it was passed, is retrospective; but courts in this state have decided it to be constitutional. The decision has been the same in Massachusetts (14).

A citizen of Massachusetts conveyed to his four sons certain lands in equal portions in fee simple. Three days *after* the conveyance, the General Court of that Commonwealth made a law, by which it was enacted that all estates, which had been or which should be conveyed to two or more persons, should be deemed to be tenancies in common, unless it should be manifestly the intention of the alienor, that they should be jointenancies. The Supreme Court said, it was unnecessary to decide whether the words of the conveyance created a jointenancy or a tenancy in common, because the statute had a retrospective effect, comprehended the conveyance, and made it a tenancy in common (15). The legislature may constitutionally enact laws, by which privileges once granted to individuals by former laws, are revoked (16). They may pass laws, affecting the rights of parties in actions already pending (17).

All laws dividing towns; or altering their limits; or altering the limits of parishes, deprive them of vested rights. The laws passed in this state, forbidding banks to issue bills payable at a future day—to order—or subject to any conditions—or payable at any other place than at the banks, whence they were issued, deprive them of vested rights. So also do those laws, passed by different states, that prohibit their issuing bills under certain denominations. Such laws are retrospective, but they are allowed to be constitutional.

It is alleged, that no vested right can be devested out of one and vested in another, without the intervention of a court of justice. This position is not correct.—By a law made in February 1791, (18) the selectmen of the different towns in this state are authorized, on application made to them, to lay out highways, whether they are for the benefit of the publick, or particular towns, or the individuals applying for them. Hundreds of instances have happened, in which selectmen have taken the lands of individuals for highways by virtue of this law. Here the vested rights of those individuals, whose lands are taken, are devested, without the intervention of a court of justice, and vested in others. It is no answer to say, that the fee remains in the individuals whose lands are taken; for the right to the actual occupation of the land is a vested right as much as any that can be named.

These acts are alleged to be unconstitutional, because they

(14) 8 Mass. Rep. 430.
(15) 4 Mass. Rep. 566.
(16) 12 Mass. Rep. 443.
(17) 6 Mass. Rep. 303.
(18) 1 State Laws, 385.

operate on *one* corporation only. Suppose there was only one bank in the state, and it should make its bills payable at a distant day; and the General Court should make a law, forbidding any bank to issue bills not payable on demand. It could operate only on a single corporation, yet no one would deny the power of the General Court to make it, on that account. The legislature of Massachusetts passed an act in March 1792, prohibiting the Massachusetts bank to issue bills of a less denomination than five dollars. No person ever supposed the law to violate the constitution, because it operated only on a single bank. An act, dividing a town, or extending or contracting its limits, operates on a single corporation only.

But what are the rights that have been taken from the trustees? They have been deprived, it is said, of their right of visitation. That right never belonged to them. The Court have been told, that this College was a private charity; that Doctor Wheelock was its founder and visitor; and that he transferred his right of visitation to the trustees. It is believed, that not one of these positions is well founded.

This was not a private, but a publick charity. In order to determine to which class it belonged, we are not to consider, whether it was founded by the government or by an individual. The government may be the founder of a private charity; and an individual of a publick one. The rule, by which this is to be determined, was considered and established by Lord Hardwicke in the case of the *Attorney General* vs. *Pearce*(19). "It is, says his lordship, the *extensiveness* of the objects to be benefited, that constitutes a charity a publick or a private one." This, then, was unquestionably a publick charity. Lord Holt informs us, that some corporations are created for publick and some for private charities; that the former are not subject to any founder; but to the general laws and statutes of the realm(20). This corporation, being established for a publick charity, was not subject to any founder, but to the general laws and statutes of the state.

Suppose this was a private charity, who was its founder? It has been asserted that Dr. Wheelock was the founder, but the assertion is supported by no evidence. It is incumbent on the trustees to prove that he founded it, if they claim the right of visitation under him. It is not intended to detract from the merit of Dr. Wheelock by denying that he founded this charity. He is entitled to the highest praise, for his extraordinary exertions in procuring donations from various persons, in Europe and in this country, for the establishment of the College. The charter, probably in consequence of these exertions, calls him the founder. But this does not make him so. "The first gift of the revenues is the foundation, and he who gives them is in law the founder"(21).

(19) 2 Atkyns 89.
(20) 3 Salk. 102.
(21) 1 Black. Com. 480.

Many individuals made donations, but who made the first? It does not appear. I am instructed to say, that Dr. Wheelock made very liberal donations to Moor's Charity School, an institution in the neighbourhood of the College, though entirely distinct from it, but that he made none to the College itself. The charter states, that Dr. Wheelock, on or about the year 1754, at his own expense, and on his own estate and plantation in Lebanon in Connecticut, set on foot an Indian charity school; and that, with the assistance of several well disposed persons, he had, for several years, clothed, maintained, and educated a number of the children of the Indian natives. In no part of the charter is it mentioned, that he made any donation to the College. If he did, there is no evidence of the fact. It does not appear then, that he was the founder or that he had power to transfer the right of visitation to the trustees.

If Dr. Wheelock was the founder and visitor of the College, he did not transfer to the trustees the right of visitation. There are no words in the charter making them visitors. It is agreed, that no particular form of words was necessary to make them visitors, but there must be some words clearly showing that this was his intention. Where certain persons are appointed trustees or governours, they are not necessarily visitors(22). The law seems to be well settled, that where the management and application of the funds given to a charity, are vested in trustees or governours, they are not visitors(23). The reason is apparent. It would defeat the charity, if the same men, who have the right of applying its funds, should possess also the exclusive right of deciding, whether those funds were properly applied. In this case, it is said, that the trustees had the legal estate in all the lands and property given for the use of the institution. They certainly had the application and management of its funds. They could not, therefore, have been visitors. If we had had a court of chancery in this state, the trustees would have been subject to its inspection and controul, but as we had no such court, they were subject to the inspection and controul of the legislature. That the legislature may exercise some of the powers of a court of chancery, in the absence of such a court, so far as relates to trusts, is admitted by the Supreme Court in Massachusetts(24).

It is alleged, that these acts have deprived the corporation of Dartmouth College of the franchise of subsisting as a corporate body; that they have destroyed it and created a new corporation in its place. Nothing can be more unfounded. It is true, the name of the corporation has been changed, but that does not destroy it, nor affect its rights, its privileges, or its duties. The name of a corporation, like that of an individual, is a mere accident; it is not of its essence. " Where an alteration is made in the

(22) 2 P. Williams 327.—2 Kyd 188. 189. 194.
(23) 2 Kyd 188.
(24) 12 Mass. Rep. 587.

name of a corporation, it retains the property, franchises, rights, and privileges, which belonged to it before the alteration, and is equally liable to all claims to which it was subject"(25).  An addition has been made to the number of trustees, but it is the same corporation still.  If individuals are disannexed from one parish and annexed to another, by an act of the legislature, is the parish, to which they are annexed, destroyed as a corporation?  If an addition be made to the members of a town corporation, by any means whatever, does it cease to be a corporation?  The General Court recognize the existence of this corporation in the most express terms.  They say, " That the corporation, heretofore called and known by the name of the Trustees of Dartmouth College, shall be called and known by the name of the Trustees of Dartmouth University."

It is urged, that to make any addition to the number of trustees was improper, because it was the intention of the donors, that the property given by them should be managed by twelve trustees and no more.  This is not true, because the principal donations were made before it was known of what number the corporation would consist.  When a man gives property for a particular object, he intends that it shall be applied to that object, but it is a matter of no importance to him, whether the application be made by twelve .trustees or by twenty.

The trustees allege, that the General Court attempted to compel them to act under an amended charter; and that they had no power to do it.  Many cases have been cited on this point, but they only show, that the King cannot compel corporations to accept or act under amended charters, not that Parliament cannot compel them.  The authority of Parliament, as every one knows, is much more extensive than that of the King.  The King cannot grant to a corporation exclusive privileges, Parliament may; the King cannot dissolve a corporation, Parliament possesses the power.—Corporations in this state have frequently been compelled to act under amended charters. The cases of Pembroke, Stratham, and Newmarket, that have been mentioned, are examples.  Indeed this is always the case, where the limits of towns or parishes are altered.  Banks, likewise, in the several instances that have been named, have been compelled to act under amended charters.  But it is not true, that the General Court attempted to compel the trustees to act under an amended charter; they gave them permission to do it, but did not attempt to compel them.

It is objected, that these acts are repugnant to the thirty-seventh article in the bill of rights; which declares, that the legislative, executive, and judicial departments of government shall be kept separate and distinct.  In passing these acts, it is said, that the General Court exercised judicial powers.  It is not very easy to perceive, how the alteration of the charter of a College is an exer-

(25) 2 Kyd 232.

cise of judicial authority, any more than the alteration of the charter of a town, or a parish, or a bank. For a court of law to undertake to alter the charter of a corporation, either publick or private, would afford something of novelty at least, in judicial proceedings. By these acts the General Court, it is insisted, have declared a forfeiture. Who ever imagined, that when the General Court altered the charter of a town, they declared a forfeiture? Who ever suspected, that when they altered the charter of a bank, they declared the charter forfeited?

The case of *Terrett & al.* vs. *Taylor & al.* (26) is said to be decisive of the present. There is no resemblance between them. The legislature of Virginia asserted a right to all the property of the episcopal churches in the respective counties in the state; and authorized the overseers of the poor, in each parish, wherein any glebe land was vacant or should become so, to sell the same and appropriate the proceeds to the use of the poor of the parish. The supreme court decided, that the act taking this property from the churches and giving it to the poor of the several parishes, was unconstitutional and void. If the legislature of New-Hampshire had taken the property holden by the trustees for the purposes mentioned in the charter, and had given it to the poor of the town of Hanover, there would have been some resemblance between the cases: but even then the resemblance would not have been striking. In the case cited, the property was taken from those who had the beneficial interest; in this, it is not. In that case, the property was given for one purpose and applied to another; in this, the property is employed for the same purposes, for which it was designed. It is indeed alleged, that the funds may be diverted from their proper objects; that they may be employed for the establishment of an institute. The institute, if there should be one, will undoubtedly be so formed as to promote the objects mentioned in the charter. The responsibility of the legislature will prevent the funds of the institution from being misemployed.

In order to form a correct opinion of the justice of the complaint, made by the trustees, in relation to the taking of property given to the use of the institution, we should be careful not to confound the corporation with the members composing it. The law regards them as separate and distinct. The legal title to property, granted to a corporation does not vest in the corporators, but in the corporation itself, which is made capable of holding it as an individual. In whom was the legal title to this property before the passing of these acts? In the corporation of Dartmouth College. In whom is the legal title now? In the same corporation existing under a different name. The legal title was in the corporation, while the beneficial interest was in the publick. The trustees have not been deprived of the privilege of being members of the corporation. By these acts they were considered as mem-

(26) 9 Cranch 43.

bers of Dartmouth University, the same corporation with Dartmouth College, but with another name; they were a majority of the members; as members they could hold property, and could exercise all their rights, privileges, and franchises for precisely the same purposes, as they could before these acts were passed. If they refused to act as members, they have no just reason to complain.

It has been repeatedly said, that if the trustees had conducted improperly, an information should have been filed, and their charter declared forfeited by the judgment of a court of law. Whether the General Court were induced to alter this charter, on account of any abuses of which the trustees had been guilty, is not now to be considered. It was sufficient that, in their judgment, it might be so amended, as to be better adapted to the end, for which it was formed. Abuses, however, might have taken place, by which no forfeiture would have been incurred. To file an information in the case of a private corporation may be proper; but, to do it, in the case of a publick corporation, like that of Dartmouth College, would be in the highest degree imprudent. Suppose the trustees had been guilty of great abuses of their trust, an information had been filed, and their charter had been declared forfeited, what would have been the consequence? Would the trustees have lost any thing? Not a cent. The publick, and not the trustees, would have been the sufferers. The publick would have lost all the benefit of the property, that had been given to promote the objects of the corporation. When the charter of a corporation is declared forfeited by the judgment of a court of law, the property given to it reverts to the donor or his heirs (27).

It has been stated, that if the General Court can alter this charter, the corporation holds it at their mere will and pleasure. This is one side of the picture, let us view the other. If the General Court cannot alter it, then the corporation may hold it in defiance of all human power. If this corporation was erected for the purpose of advancing the publick interest, there is a peculiar propriety in having its charter subject to the will of those, who are the guardians of that interest. This is far more proper than that a corporation, created entirely for the publick good, should hold its charter, as fixed and unalterable as the decrees of fate, although the publick good may loudly demand its amendment.

The legislature, it is urged, may abuse their power, and may, by an improper interference, discourage donations. But is there no danger that the corporation will discourage donations, by an abuse of its trust, if it may claim to be independent of the legislature? If it really possesses those rights and privileges, which are said by counsel to belong to it, donors can have no reasonable security that their bounty will not be misapplied.

In the first place, we are told, that the corporation is placed beyond the controul of the legislature. They have no authority

(27) 2 Kyd 516.

to amend its charter; to touch its property; to take from it a single right or privilege; or to limit the exercise of any one of its powers. In the next place, we are told, that the trustees are visitors of the College and of the application of its funds. This places them beyond the controul of every court of law, let them do what they will with the property given to the institution. "The sentence of a visitor, on subjects within his jurisdiction, is final and conclusive, and the king's courts cannot, in any form of proceeding, review the sentence" (28). It is within the jurisdiction of a visitor,—it is his duty to see, that the funds given to the institution of which he is visitor, are properly applied: and when he decides, his sentence is conclusive on all courts. Suppose the trustees should appropriate the funds of the College to their own use. If they are visitors as to the application of the funds, as is contended, no court of law can make them accountable. A visitor is himself subject to no visitation—to no controul. Where is the man, though possessed of the most charitable and benevolent feelings, that would give to a corporation, raised so far above all responsibility? Such a corporation is a monster, that would devour all charities. The very sight of such a monster, placed beyond all legislative, all judicial controul, like the terrifick head of Medusa, would convert even charity herself into stone.

The counsel on the other side have expressed an opinion, that the legislature are a very improper body to superintend literary institutions. The people, when they formed their constitution, thought otherwise. By that instrument they declare "That it shall be the duty of legislators, in all future periods of this government, to cherish the interest of literature and the sciences, and all seminaries and publick schools." The people did not expect, that this would be done by donations merely, but by wise and salutary laws. It is feared, that the legislature, under pretence of aiding these institutions, will deprive them of their property, or their most valuable rights and privileges. But no such danger is to be apprehended. If the property of a literary institution should be seized by the legislature, and appropriated to a use, different from that, for which it was designed; or if any oppressive laws should be passed, injuring and retarding its growth, there would be an universal burst of indignation throughout the state. Any legislature that should act in this manner would be considered as unworthy of confidence, and would lose their offices. The members of the legislature know this. Our frequent elections make them feel their dependence on the people, and keep them faithful to their duty. Most of them have children or friends to be educated at the seminary; they must, therefore, feel the strongest wishes for its prosperity. The interest of the legislature, as well as that of the publick, will become sentinels over the rights and privileges of the corporation, and will protect them.

(28) 2 Kyd on Corporations 196.

I am aware, that in examining and deciding this question, prej-
udices, strong and inveterate, are to be encountered.   We are too
apt to imagine, that there is something of sanctity, investing the
rights and privileges of corporations.   But it is justly remarked,
that "a corporation is nothing more than a *mean to an end.*"   In
this case the promotion of christianity and the dissemination of
knowledge were the ends; the incorporation of a number of indi-
viduals was the mean of obtaining them.   When the sovereign
power of a state has a right to effect certain objects, it is neces-
sarily incident to such power to employ all the means, by which
those objects may be effected; it is also incident to such power to
alter and to shape the means, already employed, in the best and
most advantageous manner.   Without the power of alteration, the
very means employed might defeat the end. If, then, this corpora-
tion was only the mean of obtaining the ends, that have been
mentioned, the legislature had a right to alter and to form it in
such manner, as in their judgment, would best effect the ends
proposed.

That a corporation, created for the sole purpose of promoting
the publick interest, may be altered in such a manner as the pub-
lick interest requires, is a principle as obvious to common sense as
any that can be imagined.

When the important purposes, for which this corporation was
erected, are taken into view, as well as the duty of the legislature
in relation to them, no doubt can be entertained of their right to
alter and amend the charter.

Civil government, like every other work of man, must be imper-
fect: the aids of religion are necessary to remedy its defects.
Whatever may be the form of government adopted by a people,
without morality they cannot be happy,   But so feeble is the
influence of laws and of political institutions on the morals of man-
kind, that no nation can be expected, without religion, to practice
the duties which morality enjoins.   It is justly remarked, that the
duties of charity, benevolence, gratitude, and, indeed, all our duties
of imperfect obligation, without the aids of religion, would remain
undischarged.   Human laws cannot enforce their performance.
It is religion alone that, by meliorating the temper and dispositions
of the heart, can lead to the discharge of these duties, so important
to the happiness of society.   It is this alone, that can prevent the
commission of those secret offences, which human tribunals cannot
know, and which, of course, they cannot punish.   But these effects
are not to be expected from those absurd systems of religion, that
so long prevailed in the world; which allowed their votaries to
indulge in licentiousness, and to trample every principle of moral-
ity under foot; which afforded a justification of every vice "by the
example of some god."   Nor are they to be expected from those
false and absurd systems that still prevail; which substitute trifling,
superstitious observances in the place of genuine piety and moral

goodness; which promise, as the highest rewards of virtue beyond the grave, the unrestrained indulgence of the sensual appetites; which afford a seat in paradise without purity of heart. It is from christianity alone, that these salutary effects can be expected. It is this system, that teaches the most perfect lessons of morality and points out our duties in every relation, and under all circumstances and conditions in life. While the religion of men wants a sufficient *motive* to action; christianity presents motives the most powerful, that human imagination can conceive. It allures to the practice of virtue by promises of perfect and endless felicity; it deters from the practice of vice by threats of the most awful punishment. This religion, " which has the promises of this life and of that which is to come," the constitution has enjoined it as a duty on the legislature to encourage and to promote.—The same instrument has made it the duty of the legislature to diffuse knowledge among the people. It declares that " knowledge is essential to the existence of every free government." Hence it has happened, that between despotism and knowledge, there has been a perpetual warfare. In despotick governments, it is necessary that the people should be kept ignorant of their rights, lest they should break the chains with which their oppressors have bound them. Knowledge and virtue are the main pillars, on which the fabrick of our freedom rests. Destroy these, and the tottering edifice must fall to the ground, and we must be crushed beneath its ruins. Then would the last hope of liberty expire. Then would the gloomy predictions of the advocates of despotism be realized, that no nation will ever be found capable of maintaining a free government. These objects, so important to the happiness of our country, and the promotion of which is among the most sacred duties of the legislature, it was the professed design of this charter to attain. This corporation, being a mere instrument to effect these objects, it was both the right and the duty of the legislature to alter and amend its charter in such a manner, as would, in their judgment, be best calculated to obtain them. If the legislature had refused to amend the charter, thinking it too sacred to be touched, they would have imprudently given up the substance for the shadow; they would have weakly sacrificed the end to the means.

Mr. SMITH.—The question to be discussed is whether, on the facts stated, the acts of the legislature of this state of the 27th of June, 18th and 26th of December 1816, are valid in law and binding on the trustees of Dartmouth College without their assent. I freely admit, that this is a question of mere constitutional right, and that it is not sufficient that the plaintiffs satisfy the court that those acts are impolitick, inexpedient and such as have no tendency " to amend or improve the corporation of Dartmouth College." To me, indeed, it appears, that the constitution of this literary seminary is made worse, not better, by these legislative provisions;

that the charter of 1769 was a good one, requiring no alteration, and is every way adapted to such an institution at the present day. I hazard little in predicting that should this new organization continue for any length of time, experience, the surest test of measures, would satisfy its friends, that most of the new provisions were inconvenient, some of them impracticable, and others useless, or worse than useless.   I admit they were well enough calculated to answer one purpose, if that was the end proposed, that of enabling the minority of the college government to outvote the majority. But though in my judgment the charter of the college required no alteration, and, as altered, that it has not been *amended* or *improved*, yet I am not disposed to deny that the college stood in need of encouragement, and had very powerful claims to the fostering care of the legislature and of all good men ; not to enlarge its charter but its funds, that it might more effectually answer the end of its creation, and by diffusing knowledge and learning more generally through the community, conduce essentially to the preservation of our free government.   But the present action was not brought to obtain the opinion of the court on any of these questions, but on the right of the plaintiffs to continue to be a corporate body, and to hold and enjoy in future, as they have held and enjoyed in times past, their corporate property and their corporate franchises and powers for the use of Dartmouth College, unimpaired and unaffected by the acts of the legislature of the last year, to which, on the fullest consideration, they have deemed it their indispensable duty to refuse their assent.

The ground taken by the defendants counsel on the former argument, and now, renders it necessary, in the first place to enquire, whether the acts in question, essentially alter the charter of 1769 ; or whether the alterations are to be regarded as immaterial.

Were it not for the suggestions which have fallen from the bench, at different times in the course of the argument, I should have thought, that on this part of our case, two opinions could hardly have been entertained.

The change of name is not in itself a matter of much consequence. But it is believed that this business of baptizing anew, individuals or corporate bodies, against their wills, by legislative acts, has not been usual.*   If there is any thing, which seems peculiarly to be a person's own, it is his name.   He may prefer the old to the new as more suitable to his condition.   Here too, the change of name seems to indicate a change in the nature of the body ;—for upon the principles of the common law, an university, on the model of those at Oxford and Cambridge is a civil, while a college is an eleemosynary corporation.   It is easy however to conceive of circumstances which might justify this act imposing a new name— such an increase in the funds by the liberality of the state, or the lovers of literature who guide its councils, as would require the

* 10 Co. 28.

formation of several colleges at the same place. Gratitude for the favour, to say nothing of the propriety of the thing, from the enlarged endowment, would soon reconcile modest men to a high sounding title.

But passing from the names of the two corporations let us look into their constitutions as settled by the charter and by the legislative acts.

As it respects the members, the charter declares their number shall be twelve and no more; the acts provide that the number shall be twenty-one. This is important. The trustees are not officers of the corporation but constituent members; the integral parts of the corporate body. Encreasing or diminishing these essentially alters the constitution of the corporation (1).

The trustees named in the charter were appointed chiefly if not entirely, (according to the established usage in such cases) (2) at the nomination of the persons providing the funds, or a person acting for them. The additional trustees, provided by the acts, are appointed, not by the corporation, as all new members by the charter were to be appointed, but by the governour and council, as civil officers of the state are appointed:—and vacancies, before a certain time, are to be filled up in the same way. This in the event, gave to the state the appointment of ten trustees before the organization of the corporation created by the acts; and " nine trustees convened agreeably to the new provisions are made a quorum for transacting business." This last provision was made before the new corporation was organized; so that the new was no way dependent on the old for its existence.

By the charter all the powers of the corporation are vested in the twelve trustees. By the acts not only nine new members are added, but a board of overseers is constituted, consisting of twenty-five members appointed by the governour and council, with a negative, on all the important acts of the trustees:—and vacancies, in this latter body, are to be filled up, in all future time, by the governour and council; that is, this branch of the college government is perpetuated, not in the mode prescribed by the charter, by the government of the college, but by the government of the state.

The power to maintain perpetual succession, that is of electing members in the room of such as go off, is said to be necessarily and inseparably incident to a corporation: (3) where a corporation has not this power, it is dependent on some other person or body politick for its continuance.

As it respects the funds or corporate property, this was held by the twelve trustees chosen under the charter, clothed with the trusts declared in that instrument in strict conformity with the will of the donors. The acts transfer it to the trustees " as consti-

(1) 2 Bro. C. C. 662.—12 Mod. 232. anon.
(2) 13 Vez. Jr. 530. Atty. Gen vs. Dixie.
(3) 1 Blac. 475.—2 Blac. 37.

tuted by the acts;"—so in like manner it is provided, that the new trustees "shall forever have, hold, use, exercise and enjoy, all the powers, authorities, rights, liberties, privileges, and immunities" which the charter vested in the trustees of Dartmouth College.

New powers are also conferred; and, what is much more material, new and different uses and trusts are created and declared: they (the new trustees) "have power to organize colleges in the university; to establish an institute and elect fellows and members thereof: to arrange, invest and employ the funds of the university," which the same acts had just taken from the college. It will hardly be pretended that the trustees had authority to do any of these things; if not, it seems to follow, that they alter and vary the original end and purpose of the institution (4).

In exercising these powers, privileges and immunities and applying the funds, the new trustees are in most cases, subject to the controul of a board of overseers, entirely the creature of the state. The acts in question farther give the governour and council the power, and make it their duty, "to inspect the doings and proceedings of the corporation and of all the officers of the university whenever they deem it expedient; and to report their doings to the legislature;"—that they, I suppose, according to the memorial presented by the late president of the college—containing a "surrender of all his official, civil and political rights," (5) may exercise "the sacred right to *visit* and *oversee* this literary establishment."

It is not apprehended that the acts are more catholic on the score of "perfect freedom of religious opinion" than the charter. The former indeed go a step farther, in making it compulsory on the trustees to accept donations, "for the endowment of professorships of any sect, of the protestant christian religion." How far this provision, which has the merit of being entirely new, may contribute to advance the science of theology as a branch of academical instruction is not for me to conjecture. Experiments of this sort, professorships "of all and any opinions" had better, perhaps, have been first made in the new institute, a term broad enough to comprehend any thing and every thing. It seems a problem not yet solved, which is better—to have professorships "of no particular religion;"—"of all sects in religion," wrangling it out in the best way they can in the same seminary;—or professorships "of no religion." The old way was to have professors of divinity leaving it to the trustees to elect.

The charter gave the trustees the power to appoint a treasurer and clerk, or secretary, and to remove them at pleasure. The defendant had been appointed to both these offices; but was removed from both and another appointed before the acts of

(4) 2 Vez, Jr. 42.—2 Bro. C. C. 662.
(5) See Documents relative to Dart. Coll. published by Leg. 1816, p. 6.

December, 1816. The act of the 26th of December in effect reappointed him, and gave him as treasurer so constituted "the care, management and superintendence of the property of the corporation whether real or personal."

The same act, as a convenient mode of settling the question now before the court, (and the legislature were not then ignorant, that the old trustees had, by a solemn declaration refused their assent to the acts) subjected them, and the officers of the college, those appointed before as well as those appointed after the 27th of June 1816, to heavy penalties should they presume to exercise their offices, except under the new acts which they considered as unconstitutional and void. Their "freedom of opinion" consisted in the right of resigning—of surrendering, in humble imitation of their late president, their official rights, leaving it to the governour and council to appoint others in their room ;—or of becoming members of the new corporation against the dictates of their conscience—or. of continuing to exercise the offices they then held, and as they believed constitutionally held, at the hazard of incurring the threatened penalty.

Such was the enlightened policy and liberal views of the framers of these acts.

After this brief review of the constitution of this seminary as provided by the charter, and by the acts in question, it can hardly be matter of surprise, that the independent members of the old board refused any connection with the new. None but independent members would have ventured on this course. But I confess it does seem strange to me, that any advocate should now be found, gravely to contend, that the acts have made no essential change in the corporation as constituted by the charter. They have changed the name, the number of members, the manner of their appointment, and of maintaining a perpetual succession ; have created a board of overseers, chosen and to be perpetuated by the state, have divested the corporation of the property given it by the founders and other donors—have altered the uses for which it was given, and applied it to new uses and trusts:—have appointed an officer for the corporation and invested him with power to hold their property against their will. They have made a new constitution for this seminary.

It semes to make a necessary part of the defence to this suit, that Dartmouth College has passed away—has no longer even a name to live. Its powers and all its property have been given to another corporate body, who are the real defendants. If the new corporation come in the place of the old, then the old no longer exists. If they exist for any purpose and with any rights, one would think, the new corporation have little interest in denying them their charter, common seal, and records : and yet the new corporation claim the right of converting these to their own use.— It is certainly true, that the old corporation has not been dissolved

in any of the ways mentioned by law writers, except on the sup-
position that our legislature, like the British parliament, possess
unbounded and unlimited power(6). The counsel are necessarily
driven to that: they are bound to contend that the acts have
annihilated the old corporation and created a new one in its stead.
Upon their principles they may at once boldly venture on this
ground. They have asserted in the broadest and most unqualified
terms the right in the legislature to do, what we say they have
done. It is their doctrine that corporations of this description, like
clay in the hands of the potter, may be modified, altered or
moulded into any shape, at the pleasure of the legislature:—or to
use the late President Wheelock's language again, be made. to
undergo such "organic improvements and model reforms in its
system and movements,(7) as the wisdom of the legislature may
judge expedient:"—In short that all such corporations may be
annihilated by the legislature "the true sovereign" of the state.
All this we deny and on this ground we meet our opponents.

I shall contend that, by the constitution of this state, these acts
are not binding on the plaintiffs without their assent;—and that
they violate the constitution of the United States.

To maintain these positions, it is not necessary that I should
satisfy the court that all their provisions are unconstitutional. It is
sufficient that any of them are so. The doctrine is well established,
(8) that a corporation in being, may take such parts of an amend-
ed charter, as they choose and reject the rest; so, they may reject
the whole, though some parts be good;—they are not obliged
to pick out the good threads from an ill woven web.

Before we can determine, as to the validity of these acts it will
be necessary to ascertain the true nature of this corporation, and to
what class it belongs. Clearly, the legislature have more power over
some corporations than over others.

Corporations differ from each other in their constitution, powers,
and objects or purposes of the association. But some things are
incident to them all. A number of persons, I speak of corpora-
tions aggregate, are invested with a political character and person-
ality,(9) wholly distinct from their natural capacity, and chiefly
intended as the means of perpetuating in succession their rights
and their duties. The charter generally specifies the purposes of
the association, and marks the limits and extent of the franchises
conferred, and how they shall be enjoyed. But there are many
powers, rights, capacities, &c. inseparably incident to corporations.
If the charter be silent, the law annexes these ; they are implied;
such as to have perpetual succession, the power of electing mem-
bers in the room of such as go off ; to sue or be sued ; to purchase

(6) 1 Blac. 485.
(7) See Documents relative to Dart. Coll. pub. by Leg. 1816, p. 7.
(8) 3 Burr. 1647. 1663.—4 Burr. 2199.—1 D. & E. 581. 8. 9.
(9) 1 Wo. 471.—1 Blac. 467.

lands and hold them for the benefit of the institution; to have a
common seal, and to make statutes for the government of the corpo-
ration(10). Though, for some purposes, Dartmouth College may be
considered as a religious, yet it is not an ecclesiastical corporation
in the English sense of the term(11). But there is another divi-
sion, proper to be stated at greater length, I mean of civil and
eleemosynary corporations. We have both sorts. Our civil cor-
porations are created for government, and for "the carrying on
of divers special purposes." Our counties, towns, parishes, school
districts, &c. are civil corporations for government; and our bank-
ing, insurance and turnpike companies, are civil corporations for
particular purposes—no way connected with charity. In England,
the general corporate bodies of the universities of Oxford and
Cambridge fall under the head of civil corporations; because
merely for government; not for dispensing alms, but for govern-
ing the particular colleges which dispense them. A civil corpora-
tion for government, for example, a town in this state, is where
persons living within certain limits, are by the supreme power,
erected into a body politick for the exercise of their civil and politi-
cal rights, and the performance of their civil duties—among these
are the rights of suffrage, the duty of supporting publick instruc-
tion in religion and morality, of supporting schools and of execut-
ing the laws for the maintenance of the publick police. The whole
state is divided into districts for these purposes. Our government
depends for its organization on these corporate bodies. The state
is nothing but the aggregate of these civil corporations. Annihilate
these, and the great body politick could no longer exist without an
entire new organization. Each citizen, and all the citizens are
benefited by this division of the state into towns or townships.
Their rights and duties are better and more advantageously per-
formed, in these districts, than they could be in any other manner.
Towns, generally hold little or no corporate property. They have
few of the incidents said to be inseparable from corporate bodies;
yet they have as many as are necessary for the purposes of the
association. They stand in no need of by-laws or private statutes
for the better government of the corporation, as the rights and
duties of one, are the same as in every other. They are all gov-
erned by the same general laws. As soon as the territory becomes
inhabited, this incorporation takes effect:—It is granted many
times before;—in which case, the language is "all who shall or
may inhabit within certain limits be and hereby are erected into
a body politick, &c."—and the inhabitants of every town are "in-
vested with all the powers, rights and privileges which any town
in the state hold and enjoy; and these are such, as the constitu-
tion and the general laws, common and statute, confer. A member
of a town corporation cannot be said, in the usual sense of the term,

(10) 1 Wo. 474.—1 Blac. 475.
(11) 1 Wo. 473.—1 Blac. 470.

to accept the charter.  He may withdraw from the corporate body, by removing from the limits, when he pleases and without its consent.  He cannot be amoved or disfranchised for any cause.  These may properly be called publick corporations; because they are created exclusively for public purposes—their objects common to all ; and not for the advantage of any particular citizen or citizens; and are all governed by the same general laws(12).  They are essential component parts of the state, and aggregately taken are the state.  Counties, parishes, and school districts are of the same general nature as towns, but more limited in their objects.

But we have civil corporations, which bear a closer resemblance to those existing at common law, than the corporate bodies (if they may be so called) which have been just mentioned.  I allude to our corporations for carrying on the business of banking—insurance—for making canals—turnpike roads—erecting bridges, &c.  These are created for special purposes, which are supposed to be beneficial to the state, and advantageous to the individual members, but which no way relate to the general rights or duties of citizens ; or to the civil government of the state.  In the case of a bank, for example, the members agree to raise from their private property a joint stock—they procure an act of incorporation, to enable them to manage this property more beneficially than could otherwise be done.  When incorporated, the owners of this stock acquire new and distinct powers and privileges, in relation to this object :—these privileges are special, peculiar to the members, different from those enjoyed by the other citizens.—As the stock after the association and before the incorporation was private property, so it remains private property after the incorporation ; and the franchise or privilege of managing it as a corporate body, is peculiar to the stockholders, and of course is private property.  This is therefore in every sense a private civil corporation.  The corporation can claim and exercise this corporate franchise against the state, and that, on the score of compact, as long as it performs the conditions on which it was granted :—and it is the province of the courts of justice to judge between the corporation and the state, whether these conditions have been performed or broken.  The corporate property and the members of the corporation will of course be subject to the legislative, executive and judicial controul of the state as to every thing not relinquished by the state ; or granted to the corporation by the charter.  The legislature cannot infringe the grant they have made ; they cannot re-create or organize anew the corporation, at their pleasure.

It may sometimes be a matter of difficulty to determine, how far the power of legislation may be extended in such cases.  But it may be safely affirmed in general terms, that it cannot touch private corporate property or corporate rights, any more than it could the private property, or private rights of a natural person ;

(12) 2 D. & E. 352.—4 D. & E. 244.

the corporation is a subject of the state, but it is an individual, and its property is the property of an individual, though an artificial one.

Eleemosynary corporations are such as are constituted for the perpetual distribution of the free alms, or bounty of the founder of them, to such persons as he has directed(13). Of this kind are hospitals for the poor, sick, and impotent; and colleges or free schools for the promotion of piety and learning and imparting assistance to learned men, by means of funds, provided and devoted to these objects, by beneficent individuals or publick bodies. The very essence—sine qua non—of eleemosynary corporations is *property* dedicated to *charitable uses.*

A corporation without any funds can hardly be called 'an eleemosynary corporation; because there are no alms—free bounty—to be distributed.

When a number of individuals create a fund out of their private property to carry on any business for their advantage; and procure an act of incorporation, the better to effectuate the object in view, this is not an eleemosynary, but a civil corporation. But if the same individuals should devote this fund to a charitable use, to heal the sick, educate the ignorant, or to improve the moral condition of their fellow men, and obtain an act, or charter, erecting them into an hospital, or free school; this would be a charitable institution, and the owners would, by the incorporation, acquire a new faculty, or power for the management, and application of this property to the use designated by them. Their right, as individuals, to the property thus dedicated would cease, and become vested in the same persons in their new character. The effect of the incorporation would be, to unite several wills into one will; and several persons into one artificial person, capable in law to hold, manage and apply this fund. So far the operation is the same in this, as in the case of a civil corporation. The difference is in the circumstance of the appropriation of this property to charitable uses—this appropriation is made by the individuals and not by the artificial person; so that the latter merely takes and holds, in an artificial capacity, what they before held, as natural persons, and to the same uses. Formerly, as individuals, they held the property dedicated to charitable uses;—now, they, in their corporate character, hold it to the same uses, and the law will enforce the perpetual execution of the uses.

The utility of the corporate character is manifest. It is the means of perpetuating the appropriation, and of consolidating several wills into one. This creature of the law was provided, not for creating property, or devoting it to charity; but of enabling individuals to live forever, and to be always of the same charitable mind. The powers conferred by the charter, or tacitly annexed by law, are just such as are wanted. They are to it, what the consti-

13  1 Blac. 471.

tution of the state is, to those who administer the government;—
or as Blackstone expresses it, they are to the artificial being, what
the laws of nature are to natural persons(14).   This artificial
person makes by-laws and statutes for its government, and the
management of its affairs, which is the exercise of its political
reason; and such by-laws are to this little republick, what the
general laws of the state are to the great body of the people.
When this artificial person is created it is at once clothed with
rights, and liable to the performance of duties.   As it is the crea-
ture of the law it is of course subject to the law, and has rights
which it can claim, and has duties to perform, all which may
be enforced at law.   It can claim the same protection for its
rights which natural persons can, and in the same manner may be
compelled to perform its duties.   The principal of these duties is
that of answering the end of its creation;—of forever holding,
managing, and faithfully applying its property to the charitable
uses declared by the donors(15).

In the case of civil corporations they are visitable by the judicial
courts; that is, subject to the general and common laws of the
land.   There is no private person who can justly claim the right
to correct their misbehavior, and decide their controversies(16).
This arises from the nature of this kind of corporations.   But the
case is different, as it regards corporations of the eleemosynary
kind.   The real founder of these is he or they who provide the
revenues to be dispensed in charity(17).

In early times the objects of the charity were generally incor-
porated.   An individual gave property enough to maintain a
certain number of instructers and students, and to procure the
buildings, books and accommodations necessary for the purpose of
education.   Without an incorporation it is obvious, that the insti-
tution could hardly be expected to outlive the generous individual
who bestowed the property.   There must be laws and regulations
too, adapted to this little community.   The corporation may be
capable in law of holding the funds; but there must be persons to
manage and distribute them, and to interpret and execute the laws
of the institution.   As long as the donor or founder lives, he is
himself the most proper person for these purposes: and accord-
ingly, though the legal property was by his consent transferred to
the corporate body; yet the law vested these powers in him; or
rather he is supposed not to have parted with these powers by the
donation to a charitable use.   They remain in him.   He has of
" common right" the very reasonable power to see that the prop-
erty is rightly employed(18) and he may transfer this right to
another.   Accordingly, if he name another person, for these pur-

(14) 1 Blac. 468.
(15) 1 Blac. 479.
(16) 1 Blac. 481.—1 Ld. Ray. 8.
(17) 2 D. & E. 352.
(18) 1 Blac. 482.

poses, the law adopts his nomination :—if he omit to name one, the law considers these powers as vested in the heirs of the founder, as those, to whom the legal property might otherwise have descended. The master, fellows and scholars have the legal ·property and are to enjoy the bounty; but the donor, his nominee, or heir, have the government and controul of the institution. Without the exertion, and constant activity of such a power,—the power of visitation— the charity, we may be sure, would soon come to an end. The master, fellows, and scholars are unfit depositaries of this power. What security would there be that their duties would be performed? An interested majority might oppress the minority.— The revenues might be misapplied or unjustly divided and distributed,(19) the instructers might exact too much obedience, while the scholars might be disposed to yield too little. Statutes, rules, and regulations, will often be wanted : who shall make and enforce them?

These considerations, and such as these, satisfactorily account for the office of visitor, and show, that the right of visitation was created of *necessity* by the common law(20). It requires but little knowledge of the human heart to perceive, how admirably this provision is calculated to enlarge the number of charities, and to secure their faithful, and judicious application. Nothing can be more flattering to the pride of those, who are rich enough to give, than this dominion retained over the thing bestowed. Every good mind must be gratified with this posthumous power as it were, of dispensing alms to the deserving, and protecting it, in all time to come, from abuses.

We have seen the origin of visitatorial power and the necessity for a visitor. His powers and duties are well stated in the celebrated case of Philips and Bury(21). The visitatorial power is a necessary one, springing from the endowment—the property, which the founder had in the lands assigned to support the charity. "The charity is a creature of the founders, and he may order and dispose of his own as he pleases."—"Every man is the master of his own charity, to appoint and qualify it as he pleaseth." He makes the constitution for his college, and "the members must submit to such laws, as he is pleased to give them."—"They must be contented to enjoy the charity, in the same manner, they received it from the founder. They who take the bounty, must submit to his constitution and laws," which are his terms and conditions. The founder is patron and visitor of course : after-visitors by his appointment, or by appointment of the law, can do every thing which the founder could do, except that of altering the constitution. It is their duty in every instance, to effectuate the intention of the founder, so far as they can collect it from the statutes,

(19) 2 D. & E. 352.
(20) 1 Blac. 483.—1 Ld. Ray. 8.—2 D. & E. 353.
(21) 1 Ld. Ray. 5.—4 Mod. 106.—2 D. & E. 346.

and from the nature of the institution. They may make statutes, and rules for the government of the college,—not repugnant to those of the founder or the law of the land. The king cannot make statutes, on a private foundation, without the donors consent. The visitor has authority at all times to hear the complaints, and redress the grievances of the members of the college, according to its constitution and statutes. He is bound to enquire into the state of the college and all its affairs, and to inspect and regulate the conduct of those, who partake of the charity, or who have any agency in managing its concerns. His powers, though great, are deemed " most useful and convenient for colleges and learned societies "(22)—they are inherent in the private donor or founder. —" Of common right " they belong to him, his heirs or appointee (23). We shall have occasion to mention hereafter the controul exercised by courts over the government of a college and its revenues.

Where the king founds a college, this right of visitation very properly belongs to him(24). Our legislature are not satisfied with this, but claim the right to visit institutions founded by others. But, by merely granting the charter to a corporation founded by private persons, the king acquires no right as founder; nor are any of the founder's rights impaired. The " fundatio incipiens," or the incorporation gives no controul over the institution after it is erected. It is the endowment which confers the right of visitation(25). " Patronage and visitation are necessary consequences one upon another "(26). " It is the donor which *creates* the charitable foundation "(27).

But all eleemosynary corporations are not constituted, in England, precisely in the manner which has been stated. Instead of incorporating the objects of the charity—the persons who are to receive the benefit of it—trustees are sometimes incorporated, who are to dispose of it according to the will of the founder; that is, for the uses he has declared(28).

At the first settlement of this country, few individuals were rich enough to found a college or any other charitable institution, alone:—And the law of visitation by the heir of the founder did not suit our law of descent. Accordingly, in our corporations of the eleemosynary kind, trustees are incorporated, and to them is committed both the funds and the visitatorial power. These trustees, by whatever name they are called, are generally the principal, and most respectable donors. It never occurred to our wise

(22) 4 D. & E. 293.—2 Vez. Jr. 619.
(23) 2 D. & E. 329. 346. 358.—1 Vez. Senr. 462. 475.—2 G. Bac. 29. 310.—Co. Litt. 96. § 136.—2 Vez. Jr. 42. 620-5.—1 Cranch 165. 6.—1 Blac. 484. n. 14.—2 P. W'ms. 325.—4 D. & E. 233.
(24) 1 Blac. 482.
(25) 1 Blac. 481.
(26) 2 D. & E. 352.
(27) 1 Vez. Senr. 472. by Lord Hardwicke.
(28) 1 Vez. Senr. 472.—2 D. & E. 352. 3.—10 Co. 23.

men of *former days*, that the best way of promoting any charitable design, was to give the funds to the publick;—or to deny to these corporations the power of perpetuating themselves. It is believed that the colleges, academies, free schools, hospitals, asylums, the theological institution at Andover, and charitable institutions gen-erally in New-England, and in the other states of the union have been endowed and incorporated in the way just mentioned. When the government, or official men of high standing, are pleased to enrol themselves among the benefactors, some high and permanent officer or officers of the government are constituted members ex-officio.

From the nature of a charity constituted in this way it is mani-fest, that a visitor, as distinct from the trustees or governors, is not wanted:—"A visitor does not *in such case* arise by implication, but the trustees have that power" (29).—It would savor of absurd-ity to give one man, under the name of visitor or overseer, the con-troul over ten men, as capable of executing the trust, and as disin-terested as himself. And if he has no such power, his office would be somewhat like that of the old overseers of a will, whose only power was to hold the candle while the executors counted the money. In the charter of Andover Academy, and it is believed some others of our institutions, the trustees are called "visitors," and "sole visitors." But whether so called or not, it is very apparent, that the whole power of visitation is vested in them: they are visitors, governours, and overseers of the charity, as well as the legal owners of the funds:—appointed by the founders and donors as their perpetual representatives, to protect the interests of the charity. The law confers on them full power for so doing:— And the same law, as we shall see, furnishes the most effectual means of correcting any abuses of the trust. This mode of consti-tuting an eleemosynary corporation does not vary its nature. In the other mode, the objects of the founders bounty hold the prop-erty; and the visitor has the perpetual power of governing it. Both the corporate property, and the power of governing the insti-tution are private; because the property designated to the charity was private. In this, the trustees have united in them, the prop-erty and the power of visitation, subject as to the former, in a par-ticular manner, to the controul of the judicial courts:—and the visitatorial power is transferred to the trustees by the founders or donors themselves, as effectually, as if done by deed. These do-nors also, in the charter which they procure, make such constitution for the charity, as, in the plenitude of their power, they think meet:—"the king makes the corporation, but the founder has power to dispose and order it as he thinks fit:" (30)—and the will of the donor is a fundamental law to the trustees. If they deviate from it, they violate their trust; and the procedure may

(29) 1 Vez. Senr. 472.—10 Co. 23.
(30) C. J. Holt, 12 Mod. 232.

be corrected, and where wilful, the trustees punished. So, any after-donor may give on such terms and conditions as he chooses : and by these, the trustees are bound, if they accept the donation.

In all this good, I had almost said divine, work of charity, it may be thought that I have taken too little notice of the king as acting for the nation. I do consider the real efficient parties to be, first of all, the founder or donors ; then, in a case like this, the objects of their bounty—the persons to be educated as they come in succession on the stage. I consider the incorporation of trustees, as giving to them the legal and equitable property in the funds destined to the charity ; and the charter as affording the most perfect evidence of the mind and will of the donor, that they should during life, that is forever, possess and exercise all his rights and powers as founder and visitor. At the same time I admit there must be another party, in the transaction ; and that there can be no incorporation without the consent of the king or supreme power of the state. He may, if he pleases, leave individuals to administer their own charitable funds in their own way, with no other means of continuing the property, than by endless conveyances from one to another ; and no other power of government over the institution, than what reason and a sense of moral obligation may supply.—If it were an object to discourage education, a disposition sometimes imputed to kings, he would undoubtedly take this course. I admit also that he has the power, and that it is his duty when applied to for a charter, to judge of the utility of the particular design in hand, and to make the best bargain he can with the charitable donors respecting the establishment.—Undoubtedly the terms of the charter are matter of compact between these parties :—the *general views* of both must be the same, but each may judge for itself, as to the details.

In ancient times, these charters were very laconic, as much so, as the acts incorporating some of our towns.* The law conferred the necessary powers and capacities. But in later times, the charter, or act of incorporation usually contains the fundamental laws, that is, the constitution of the body, and such special provisions as are thought necessary by the donor, and approved by the king, to effectuate the ends proposed. The law which has a remedy for every real grievance, provides that in case the king should be betrayed into an improper grant,—one hurtful instead of beneficial to the publick or nation, the charter may, when so adjudged in due course of law, be repealed.

I have been thus particular, in stating my ideas of the nature of publick and private civil corporations, and the nature of charitable institutions in general, and of the rights and powers of the founder and of visitors in particular, from a belief, that it is all important to a correct decision of this cause :—without this we shall never

* "That Tremontaine be called Boston: "—And, that "Winnicunnet be called Hampton," &c.

come to a correct result. I could refer the court to many cases and passages in the books which treat of corporations but have thought it unnecessary, believing the current of authorities to be strong, in favour of the view I have endeavoured to present of the subject.

Let us now examine the constitution of Dartmouth College.

Its original funds arose altogether from the donations of individuals: principally obtained through the agency of Dr. Eleazer Wheelock. In no sense, and in no way can it be said, that they originated with the king or the publick. Not a cent of money, or an acre of land was given by the province or any publick body, till long after the college went into operation. Who, that has the smallest acquaintance with the law of eleemosynary corporations, can read the charter and not perceive, that this corporation was considered by its framers, as eleemosynary?

It speaks of the funds as private from beginning to end;—Dr. Eleazer Wheelock as the agent in procuring them;—treats him as the founder;—as requesting the charter;—suggesting its various provisions and nominating the trustees:—who can read it and then say, that this was not just what he would have it to be. It is just what the law says it ought to be; the *creature* of the founder or donors.

I have already said, and I repeat it, that in my poor judgment, it is an excellent one, and does great honour to the head and heart of its author.

The college was erected, and the trustees made a body politick with certain powers and privileges, particularly that of perpetuating themselves, to effectuate the charitable design of its donors. The incorporation, and, *in this form*, was a mean to that end.

Throughout the whole charter the corporation is treated as a private one, and as a party grantee, standing in the place and stead of the donors. In what part of this instrument do we find any evidence of a transfer of the property to the king or the publick? It seems not a little absurd to talk of the grant of the privilege and power of managing the property, and governing the institution granted by the king to certain persons, having the power to perpetuate themselves, as powers and privileges granted, in any sense, to the king or the public. Suppose it had been intimated at the time of granting the charter that its effect and operation would be, to pass the property, and place it beyond the controul of the corporation:—that the king or his successors, even the republick, if its existence had been then foreseen, might, whenever they chose, become the governours of the institution, instead of Dr. Eleazer Wheelock, and the rest of the trustees? there might indeed have been a college created—on paper; but it would have been like your university with its eighteen professorships, without professors—with its many colleges, its institutes and fellows, without funds, and without that confidence which, is able to procure them;—

which has no patron (for the legislature bestow nothing but the *improved charter*) except its late President, who will trust no legislature but the present. The king might have incorporated a college;—But he must have been the *patron* himself. Dr. E. Wheelock never would have parted with his funds *on any such terms.*

This charter gives the donors all the security, which a charter can give, that they shall have the administration of these funds *forever.* They are vested in trustees "to be expended in the education and instruction of youth of the Indian tribes, in this land, and also of English youth, and any others." All the powers, franchises, and immunities usually bestowed on colleges are granted, and in terms irrevocably granted, to the trustees, named in the instrument.

The law then of eleemosynary corporations, so constituted in England, or in this country, the common law is the law of this corporation. Whatever any charitable institution can claim to hold, as to their property, offices, and corporate franchises against the king, the state, and all the world, this corporation can claim and hold. We are now in a court of law: and I need not say, that I speak of our legal rights. What arbitrary power can do, or attempt to do, is not the question : but can the legislature, by a legislative act change the constitution of this seminary, and new model it at their pleasure ? I contend they have no such power : because this is private property, both as it respects the funds, and the corporate franchises. Our opponents contend that this is, what they are pleased to call a *publick corporation,* created exclusively for the publick interest; and to make sure work of it, that even if the corporation be a *private one,* the legislature had the right of making the alterations they have made. I do not understand the defendant's counsel as denying that there are in this country eleemosynary corporations. Nothing can be clearer than that Dartmouth College was of that description.

There are two respects, indeed in which charitable corporations may, in a certain sense, be considered as publick or private. 1. The property may arise, and the endowment be made, by the king, in which case it is an institution of "royal foundation." If the state found a college and endow it out of state property, this would, in respect of the foundation, be "a publick institution." And we freely admit, that where the state are the patrons of a college, they may justly claim the superintendence and government of it. Where the endowment is by an individual or individuals, in the same sense the institution is a private one. It will not be pretended that Dartmouth College, in this sense, is a publick institution. Though the state have given lands they were not the real founders. They were not the *first* benefactors, who, and who only, are considered as founders. These grants imply that the college was founded ; and they are made on such terms

and conditions as the state thought fit.     2. One charity may be distinguished from another on account of its *extensiveness.* When the objects of the charity are, or may be, many, it is in this sense publick;—when one only, or a small number, private.     In this sense I agree this was a publick charity. Many were intended to be benefited, and many have been educated in this respectable seminary.     Perhaps no college has done more good, with so small means.

The number of the objects of the charity may affect the remedy to enforce the execution of a trust; but we deny that it all affects the right of patronage;—the rights and powers of the founder or donors ; or the visitatorial power.  Property given in trust for an individual, or a small number of persons, is usually given to private trustees, who never become incorporated.     They hold and manage it as private persons: and chancery compels the execution of the trust.     When property is given to uses, it passes to cestui que use.     There may be cases in this country, where the same thing would take place, in the `case of property given in trust. There are also cases, where chancery compels a conveyance of the legal estate to cestui que trust.     But where the objects of the charity are not designated by the donor, devisor, or testator, but are to be selected by the trustees, at their discretion, chancery does not take the legal or equitable property from the trustee ; but, leaving them in the exercise of the power and discretion bestowed, and confided in them, by the donor, &c. superintends the execution of the trust—corrects all abuses, and sees that the beneficial uses are not disappointed.

But it is proper that we should confine our attention at present to the cases of charities incorporated.     In the sense of " extensiveness " most eleemosynary corporations, and all colleges, whether the endowment were by the publick, or by private persons, are publick.     The objects are many, and to be selected by the corporation, its governours or visitors.     It is to be managed in an institution or society;—small, when compared with the whole state, but large when compared with the objects of limited and special trusts, created in deeds, wills, &c. and where executors, or particular persons, are to execute them. It is manifest that such institutions, as colleges, must be managed by some disinterested and discreet person or persons.     Hence originated corporations— the powers of founders, donors—the office and duty of visitor, &c. Now where are the cases, authorities or even dicta to be found, showing, that the " extensiveness " of the charity affects the right of donors, founders, or trustees supplying their places ?—that if the charity is extensive, the right of patronage is lost; the king is patron, and may govern the institution, and visit it as a private founder does, and new-model its constitution at his pleasure? Where do we find a division of eleemosynary corporations into publick and private, *and a different law for each ?*  It seems incum-

bent on our opponents to produce such authorities. The thing does not seem reasonable in itself. The munificent friend of learning who bestows property enough to educate one hundred ingenious young men, destitute of the means of education, seems to have as much right, to say the least of it, to govern them, and superintend their education, as he who provides for the education of ten only. No such line is drawn in any case.

The opinion of lord Hardwicke, in the attorney general against Pierce(31), is supposed to militate with this doctrine. The question was, on the construction of a will, in which the testatrix bequeathed a certain sum to each of the publick charities, mentioned in the will of Mrs. S. of which she was executrix. Several charities of a public nature were given in Mrs. S.'s will. What did the testatrix in the last will mean by publick charities, was the question. Lord Hardwicke was of opinion the word " publick was used by way of description. The extensiveness of the charity makes it publick." " A devise to the poor of a parish is a publick charity. Where the trustees have a discretion to choose out the objects, though each particular object may be said to be private, yet, in the extensiveness of the benefit accruing from them, they may very properly be called publick charities. A sum to be disposed of by a particular person, and his executors, among poor house-keepers, is a public charity." In the *same sense,* I admit that Dartmouth College was a publick charity;—not, as lord Hardwicke observes, that the charter of the crown has made it so ; for that only makes it more permanent, than it otherwise would be. Certainly, Dartmouth College is uncommonly extensive in its objects; for it embraces in the arms of its charity,—" the Indians in this land, English youth, and others;"—and extensive in its uses—the spread of the gospel, as well as the education of youth.

But what will our opponents do with lord Hardwicke's case, of a devise to the poor of a parish, or a sum to be disposed of among poor house-keepers?—These are publick charities. Does the administration of these belong to the king or the state?—and can the legislature interfere in the superintendence and management of the funds, or in the selection of the objects ? The same remark would apply to lands given to a town for the use of the ministry or schools. Can the legislature change the trustees without the consent of the town, that is, of those, in whom the donor or testator has placed both the funds and his confidence? Have the legislature the same supervision of these funds, as they have of publick money, publick officers, and the public property of the state ?

Philips and Bury was the case of a college. It was founded by a private person (William Stapleton). The rector and fellows were made a body-politick;—and by the founder's statutes, the bishop of Exeter and his successors were constituted visitors. The

(31) 2 Atk. 87.

visitor deprived the rector. The latter brought an ejectment for the rectory-house;—still claiming to be rector. It did not occur to the three learned judges of the king's bench, who held that the king's courts had, in that case, jurisdiction, that this being a *publick corporation*, the bishop of Exeter had no jurisdiction:—that the property was *publick property*, because dedicated to a *very extensive* charitable use;—an use every way *publick*; and so the college visitable by the king in his courts, and no where else. This would have made very short work of the dispute, between the visitor and Dr. Bury, the deprived rector.

C. J. Holt and the House of Lords were just as ignorant of this doctrine—of eleemosynary corporations devoted *to publick uses*, being *publick corporations*, and so subject to no visitation, but merely to the common law of the land, and in the court of king's bench,—where, and where only, according to this doctrine, all misbehaviour of colleges must be enquired into, and redressed, and all their controversies decided. On the contrary, they held " that the visitor's authority was by the common law"—" the founder having reposed in him so entire a confidence that he will administer justice impartially"—and in the government of the institution faithfully execute his intentions—" that his determinations are final," and, under the circumstances of that case, " examinable in no other court whatsoever" (32).

C. J. Holt, in the same case(33) says, that corporations constituted for private charity (and he applies this to Exeter College) *are entirely private* and *wholly* subject to the rules, laws, &c. of the founders" or donors " and to no others."

In another report of the same case(34), the language is, " But private and particular corporations for charity, (applying this to the same college) founded and endowed by private persons, are subject to the government of those who *erect* them;"—meaning here, the person who provides the revenues, not the king, who gives the charter. All the cases speak of colleges founded by individuals, as subject to private visitation;—treat the property as private property;—and the king, as having no superintendence, or controul, except that, which flows from the exercise of judicial power; which we shall have occasion to consider hereafter.

It has been stated here, and elsewhere, that acts of incorporation, of a similar nature to the present, have been frequently amended, and changed by the legislature;—for example, the boundaries of towns altered,—towns divided, &c.

If I am correct in what I have stated of the nature of our towns and other civil corporations for government,—such as regard the publick policy of the country,—the administration of justice,

(32) 1 Blac. 480. 3.—1 L. Ray. 5.—2 D. & E. 346.—2 Kyd on Corp. 179.—See also 2 D. & E. 290-345.
(33) 1 L. Ray. 8.
(34) 2 D. & E. 352.

&c.(35) the argument from precedent is quite inapplicable. There is no analogy between those and eleemosynary corporations.  As it respects counties, towns, parishes, and smaller divisions, why should not the legislature regulate their limits, and alter them as occasion may require; just as they arrange the militia into divisions, brigades, regiments? &c.   The one arrangement is made, for the more convenient performance of some of the duties, which citizens owe the state; and the other division, for the more convenient performance of other similar duties.   "These sorts of corporations," says C. J. Holt(36), "are subject to no founder, or visitor, or particular statutes, but to the general and common laws of the realm, and by them they have their maintenance and support." So Mr. Justice Story in *Terret* vs. *Taylor*(37) "the legislature may, under proper limitations, have a right to change, modify, enlarge or restrain them" (speaking of corporations which exist only for publick purposes such as counties, towns, &c.) "securing, however, the property, for the uses of those, for whom, and at whose expense, it was originally purchased."   Do the defendants counsel contend, that if a town should acquire by gift, or otherwise, a fund for the support of a school, for the inhabitants of such town, that the legislature could constitutionally annex another town, giving to all the inhabitants of the new corporation, equal right to participate in this fund?

But it has been much insisted on, that this corporation is *a publick one*, and its funds, franchises and immunities have become *publick*, and so subject to legislative controul,—because the publick, and not any particular individuals—whether trustees or others,—have *exclusively the whole beneficial interest;* and the legislature are the guardians of that interest;—The trustees are mere publick agents, and removable at pleasure, &c.

This claim of right seems to be founded, on the greatness of the gift.   An individual bestows a sum, the income to be dispensed in charity, among some few individuals.   This is a limited charity and the publick have no claim.   But he enlarges the fund as his love for his fellow-men enlarges,—provides for a proportionate increase of the objects to participate in his bounty,—and to make the charity perpetual procures an artificial being to be created, with the right and power of dispensing it forever, according to his mind and will.—This operates as a transfer of the property to the state; and is a virtual repeal of the powers and privileges granted by law to him as patron and founder.

The state it is thought have a right to say to this generous individual, "you intended this for us and and not for yourself:—why do you complain that we choose to manage it in our own way? We know better what we want, and what will benefit us than you

(35) 4 D. & E. 244.
(36) 1 L. Ray 8.
(37) 9 Cranch 52.

do. Depend upon it we will manage it well." To all this, may not the donor reply, "I had rather do you the favour in my own way. I supposed I had your solemn engagement, that I might do so. If you take back your grant, I will take back mine." This would seem reasonable. C. J. Holt in *Philips* vs. *Bury* seems to be of that opinion. "The *will* of the donor is *his reason* for ordering and disposing *of his own*, &c. But Holt lived more than a century ago. But where do we find it written in the law, that those who are to enjoy the beneficial use of college funds, can claim,—or that any person in their behalf, or as their trustees or guardians can claim to hold and manage the funds, and superintend the institution, which *the donors* have placed *in other hands?* This doctrine, I suppose must be looked for among the leges non scriptæ. It seems little better founded, than the much older one, that dominion is founded in grace. It harmonizes about as well with the law, as the doctrines of a sect of modern philanthropists, the basis of whose system is, "that the land holders are not proprietors in chief,—but mere stewards:—the land is the people's farm."

This beneficial interest in the state, which is every thing, (if any thing like what is claimed,)—how is it to be enforced? when violated, what is the remedy?—Would an action lie in the name of the state, against the corporation, to recover the college lands? And as to the government of the institution, could the state confer a degree in the arts? (I admit their competence to judge of the qualifications of the candidates)—could they appoint, or remove, an officer of the college? We admit the right of the judiciary to enforce the trusts, as far as courts have ever gone, or ought to go. But this concession avails the defendant nothing. Has the state no way of enforcing its rights but by its legislative acts? This proves that it has no such claim in law or justice. Every legal or equitable right has its remedy.

When the state asserts its claims *to disputed rights* by legislative acts, it is an admission that its claims will not bear examination.

Is it pretended that the state has the same estate and interest in the college lands and funds, as in the medical house?(38) There, the state secured a title to themselves in the land, before they erected the building, and then became proprietors of the land, building and all: and so made a good speculation out of the college. As to these, no one has ever called in question their title.

But the truth is, the right now claimed for the state, is a late discovery. Did the state of Vermont understand that this state made any such claim, when they (Vermont) made the liberal grant of lands, mentioned in the statement? Were those lands granted for the exclusive benefit of New-Hampshire? What act of this state, before 1816, asserts, or hints at, any such claim?

(38) See act 22d June 1809.

So far from it, that all the proceedings of the state imply the contrary?

In the act of 1789 granting lands to the college, the preamble states, "that the institution had been and would be useful to mankind in general, and this state in particular," the grant is, "to the Trustees of Dartmouth College their successors and assigns forever, for the benefit of said college;"—not for the benefit of New-Hampshire. It is well known, that colleges are intended, (and always are so administered) to be open to all;—no regard is had to state lines. Conditions were annexed to the grant, implying that without such conditions, the disposal of the avails of the grant was entirely with the trustees;—"that in the expenditure, and application of this, and all grants made by the state, the supreme executive magistrate and council should be incorporated with the trustees."—The grant of 1807 contains similar conditions, and declares a particular use, or trust in relation to the avails:—appropriating them "*wholly and exclusively*" to assist the education of the indigent youth of this state. This was hardly generous as it respects Vermont. But the legislature had a right with respect to *their own* to be selfish. The trustees, in relation to the avails of this grant, are to be "responsible and subject to the direction of the legislature, for the faithful discharge of their trust relative thereto." These conditions, the state had a right to annex to their grants, and when the grants were accepted, the conditions were binding on the trustees. But do not they clearly shew the sense of the legislature, as to their controul,—or rather want of controul, over the other funds, and the college government?

This claim, in behalf of the legislature to pass the acts in question is just as destitute of matter of fact to support it, as, on the assumption of the fact, it is, of just reasoning, and of the authority of precedents.

The donations which constituted the college funds, the charter informs us, were made for the purpose of "christianizing the Indians," and they were so applied for some time: afterwards additions were made to that object, and to "promote learning among the English," and "be a means to supply a great number of churches with a learned, and orthodox ministry." It appears then, that Dartmouth College was erected for the "education and instruction of youth of the Indian tribes, in this land," in all parts of learning, necessary for civilizing and christianizing the savages; and also of English youth and any others." What interest then, had the province of New-Hampshire, in this institution, except, that it was located within its limits?

Suppose the trustees, immediately after the founding of the college, had made an ordinance or law, (they had power to make such, as might tend to the good and wholesome government of the college, and to the publick benefit of the same, not excluding *any person* from *free and equal liberty and advantage of education*, on

account of his speculative sentiments in religion) that none but subjects of this state, should receive any benefit from the institution? Would not this law have been a violation of the constitution of the college; a perversion of its funds; a wrong done to the generous contributors? If so, with what propriety, can it be said, that the college was created *exclusively* for the inhabitants of this state? That the state are *cestui que trusts,* and have the *whole beneficial interest?* Was the christianizing and educating the Indians no object in founding this institution? It is believed there were no Indians within the limits of the province.

What is the nature of the interest vested in the state? The benefit of having a college erected within its borders:—This benefit would have been nearly, or quite as great, if the location had been, on the western, instead of the eastern, bank of Connecticut river. Let it be admitted, that the people of this state derive a benefit from the college; what *title* does this confer? Is there not always a benefit accruing to the publick, from the useful employment of the faculties, and property of individuals? Here the benefit is too extensive for the purpose of the defendants argument. If the legislature are guardians of any interest, it is that of the *Indians in this land,* and of the *English youth.* Who constituted *them* guardians of all these?—not the authors of this charity. The legislature appointed themselves guardians. The truth is, the legal and equitable property is in the trustees, to be applied to Indians and others, *in their discretion*—in the manner usual in colleges;—subject to the controul and superintendence of the judicial courts. The *donors* might have established a college for the *exclusive* benefit of this province; but they did not. It is sufficient to say, *their views were altogether different.* And so have been the views of all men in this state till now.

But it is said the annulling of the college charter works no injury to the trustees. It is a sufficient answer to say, that it hinders and prevents them from answering the end of their creation; the end of their political being.—It takes from them the power of administering the property entrusted to them by the donors, *whose representatives they are,* according to their declared instructions. The rights of the trustees and visitors and governors have been stated and need not be here repeated. Sitting in the chair of the founder, they have all the rights he had. These rights are infringed, and they are hindered from performing their duties. They are deprived of that controul over the property, and that power of inspecting and governing the institution which the law has wisely said, remains with the donors. The munificent Dr. Phillips, late of this place (Exeter), gave all his estate which was large, to charitable uses. He liberally endowed the academy here, which bears his name, for the education of youth; having no regard to town, or state lines, in the selection of objects. He procured a charter from the state, constituting himself, and his nominees

trustees, with power of perpetuating themselves, and of selecting the objects of the charity, and of governing the institution.   Can the legislature substitute themselves in the place of these trustees, in relation to these powers and duties?   Is there one man who hears me who believes that Dr. Phillips would have made the donation, had he entertained any suspicion of the fact?

I know it has been objected to us, that our doctrine places this institution beyond all controul;—takes away all security, that the beneficial uses intended by the contributors and donors, will be enjoyed;—is at variance with the just claims of the state, to cherish, and protect the interests of literature.

If these objections were founded in fact, it would go far to shew, that what I have stated, as the doctrine of the common law, cannot be correct,—or if it be the English common law, it is repealed by the revolution, and our free constitution, and of course is no longer binding.here.   But how are the facts.   We are so far from denying the right of the legislature, " to spread the advantages of education, through the various parts of the state;—to cherish the interests of literature and the sciences, and all seminaries and publick schools;—to encourage private and publick institutions, rewards and immunities, for the promotion of the arts and sciences,"—that we hold these to be among its most important duties;—all of which are violated, by the acts in question:—These duties we believe to have been at all times, too much neglected, and by none more, than by the legislature of 1816, who *in words*, acknowledge their obligation and importance.

The legislature may erect an university, consisting of as many colleges as they please; and endow the institution and govern it in their own way: But are not at liberty to cherish the interests of literature, by destroying or altering those erected, for the purpose, and endowed by munificent individuals.   We hold, that the power here claimed for, and exercised by, the legislature, would effectually discourage, and prevent all charities of a permanent nature, founded by individuals.

We are so far from placing this institution above controul, that we claim for it the protection of the law, against what we consider, as a deadly blow aimed at its existence, by the persons exercising the supreme power of the state.   And when, and by whom, has it ever been denied, that the institution, its administrators, property, and rights are all amenable to the law, and proper subjects of judicial enquiry?—that the judicial department of the government which can and ought to protect its rights, and redress its wrongs, is bound to enforce the performance of all its duties. On this subject, we have been explicit from the beginning.

An institution like this, unprotected by the judiciary, could not exist; and uncontrouled by the law, might be a nuisance, instead of a benefit.   The charter may be repealed, for causes known to

the law.   All contracts and disputes between this corporate body and others are within the jurisdiction of courts(39).

As it respects the state, and the interest the publick have in all literary establishments, it is for the judiciary to protect these interests, and make them effectual:—to keep this corporation within the limits, prescribed by the charter, and the law of the land.   If the trustees put a wrong construction on the charter, the constitution, or law of the state, or make statutes repugnant to these; the courts will correct the procedure ; compel it to act up to the design of its founders, and to apply the corporate property forever, to the uses intended by them, and to no other;—to govern the institution according to its fundamental laws—just as the donors themselves would have done—as far as can be collected from *their will* expressed in the charter, and instruments of donation : to restrain all abuses of trust;—to protect every member, officer and student of the seminary in the enjoyment of his rights and privileges (40).

And where the trustees or governours have, as they have in this case, not only the powers of government, but the legal estate, and are entrusted with the receipt of the rents and profits, it is clear, that with respect to these, they are considered as trustees, and are accountable for all breaches of trust.

Lord Commissioner Ashurst says, (41) " There is no doubt as a general position, that this court has a controuling power over all charitable institutions.   As little doubt is there, that this court will grant an injunction, whenever it is properly laid before them either by positive or probable evidence, that the trustees are acting in a manner inconsistent with the trust; and are either doing, or about to do, what will be detrimental to the charity," &c. (42)

Many and various are the occasions, which may call for the interference of the judicial courts (43): and the exercise of these judicial powers, is not deemed inconsistent with the visitatorial power, which we claim for the plaintiffs:—But it is not to be carried so far, as to interfere, with the discretionary powers, confided by the founders to the trustees :—the power of selecting the particular persons, who are to receive the benefit of the charity;—of making statutes, and rules, not inconsistent with the laws of the state and of the institution;—of interpreting and enforcing them within the limitations before stated ;—of prescribing the course of education, &c. &c. (44).   As to all these, neither judicial courts, nor any other body of men can, or ought, to substitute their discretion in the place of the donor's discretion, or that of his visitors or trustees ;—for the law presumes, and I think rightly, in favour

(39) 1 Wo. 479.
(40) 2 Wo. 479.
(41) 2 Vez. Jr. 49.
(42) See 2 P. W'ms. 326.—Duke char. uses 69. 684.—2 Atk. 165.—2 Vez. Jr. 49. S. C.—4 Bro. C. C. 167.
(43) 1 Wo. 479-483.—1 Blac. 480-4.
(44) 2 Ves. Senr. 551.

of the latter.   It says on these subjects they have the most discretion.—Where the donors have placed the *discretionary power*, essentially necessary in conducting and governing all charitable institutions; *there* it ought to remain, as long as it is exercised fairly, soundly, without partiality, and free from corruption (45) till some body of men shall be found, better qualified for its exercise, and more likely to fulfil the donors benevolent intentions. I am very sure this body of men will never be, any legislative assembly, constituted like ours.

On the subject of judicial controul over literary institutions, I need not be more particular, or refer to the cases.   We admit it in the fullest extent to which it has been carried by the current of the authorities.

Respecting the legislative power over eleemosynary corporations, we believe it to be much the same, as that over private persons, and private property.   The charter cannot be repealed by a legislative act.   Nor can the legislature pass any acts altering the charter, or respecting the internal government or management of the affairs of the corporation, or in any way interfering with its special powers, and privileges, without its consent.   But with the assent of the trustees, who represent the founder and donors an imperfect, or inconvenient organization, may be remedied; and such alterations made in the power of visitation, as it may be presumed the donors themselves would have desired.   The act of this state of 1807 granting a tract of land to the college, very improperly restrains the grantees from alienating.   This greatly reduces the value of the grant; and on application of the college, may be remedied.   And generally, in the case of private corporations, as in the case of private persons, special acts may be passed, when the consent of all parties, having an interest is, obtained.

Experience has shewn, that there is no unwillingness in individuals, or private corporations, to apply for such acts.   It is confidently believed, that such applications have been too frequently made.   How unfounded then is the charge, that our doctrine places this institution above all controul?

We will now consider the remaining objection—that it gives no security for the enjoyment of the benefits intended;—no security against a total departure from the charitable purposes of the donors.

On this ground we cheerfully meet our .opponents.   If the objection is well founded, it will certainly have some tendency to shew, that the law is not quite so wise, as we have represented it to be.   The argument *ab inconvenienti* is a powerful argument to shew what the law is.

One, or ten individuals, (the number is immaterial) propose to dedicate property enough to found and endow a college for education.   They fix on their plan.   Obtain the sanction of the supreme

(45) 2 Ves. Senr. 551.

power of the state, in which it is to be located; that is, they obtain a charter.

They themselves become incorporated, as trustees, to dispense the charity, and govern the institution. The case would be the same, if, by their consent, other persons should be incorporated as trustees.—The trustees have power to perpetuate themselves. The dedication to charity is irrevocable. The law takes the institution under its protection, and secures it all its rights, and compels it to perform all its duties.

Can any better mode be devised of continuing, beyond the limits assigned by the author of nature to the donors' lives, *the same charitable mind and views* which was in them? Is not this the general sentiment of mankind?—Are not our charitable corporations perpetuated in this way? The very liberal and highly respectable founders of the theological institution at Andover, provided a set of visitors, *with power to perpetuate themselves* as the best mode of securing forever instruction in theology, in that way, they deemed the most scriptural and correct;—an object with them; and one, which our legislature have deemed every way proper (46).

Dr. Eleazer Wheelock certainly thought so. He represented, that for "many and weighty reasons," it was expedient, that his friends should be of the incorporation proposed for Dartmouth College;—and, that as to the trustees in England, "*it may be expected*, that they will appoint successors in time to come, who will be *of the same spirit with themselves;*—whereby great good may, and will accrue, many ways, to the institution," &c.

This expectation was a reasonable one, and has received the sanction of lord Loughborough's powerful mind (47).

The power of holding the property, applying it, and inspecting and governing the institution, must be lodged somewhere. The parent, anxious for the welfare of his offspring, has devised this, as the best mode of effectuating *his intentions*, in all time to come. If he has not devised the best mode;—if, confiding the power of filling vacancies to the governour and council of the state would be more likely to secure the appointment of men, *of the same spirit with the founder;* still the founder has a right to judge for himself, and it is not with a very good grace, that we, claiming the benefit of the bounty, should undertake to be wiser than our benefactor, or quarrel with the terms of his gift.

It is not my intention to call in question the fitness of the legislature for the exercise of the powers confided to them by the constitution. But it is my doctrine, that they have no power to change the constitution of this seminary without its consent, or to exercise any visitatorial power over it. Why should they have this power? Is it conferred by the clause, which makes it their

(46) See act of 27 June 1816, Sect. 8.
(47) See 2 Vez. Jr. 619, &c. Ex parte Wrangham.

duty to cherish the interest of all seminaries of learning? Would the change of constitution of this literary seminary for example, at the pleasure of the legislature for the time being, have a tendency to secure the *permanence* of the institution?—Make its immediate administrators faithful to the donors—above all things desirous to execute their will?—Would it give security and inspire confidence, in the officers and instructors of the college?—Would the legislature, or its committees, be an useful, or convenient forum, for the inspection, and controul of establishments of this nature and for settling their disputes? (48)   And above all would individuals, if not suffered to conduct the charity according to their own judgment and consciences, and agreeably to the constitution they prescribe, found and endow literary institutions?—And would publick bounty supply that efficiency, which the zeal and beneficence of individuals are capable of giving to a system of education?

If there is any reliance to be placed on the opinions of learned men, fortified by our own experience, no body of men can be imagined every way worse qualified for the exercise of the powers now claimed for the legislature. Some of our most experienced statesmen, while they tell us that this department is much disposed to extend the sphere of its activity, and draw all power into its impetuous vortex, represent it, from its want of capacity for deliberation,—from passion—and from other causes, as exposed to the intrigues of executive magistrates;—its policy as fluctuating (49);—its sudden changes, and interferences in cases affecting personal rights, becoming jobs in the hands of enterprising and influential speculators (50). And why should there not be persons ready to speculate in college property, and college offices, as well as in other property and in other offices? We have been assured too (51) that the legislature of one of our most respectable states, "have deliberately interfered with cases *notoriously* within the jurisdiction of the established courts; and that some of the cases, in which this interference has taken place, were irresistibly ludicrous." *

It is not necessary for my present purpose that I should adopt the sentiments quoted in their fullest extent.—But after having made these quotations it is but justice to our legislature, to declare my belief that in exercising their powers, they have been in general, as correct as their neighbours. The evil lies in the nature of the body, and its total unfitness for this work;—and its liability to be drawn in, by interested individuals to act out of its proper sphere.

(48)  4 D. & E. 243.—2 Voz. Jr. 619. Ex parte Wrangham.
(49)  Mr. Madison, Federalist No. 48.
(50)  Federalist No. 44.
(51)  Coop. Just. 436.

* Reference is made to an act which the compiler of the index to the laws was ashamed to insert.

It has been often said that the legislature have no motive to divert this charity from the uses declared. I agree that it is and always will be the true interest of the state to abstain from all injustice—all measures which shall divert charities, to improper purposes. But let the power to interfere in respect to private charities be conceded and where is our security against abuses? Is it uncandid to say that the time may arrive, when those that may be called to guide our councils, and to compose our legislature, may not be so disinterested, and patriotic, as our present rulers. It is possible that they may be prevailed on, even at the hazard of losing their offices, (if there should be any danger of that) to convert this institution into an instrument of party, and change its trustees and officers to gratify private pique, or to raise an influence favourable to them or their friends. It is certainly within the limits of possibility, (I do not say that it is probable) that this administration of college revenues, and college affairs, by committees of the legislature, might prove in the end as hurtful to the state as to the college,—by corrupting the members, when less virtuous than at present. There is every reason to believe, that the spoils of the monasteries in another country was attended with this pernicious effect.

We have shewn how abuses of trust may be corrected, when the revenues and government are in the hands of the corporation : and, I think, have shewn that in the exercise of the powers now claimed for the legislature, there may be abuses. Let our opponents shew how these can be corrected.—Who shall visit the legislature ? Quis custodiet ipsos custodes? Philip the Second of Spain, husband of Queen Mary, had a mind to be appointed Regent of England, (all for the good of the English nation no doubt) during the minority of the child of which the queen was supposed to be pregnant;—and offered to parliament *security*, to resign the regency, on the child's coming of age. It was nearly carried in the house of peers, when lord Paget stood up and said, "Pray my lords who shall sue the king's bond should he happen not to resign."

If I have succeeded in any degree in my attempts to shew, that Dartmouth College is to be regarded as a private corporation,— its property and franchises private,—subject to the same judicial and legislative controul, as individuals and their property, and to no other;—and that the circumstance of the appropriation of the property to the use of a college, founded and governed like this, no way alters the case ; it will not be a difficult task to shew, that the acts in question violate the constitution of the state.

As it respects the charitable fund, the acts take it from the holders without their consent. The 2d article of the bill of rights gave the plaintiffs "the right of acquiring, possessing and protecting" this fund, and the law gave them the power, and made it their duty to apply it to such uses, as the donors had declared. The 12th article declares that "every member of the community

(and this embraces corporate bodies as well as individuals) "has a right to be protected by it in the enjoyment of his property." What is *the nature of the protection* afforded by these legislative acts? It has been said, indeed, that by the same 12th art. it is implied, that the property of an individual may be taken from him and applied to publick uses, without his consent. By the constitution of the United States (amendment V.) it is declared that "no private property shall be taken for publick use without just compensation." I admit that when the publick safety, or even convenience requires the lands of the plaintiffs for sites for forts, arsenals, for roads, canals, &c. on payment of a fair equivalent, they may be taken, in the same manner as lands of individuals. Do the defendant's counsel mean to be understood as contending, that this clause in the constitution authorizes the state to take private property of individuals against their will for any other purposes?—or that the acts in question can be justified under this article?

As it respects the corporate franchises, I contend that these come under the denomination of *property.* The plaintiffs have an incorporeal property in their membership, franchises, and privileges; These have been wrested from *them,* and have been bestowed upon *others.* If this act of violence had been committed by an individual, the plaintiffs by the 14th article of the bill of rights, would have been entitled " to their certain remedy by having recourse to the laws—to obtain right and justice, conformably to the laws." But here the injury is done by the legislature, under the form of legislative acts, and under colour of law : But this violation of the plaintiffs rights is not the less an injury on that account.

The fifteenth article declares, that "no subject shall be despoiled or deprived of his property, immunities, or privileges but by the judgment of his peers, or *the law of the land :*"—which surely means in this place the same law which governs subjects in general : and not a statute or law which itself inflicts the injury, and does the act forbidden. Such a doctrine seems absurd. To be deprived of property by the "judgment of one's peers, or the law of the land," is the same thing as to be deprived by due process of law.

It is admitted, that the plaintiffs, both as a body politick, and as individual members, like all other corporations, and members, are liable to be deprived of their corporate property, and franchises, for causes known to the law. If these acts of the legislature, are attempted to be justified on the ground of forfeiture incurred by the plaintiffs; —still, they violate the constitution ; because the forfeiture without which there can be no deprivation has not been ascertained in some " due course of law " (52). Our

<hr/>

(52) See objections of the " Council of Revision " of New-York (23d March 1798,) to an act of the assembly repealing the grant to John Fitch of the " sole right and advantage of making and employing the steamboat, &c.

statutes of 6 February 1789, and 19 June 1794, (53) are predicated on the idea, that grants of land, the privilege of erecting bridges, canals, locks, &c. are *compacts* between the state, and the grantees.  It provides that disputes between them concerning the performance of the conditions, shall be determined by the superior court as a court of equity.  These acts declare that " the *liberty* and *safety of the subject* require,· that re-grants of the same property and privileges should not be made upon mere suggestions, without the intervention of proofs, and trial by jury, *according to the constitution and laws*, to ascertain the performance or non-performance of such conditions."—The parties affected are to be summoned, and the trial to be by jury.—This language, as dignified as it is correct, becomes a legislature.—It was worthy of all imitation.  Instead of the state asserting by *act* her title to what might, or might not, be her own, according to the fact of performance, or non-performance of conditions by her citizens, she goes into her own courts, on a level with the meanest of her subjects;—admitting, and correctly admitting, that in privileges, and the right to impartial trial, they are on a level with her (54).

In the case at bar the acts are a legislative sentence of deprivation, accompanied by a writ of seizin, in favour of the university, to put the party into possession of the property;—and a bill of pains and penalties, to put the trustees out of their offices.

If the state suffered an injury by the plaintiffs' claiming to exercise their corporate franchises; or by their violating their trust, the law was open, equally to the state, as to its citizens.· If this corporation is so constituted, and it's *monarchical* tendencies are such, as to disseminate poison among the citizens of our republick,—if this institution be the monster, we have heard of, which devours all charities, and converts even charity herself into stone, the sooner the charter is repealed the better.

I do not admit that *complaints* of this kind, (if any such have been made) are any thing more than evidence that a " controversy " existed between the state, and this learned seminary, concerning " rights " and " property " claimed by the one, and denied by the other : and does not the 20th article of the bill of rights " secure " to the smaller body, in this controversy, " the right to a trial. by jury ? "   Does this article only embrace individuals and private corporations, leaving the state the more powerful party, the right of trying their own causes, of obtaining redress for all the injuries done them, not " in due course of law," but by their own act, finding at once both the fact and the law.  I hope the time will never come when such doctrines will be popular.  If they ever receive any countenance, in our government, from any of its great departments, it will behove us in future, to speak more respectfully of other governments, even of that of Turkey, than

(53) N. H. Laws, Ed. 1815, p. 67—73.
(54) 7 Johns. 505.

we have been hitherto accustomed to do. The plaintiffs have been *deprived* of what they claim as *their rights*,—have they had any trial?

Our constitution declares (55) that "it is essential to the preservation of the rights of every individual, his property, and character, that there be an impartial interpretation of the laws and impartial administration of justice:—and that "it is the right of every citizen to be tried," and to have his causes and controversies tried, "by judges as impartial as the lot of humanity will admit." While I entertain the highest respect for the legislature, *as a legislature*, I have no hesitation in saying, that *as judges* they are as bad as the lot of humanity can possibly admit;—that private property, and character would be altogether unsafe in such hands.

If there is any thing established by our constitution, it is that the legislative department of our government should abstain from the exercise of judicial power, *as every way totally incompetent to the task.* It is not merely the 37th article of the bill of rights which prohibits it,—the whole constitution forbids it. Remove the restraint on the legislature to exercise judicial power, and your constitution is not worth what the parchment on which it is enrolled cost (56). Legislative bodies are much inclined to exercise judicial power; but in a very summary way, they do not try, they pass sentence. They are always prompt and ready for that. In this case they refused the plaintiffs any opportunity of being heard to vindicate their charter, against unfounded charges publickly made against it, *and from the highest authority in the state.*

The acts in question violate the 23d article of our bill of rights; because they take away vested rights,—acquired under existing laws;—take from one set of men, and give to another. This article says, "no retrospective laws shall be made, for the decision of civil causes." These acts were made for the decision of this cause. They decide the plaintiffs' rights, and if valid, they are conclusive against one party and in favour of the other. Lay them aside, and where is the defence?

But acts of the legislature have been mentioned, as equally affecting private property, and private corporations, with those in question;—such as acts restraining banks from issuing notes payable at any other place than the bank from which they issued, &c. &c. I do not feel myself called upon, to vindicate the constitutionality of any act of the legislature, on this occasion.—If unconstitutional acts have been passed, and have been submitted to, it may be some apology, but no defence of the acts in question. But, for my own part, I am not disposed to condemn general acts of legislation, laying down a rule for all banks, as well as for all individuals, as to the form of notes or bills. Individuals are restrained

(55) Art. 35
(56) See 1 Wheat. 329.—3 Dall. 388.—2 Cranch. 276. 7.—11 Mass. Rep. 402.
—Coll. of Protests made in the House of Lords (1661) p. 7. 8.

from banking, without an act of incorporation, and from issuing and circulating notes, in imitation of bank notes, bearing the impression of plates, &c. (57). And why may not the legislature, by general laws, applicable to all banks, prescribe the form of bank bills, or establish a rule of damages? I do not know that our legislature have, in any instance, deprived banks in this state of rights conferred on them.—If they have, all such acts passed without the consent of the bank, whether submitted to, or not, are unconstitutional and void. The acts referred to, it is believed, were *prospective* only (58).

I cannot give my assent to the doctrine, which seems to be contended for by the defendant's counsel;—that the legislature have a right to alter the charter of a private corporation, *whenever the publick good—the welfare of the community, in their opinion requires it:*—to deprive *it* of its rights, for the good of *the many.* The principle is broad enough for this case. But I deny the principle.

It was the ground taken in the British parliament, in favour of *the bill of pains and penalties,* respecting the south-sea company, about a century ago. The act took from the company their property,—imprisoned some of the directors, and compelled them to pay certain sums, out of their private funds.—Could our legislature so deal with our banks which refuse payment, and thereby defraud the publick.

If the principle now contended for be a sound one, it is not easy to see the use of a written constitution, defining and professing to establish private rights;—and then leaving them at the mercy of the legislature.—Will they be at a loss to find good reason for passing any bill?—the corporation has abused its privileges;—its constitution, emanated from royalty;—it is necessary to *enlarge* and *improve* its charter, and render the government of the college more dependent on those, who are honoured with the confidence of the people, and of course, well qualified to preside over their literary as well as civil concerns. The charter of Massachusetts was taken away because it was not a good one;—and its powers had been abused.—These acts (it may be said) were not intended " to *destroy,* but to *reform.*"—So said Sir Robert Sawyer on the *quo warranto* against the city of London,—" to prune off those exorbitances of power which the city magistrates had assumed." It has been asked, shall the good of the *many* be sacrificed to the *few?* Has not the state as deep an interest in the prosperity of the college as the trustees? In the case of the city of London, it was asked, is a corporation once constituted, forever out of the reach of the common law?—so here,—is this *royal charter* beyond the controul of the sovereign power of the state, vested in the legislature,—bound to promote the publick good?

(57) N. H. Laws, Ed. 1815, p. 82.
(58) See 8 Mass. Rep. 445.

We admit that our government " was instituted for the general good,—the common benefit,"—the prosperity and happiness of the people.   But was it not also instituted for the protection and security of every individual, whether natural or politick, his person and his property?   Without the protection and security of these, how is the publick good to be promoted?

The framers of our constitution. and the people who ratified it, seem to have entertained the opinion, that the people in their capacity of sovereign should declare some rights, fix some principles, and place them beyond the controul of any and every department of the government.—Now the doctrine contended for, removes all barriers out of the way of the legislature.   If they have-the right to pass all laws publick and private, general and special, which the publick good requires, what power has the judiciary to declare *any law* unconstitutional?   Would not this be making the legislature subordinate to the judiciary?   A doctrine which I totally deny.   In the same sense, that the publick good requires, the new modelling of Dartmouth College, it may require all or any part of the private property of any bank or individual.   No arguments have been addressed to the court shewing, wherein the publick good required these acts.—They stand on the *sic volo, sic jubeo, stet pro ratione voluntas.*

No one can justly charge me with want of respect for British precedents.   I consider the respect shewn by parliament, in modern times, to private rights, and the extreme caution with which they are guarded by that assembly, as entitled to the highest praise, and every way worthy of our imitation.—There has been, and still is, much ground of complaint with us on this head.   But still parliament may pass many acts, which our legislature are prohibited from passing.   It can pass *ex post facto laws*, in the worst sense of the term.—Bills of attainder—as often perhaps, condemning the innocent as the guilty, and always attended with confiscation of property, are not forbidden.   Is it to be presumed that the parliaments passing such iniquitous bills, did not contain on their rolls the names of many great and good men?—and that the advocates for these *special acts* had nothing to say about the *publick good?*   Such acts are always defended on the ground that the *publick safety*—a much higher consideration than the publick good —demands the enactment.   It is in the exercise of the same authority, that parliament can dissolve all corporations.   So it can declare *authoritatively* what is, and what shall be truth, and what heresy in matters of religion; and can, if it pleases, provide for the purification of religion by burning all heretics.   So that Sir Edward Coke, is abundantly justified in saying, *that parliament has despotick power.*

Precedents drawn from the English parliament in troublesome times, or any other assembly of legislators or judges in such times, are about as good authority here, at this day, as the decisions in

the reign of Richard the second, where the judges were capitally condemned for the judgments they gave. The condemnations and the judgments were pretty much alike.

The defendant's counsel seem aware that the right claimed for the legislature, to take away the property and privileges of private corporations is liable to be abused; and therefore agree, that it ought never to be exercised but for the strongest and most important reasons. This restriction promises something on paper: but what is its practical utility? Who shall judge of the *weight* and *importance* of the reasons?—Not the judiciary surely;—and not the party to be affected by the measure. If the legislature judge amiss there is no remedy.

The mischief here arises from the principle which concedes to the legislature a power altogether indefinite, or in other words, despotick. Is there a government in the world which would hesitate to acknowledge the obligation of *such a principle?*

But extreme caution in dealing with these plaintiffs seems not to be required, because the interest of the legislature and the trustees are said to be the same. But I hope it has been satisfactorily shewn, that this is by no means the case.—Have the legislature of New-Hampshire no inducement to apply the funds raised from contributions from without as well as within the state, (it would be *invidious* to state the proportions accruing from each source) *exclusively* to our own citizens? And if they should do so, who shall correct the procedure?

At present they have contented themselves with taking the property from the men to whom the donors entrusted it, and giving it to a corporate body created by themselves, adding to the uses (I suppose on account of the greatness of the funds) other colleges, an institute, &c. They have not diverted the funds from literature. But what they have done, is an assertion of the right to do what they please with them. I am by no means convinced from any thing which I have heard, that the dependence of the legislature on the people would be a sufficient check to an entire misapplication of the funds. What prevents the people, for example, from preferring the institute proposed, to our old fashioned colleges? They may, possibly, like it the better for not knowing precisely what it is; and yet their ideas on this subject may be as distinct as those of the majority of the legislature.

I know that courts of chancery have a controuling power over all charitable institutions. But our legislature seem to have no disposition to provide for the erection of such courts: and it seems to be intimated that, till we have such, the legislature themselves may rightly exercise chancery powers. I admit they are as well qualified for chancellors as for common law judges.

We have heard it gravely stated, as a reason for the interference of the legislature in this case, that literary institutions are subject to decay; that the charter of our college was granted

under the authority of the British king, and as it emanated from royalty, so it contained, as was natural, principles congenial to monarchy:—one of these is, the power of self perpetuation.   This last "monarchical principle," so hostile to the spirit and genius of a free government, has been, it is believed, pretty carefully preserved in all the charters of charitable institutions granted by our legislature.   It is candid to presume they were not aware of its anti-republican tendency.

If Dartmouth College has suffered in its constitution from "*decay*" it is certainly not the effect of old age; and as little to be ascribed to the corrupting influence of ease, leisure or wealth.

From the same quarter it has been intimated that much good would result to this seminary and to the publick from *governmental checks* on its officers and affairs.   I am not a convert to these opinions.   As there is no royal road to science so there is no such republican road.   The best road is that which has been marked out and trodden by learned men; those who are themselves proficients in science, not sciolists and mere pretenders to learning.   And the best reliance for funds is on munificent individuals, men who have wealth to bestow and hearts to bestow it; —to found colleges, and *really* to *improve* the literary seminaries we have.

It is the duty of the legislature by all fitting ways and means to encourage such men to give; and the most effectual will be honestly and sacredly to respect the rights, privileges and immunities of the seminaries they endow.   The state should do all she can; but her best gifts to her colleges will always be, not a code of laws but lands or monies.   For myself, I do not wish to see the time when the government of this or any other literary institution (always excepting perhaps the institute) shall be closely connected with the government of the state.   *Changes* in the latter, if not desirable, are always to be expected; *permanence* in the former is every way important.   There is besides something in political men generally speaking, which unfits them for the management of an academical institution, or to be useful fellow-workers with instructors of youth. I do not say that such alliance is as bad as that between church and state; but it is somewhat like it.   I had rather see government stand neuter, content itself with seeing fair play between the friends and patrons of learning and its foes, than to take upon itself to prescribe systems of education, elect the professors and officers and regulate the interiour of colleges as its caprice may direct.

It only remains to consider whether the legislative acts in question violate the constitution of the United States.   Is the charter a contract within the meaning of that constitution? If it be, I trust, I need not add any thing to the observations which have been made, showing that its obligation has been impaired.

It has been my endeavour to shew that when property is given to a charity of this kind, the owners, as founders or donors retain

the power of inspecting its application, of protecting the interest of the foundation, and of correcting all abuses in the management of the property and in the government of the institution.   When a charter or an act of incorporation like the present is granted, this power is neither lost nor transferred to the king, the state, or to the publick, but, by the founders consent and at their request is vested in the trustees : Thenceforth they, as a body corporate hold the property, as the perpetual representatives of the donors ;—are perpetual visitors and governours of the charity.   This is the will of the donors :—and the supreme power granting the charter sanctions the transfer, and stipulates by implication with the donors and *expressly* with the trustees, that they shall forever as a body politick hold and enjoy the property, and the powers and franchises contained in the charter.   The charter is evidence, and *conclusive evidence* of the compact, its terms and conditions.   The most important of these are, that the body politick shall have the very necessary power of electing members in the room of such as go off ;—the right of acquiring and holding property for the use of the institution :—the power to make statutes for the government of the institution, and generally to exercise all the powers, and to have all the privileges usually belonging to the government of a college. Here seems to be every thing requisite to form a *compact.*   The king is one party, the donors in the first instance, and then the trustees as their *acknowledged substitutes or representatives* are the other party.   There are stipulations, express and implied, in favour of each party.—Dr. Eleazer Wheelock acted for the donors, (or for himself, if it should be thought the property contributed was then in him.)   Is not this Dr. E. Wheelock's language ?   I propose to give the funds collected here, and which have been hitherto employed in support of the Indian charity school,—those now in the hands of the trustees in England, who are in fact my trustees,—those offered, and procured here, with more immediate reference to the college to be located in the western part of New-Hampshire, procured at my solicitation ;—I propose with these funds to found a college ;— certain of my friends to be appointed trustees,—and the corporation to have certain powers and privileges, (the same which were conferred by the charter) and the uses and purposes of the institution the same as those specified.   The king accepts the proposal, and thereby secures *to his subjects* (not merely those inhabiting the province of New-Hampshire) the benefits arising from such an institution in such a place : and these benefits his courts will take care shall be forever enjoyed.   The trustees after accepting the charter are bound to answer the end of their creation ;—and apply the funds, and such as they may procure, *forever* to the uses designated by the donors, and declared in the charter.

This was a good contract on both sides.   The original donors have no doubt already received their reward.   The trustees, till this unlooked for intrusion by the state were enjoying the satisfac-

tion of seeing the good work prosper in their hands;—and the state and its citizens were reaping the advantages resulting from the diffusion of knowledge.   The charter and its  privileges were purchased with something better than money.—It was not a monopoly even of charity; for the state, its rulers, and all charitable individuals may still foster learning by endowing colleges and free schools. Does not then every principle of good faith require the fulfilment of the contract on both sides?

It is too late for the king to quarrel with the terms.—He never did.   No complaint was made till 1816.   What claim have the state now to the funds or the controul over the institution, except that they prefer the absolute property to the *benefit* secured by the charter?—And what sort of *title* is this, in a court of law or equity?—And what should we think of an *individual* who should assert it?   The privileges granted were such, and such only, as the experience of centuries had demonstrated to be proper and safe.

Was the king deceived in this grant? Who practised the deception; and in what does it consist?

Does this compact bear any resemblance to that which may be supposed in the formation of a county, town, &c.?   Here, *private property* is given for certain purposes, and on certain terms and conditions; and in return, certain franchises are bestowed.

We have seen that our law regards grants of corporate privileges for the holding and managing property from which the publick derive a great benefit as a compact(59).

It is difficult to imagine a reason, why compacts of this sort should not be entitled to the protection of the constitution of the United States.   A state may contract (60), and experience shews, she may pass acts violating her own solemn contracts, as well as make laws impairing contracts to which she is not a party.

I know it has been said, that the annulling of this charter deprives the plaintiffs of no *valuable estate* or interest.   The whole beneficial use was in the state.   In this view the charter is *a mere appropriation* of the funds by the king, not by the donors,—to the use of a college, which he was pleased to call Dartmouth College;—the charter was the sole act of the king;—there was but one party;— the king, consequently may change it, though drawn up in solemn form, as men change their last wills though in the name of God amen.—The donors parted with all their property; and Dr. Eleazer Wheelock (from his great love, I suppose, for monarchy,) gave all to his majesty, who was then graciously pleased of his own special grace, certain knowledge and mere motion, with these funds to constitute and endow a college;—and for the present place it under the administration of certain persons, as *his agents—publick agents*

(59) See acts of 6th Feby. 1789, and 19th June 1794, N. H. Laws, edn. 1815, p. 67. 73.—ante. p. 147,—and see also N. H. Turnpike acts—Bank acts, &c.

(60) 6 Cranch 137.

—to manage this *publick property.*—His successors, who surely inherit all the love of learning and all the honesty and justice of the crown, have only done what his majesty *might* have done, removed one set of publick agents, and provided for the appointment of another.—Either this account, of the nature of this property, or ours must, I think, be the correct one. Every one who reads the charter can determine.

If the state have no legal or equitable estate in these funds and in this charter, its franchises and privileges, then this objection entirely falls to the ground. The truth is the trustees, as a body politick, are the legal and equitable owners of the property and of the franchises conferred by the charter :—as long as they hold and apply the one, and use the other according to law, their property is sacred and ought to be protected from legislative, as well as every other violation.

That the plaintiffs hold the funds for others (certainly, if the state be not those others) no way affects the plaintiffs' right to claim the benefit of the compact formed by the charter, *unimpaired.*

I do not think that authorities are needed on this part of our case. In *Fletcher* vs. *Peck* (61), it was decided, that a grant of land by a state is a contract and protected by the constitution of the United States.

The legislature of New-Hampshire have, in effect, determined that *the grant of the privilege* to make a canal, &c. is a compact (62).

In *New-Jersey* vs. *Wilson* (63), it was decided that where the state granted an easement—the exemption of certain lands from taxation—the grant could not be repealed by the legislature.

In *Terret* vs. *Taylor* (64), it was held, that a legislative grant was not revocable, and that property held by certain persons for the use of the church could not be divested by an act of the legislature of the state, in which the lands were situate.

In *Pawlet* vs. *Clarke* (65), it was held, that where lands were granted by the state to the town in which they were situate " for the use and support of religious worship " the legislature could not by an after act appropriate the same lands "for the use of the schools of such towns."

No authorities have been cited which militate with the principles recognized and established by these cases nor any arguments adduced, which seem to require a particular consideration.

Though I do not think the arguments of the defendant's counsel sound, yet I have too much respect for those who urged them to adopt the language of lord Coke, in the case of Sutton's hospi-

(61) 6 Cranch 87.
(62) See ante, p. 147.
(63) 7 Cranch 164.
(64) 9 Cranch 43.
(65) 9 Cranch 292.

tal (66),—"all the arguments which have been made against *this* "*honourable work of charity*, are hatched out of mere conceit and "*new invention*, without any ground of law, and such which have "any colour were utterly mistaken"—not founded in fact.

I am sensible much might be added to illustrate and enforce this and the former heads. But as the court are fully apprized of the *general principles* on which we contend the acts of the legislature in question are impeached, I forbear further detail.

In advocating this cause, I have not for a moment been relieved from a most oppressive sense of its importance,—to the literary institution whose rights have been prostrated, and to all our charitable establishments for the promotion of religion or literature: the cause of one is the cause of all. I might have declined the duty of an advocate: but I have felt myself impelled by a solemn sense of duty,—the duty which every citizen owes his country, to make every exertion in my power to maintain and defend the constitution against all violations, from what quarter soever they may proceed. The plaintiffs have discharged a necessary duty on their part,—that of bringing this cause where relief can be obtained. Nothing remains, but to expect that impartial judgment which the law is bound to pronounce on the facts of the case.

---

Mr. BARTLETT.—However arduous may be the duties which devolve upon the defendants' counsel in this case, I rejoice that we have not *here* to encounter all those difficulties which, from the publick excitement, appear to have burthened the publick mind.

The hopes, fears and interests of those, who partake of the feelings of the parties in this action, may present many difficulties to *their* coming to a proper decision ; but none of those obstacles lie in the path of the court.—Many circumstances at this moment call us to rejoice, that the breath of faction, whatever tempests it may raise upon the surface, can never disturb the serenity of the atmosphere that surrounds their elevation—that whatever may be others' feelings and passions, our system of government has given us a tribunal, which in all judicial proceedings may look with perfect unconcern upon "this noisy babel earth, nor feel its giddy whirl."

From the course that has been adopted by the defendant in this action, it is perfectly apparent he has no objection that the plaintiffs should investigate, however informally they may come to it, every part of the ground upon which he stands, for had he felt any want of confidence, he could, without *any* lack of courtesy, have stopped them in this prosecution at its very threshold. That the *name* of a corporation may be altered with or without their consent, and by a power much inferior to our legislature, would not be contested even by the most undoubting disciple of .the modern

(66) 10 Co. 29.

doctrine of corporate supremacy (1).—And when the name is thus altered, it is indisputably settled that the corporation must sue by its new name (2).

Should the plaintiffs, on a plea in abatement, have amended their writ and taken the unwelcome name of the amended charter, even then, without a further extension of courtesy by the defendant, their action must have failed;—for whatever be the final decision on the validity of the law, the defendant, detaining the articles sued for as an officer in the discharge of a publick duty under that law, could not be found guilty of a conversion to his own use in this form of action (3).

[The Chief Justice here observed that although inclined to the opinion that this was not the proper form of action, yet he understood that point to be waived by the parties.]

The defendant, sir, does most cheerfully waive this and every exception in point of form, with a desire to accelerate the plaintiffs' progress to the temple of justice, believing they will the sooner find there the inscription to themselves of *mene tekel* upon its walls.—The plaintiffs, however, having been thus careless in their process, it may perhaps excite less surprise, should they be found sometimes inaccurate in their principles, and not always infallible in the application of them.

The question is understood to be upon the validity of the acts of the legislature of New-Hampshire of June 27, 1816, entitled "An act to amend the charter and enlarge and improve the corporation of Dartmouth College" (4)—and of Dec. 18, 1816, entitled "an act in addition to and in amendment of an act to amend the charter and enlarge and improve the corporation of Dartmouth College" (5).

The defendant does not introduce to the present discussions the additional act of Dec. 26, 1816 (6), as he does not rest his defence in this suit upon any provision of that act.

The imperfect manner in which our remarks may be offered in answer to the plaintiffs' learned counsel, it is hoped, will find a sufficient apology in the disadvantageous circumstances under which we appear.—A recurrence to books, to principles, to reason, could give no very certain indications of the objections to be raised against these acts of the Legislature. Those objections, as we apprehend, resting principally in the subtle ingenuity of the learned counsel could not, by our feeble efforts, have been anticipated.—And since they were but yesterday communicated to the court with the splendor of learning and depth of logick common

(1) 3 Bur. 1780.—3 Term Rep. 240.
(2) 1 Bos. & Pul. 40.—3 Salk. 102.—1 L. Ray. 30. Bac. Abr. Corp. E. Com. Dig. Franch. F. 1.—1 Rol. 512.
(3) 2 Mass. Rep.
(4) N. H. Laws, June Sess. 1816. p. 48.
(5) N. H. Laws, Nov. Sess. 1816. p. 74.
(6) N. H. Laws, Nov. Sess. 1816. p. 94.

to those distinguished advocates, a few hours only have been left us to consider even cursorily the wide extent of the argument.

I cannot say that I follow precisely the order or form of their objections to these legislative acts, but believe that their arguments were directed to the support of the following general positions—

*That the legislative acts in question are contrary to the principles of natural justice.*

*That corporations of this nature are independent of legislative control.*

*That the provisions of these acts violate the constitutions of New-Hampshire and of the United States.*

This court unquestionably have the power, and cases may exist in which it shall become their duty, to declare acts of the legislature *void;* but this power or duty by no means demand of them an indiscriminate warfare against all Legislative acts which may or may not be of doubtful expediency.—It is a power evidently not to be exercised for slight reasons,—"Admitting such a power in the judiciary," says judge Thompson, " it ought to be exercised with great caution and circumspection " (7). "As the authority to declare an act of the legislature void" (says judge Judell) " is of a delicate and awful nature, the court will never resort to that authority but in a clear and urgent case " (8). By an eminent jurist of this state it has been observed of this power, that " it is a gem which would tarnish by too frequent handling ! "

Whatever opinion the justices of this court in the character of legislators might have entertained of the policy or expediency of these acts, sitting as a judicial tribunal, their only enquiry can be whether the legislature, had power to pass such acts, and not as to the wisdom of the exercise of it.—Though were it proper here to enter upon such enquiry, I have no apprehension that the legislature would suffer by the investigation. Notwithstanding the severity of remark which one of the learned counsel has been pleased to indulge upon that part of our system, we have no doubt it will continue to be held in high consideration. And it is believed that the court will not refuse a proper respect to an opinion expressed in the form of a law by the other two branches of government—a law, which to become such, must after due deliberation have passed the house of representatives, have passed the senate, and been approved by the chief executive magistrate of the state. " With such a weight of *prima facie* evidence in favor of these laws " (said judge Thompson in *Livingston* vs. *Van Ingen*) " I should not have the boldness to pronounce them void, without the most *clear, satisfactory* and *unanswerable* reasons (9). "And in such case" (said Ch. Jus. Kent.) " the court should be able to

(7) 9 Johns. Rep. 564.
(8) 3 Dal. Rep. 399.
(9) 9 Johns. Rep. 564.

vindicate itself by the soundest and most demonstrable arguments"
(10). Such authorities need not the support even of Ch. Jus.
Parsons' opinion, as expressed in the case of *Kendall* vs. *Kingston*
(11). Nor need we insist upon the principle any further than is
already adopted by this court in their rule of decision *justitia fiat*,
and the maxim of their province *dicere non dare legem*.

I. The plaintiffs' first position that *the acts in question are con-
trary to the principles of natural justice* is certainly a very broad
and indefinite one.

"The ideas of *natural justice*" (says a learned judge) (12) "are
regulated by no fixed standard; the ablest and the purest men
have differed upon the subject, and all that the court could prop-
erly say, in such an event, would be that the legislature (possessed
of an equal right of opinion) had passed an act, which in the opin-
ion of the judges, was inconsistent with the abstract principles of
natural justice."—"The court" (says the judge) "cannot pro-
nounce it to be *void*, merely because it is in their opinion contrary
to the principles of natural justice." And the strong language of
sir William Blackstone is that if the legislature saw fit to enact a
law *manifestly* contrary to the principles of natural justice he
knew of no power that could declare it void" (13). But if the
court find in these acts any thing contrary to the principles of nat-
ural justice, the defendant will disdain to protect himself even by
the unequivocal authorities above cited.

He asks no aid for injustice—no protection by acts of the legis-
lature, unless they are equitable in principles as well as legal in
their operation. As an investigation, however, of the expediency
and propriety of the legislature's passing the particular acts, in
question would open a wide field for discussion, which would at
once manifest the irrelevancy of such an enquiry before a judicial
tribunal, we shall forbear to dwell upon, or even to notice the facts
and circumstances which not only *justified* but *demanded* the pass-
ing of the acts in question; and shall consider that point to be set-
tled by the acts themselves, unless upon the face of them some-
thing appear to rebut that strong *prima facie* evidence.

In support of their first position, the plaintiff's counsel say that
*these acts of the legislature destroy the old, create a new corporation
and transfer to it the property of the former.*

Here we protest against imputing to the acts of the legislature
any consequences which result from the plaintiffs' opposition to
and violation of those acts. If by opposing they have forfeited
any office or place they held by the law, let not the law be made
accountable for the effect of their transgressions. As well might
the tenants of our State Prison reproach the statute book for the
consequences of their crimes.

(10) Ibid.
(11) 5 Mass. Rep. 584.
(12) 3 Dal. Rep. 399.
(13) 1 Blk. Com. 91.

We appeal to the statutes themselves to negative this declaration of the plaintiff in support of their first position.

The title and preamble of the acts certainly do not exhibit proofs of any such design as the plaintiffs impute to them; but to *enlarge* and *improve* the charter of this institution; and in the opinion of the legislature, who in this case can have no other interest than that of the publick, to render it more extensively useful. The object here announced is certainly a laudable one, and no doubt, we shall be able to shew, is within the power and duty of the legislature.   The first section of the act of June 27 changes the name from College to University,—increases the number of trustees from twelve to twenty-one; their authority is more detailed, but not extended to any object beyond that of the original design of the institution, nor are the funds diverted to any new purpose.   By the second section a board of overseers is constituted. The third, fourth, and fifth section prescribe some additional duties to the offices of president &c.   The sixth section provides for the appointment of the additional trustees and for filling the vacancies, until a meeting of the board, by the governour and council.   The other parts of this and the two subsequent sections extend merely to the meetings, inspection of the records, oath of allegiance and freedom of religious opinions.   The first section of the act of Dec. 18, provides for calling a meeting of the trustees in consequence of a quorum not having assembled at the annual meeting and for filling of vacancies which had happened since that time.   The second section provides that nine may form a quorum for business &c., and the third enacts that the trustees shall make and subscribe the oath of office.

In which of these sections then, have the plaintiffs discovered all this mischief? Is it that which abolishes the oath of allegiance to the king of Great-Britain, and substitutes an oath to support the constitution of the United States? or the section which, conformably to that constitution, guarantees freedom of religious opinion? If any of their number were born subjects of the king of Great-Britain, and adhere to the doctrine that a subject cannot expatriate himself, then may they insist at least in argument, that the principles of natural justice are violated in compelling them to swear against the allegiance to which nature had bound them.

How have these acts destroyed the corporation? Is it destroyed by the change of name? What hecatombs then are annually sacrificed by legislative acts, passed for the alteration of names.—But that the corporation with a new name remains the same in all its rights, duties and privileges is most incontrovertibly settled in the cases of *Colchester* vs. *Seaber*(14), and *Rex* vs. *Pasmore*(15).   In the one case where the corporation by a new name sued on a bond given to the corporation in its old name, lord Mansfield in deliver-

(14) 3 Bur. 1870.
(15) 3 Term Rep. 240.

ing the opinion of the court says, "it is argued that this new corporation is totally distinct from the old one; but there is NO AUTHORITY,—NO DICTUM FOR IT." The same is decided in *Miller* vs. *Spatiman*(16) when that learned reporter has this marginal note : " A corporation does not lose its franchises by a change of its name." The same is decided in the *Mayor and Burgesses of Scarborough* vs. *Butler*(17), *Knight & al.* vs. *Corporation of Wells*(18), as also in the authorities before referred to on this point confirmed by the whole record of judicial decisions.

Has the addition to the number of corporators abolished the corporation, or in the language of the plaintiffs " confiscated *their* property?" As this point must be more particularly noticed in our consideration of the *private rights* claimed by the plaintiffs under their *constitutional* objections, we shall leave it for the present upon the opinion of the court cited from the 3 Term Rep. 241—which supports this power as exercised by the *Crown* alone, and that too in a case where the corporators had personal interest in the corporate property. Lord Kenyon observed " by the new charter, the king did not consider the old corporation dissolved to all purposes, but he granted those rights to a new set of men, and superadded such other powers as he deemed necessary," to which justice Ashurst adds "as to there being here a dissent of a majority of the old members I lay no stress upon it." And as though this case had been before him, he observes " here the members of the old corporation have no *injury* or *injustice* to complain of, for they are all included in the new charter of incorporation, and if any of them do not become members of the new corporation but refuse to accept, it is their own fault.—But at any rate, whether they refuse or accept it does not affect the right of the Crown." In the case of *Colchester* vs. *Seaber* before cited, when it was urged that the new charter had created a distinct corporation from the old one, lord Mansfield said, that " without an express authority so strong as not to be gotten over with, we ought not to determine a case so much against reason." In this case it is apparent there was no intention of the legislature to create a new corporation or to destroy the old one—and we apprehend no point can be settled by decided cases unless this is, that the old corporation is not destroyed or a new one created by the change of name or addition to the number of corporators.—It of course becomes unnecessary here to follow the plaintiffs' counsel in the great latitude of remark upon the consequences of these acts, predicated upon the assumption that they dissolve the old and create a new independent corporation.—An assumption unsupported by fact or law.

II. But, say the plaintiffs, *corporations of this nature are independent of legislative controul.*—And any interference, however harmless in itself is illegal.

(16) 1 Saund. 344,
(17) 3 Lev. 237—8.
(18) 1 Lutw. 508.

This has been urged by a sacredness in the constitution and character of corporations, and the unfitness of legislatures, by their weakness and wickedness to approach them.

Let us a moment look at the nature of corporations, and of legislative powers with reference to them and the general practice upon this subject. What is the charm or magick in the word corporation, that all other moral and civil liabilities and duties should be merged in the privileges of its members? Does it result from the form or solemnity of their origin? Speaking of the duties of individuals as members of civil societies, Kyd observes(19) that from the establishment of civil society and political government collective bodies of men "become subject to common burthens and common duties, assume a known character and description and become objects of political regulation. "At their first introduction they were little more than an improvement on the communities which had grown up imperceptibly without any positive institutions, and for a considerable period the shade which separated the one from the other was a touch so delicate as to require the most minute attention, and the most discerning eye to distinguish(20)." "As no particular form of words or grant is necessary, so no particular *privileges* are conferred in the creation of a corporation by the mere act of making it such, unless embraced in the nature and object of the institution(21)." Even without any ceremony or form of words creating them such, the people of any religious denomination, although a minority in a town corporation, are themselves a body corporate for certain purposes as was decided by one of the plaintiff's counsel while upon the bench of our supreme court(22). The union of the several circumstances in which a corporation resembles other communities seems to constitute its very essence; and its political rights are more or less extensive according to the *design* of its institution(23). "A corporation has been called a *franchise*, the propriety of which appellation depends on the more or less extensive meaning in which the word "*franchise*" is used; for this, with several other appellations have been given to corporations, which unless particularly explained are apt to bewilder and mislead the understanding(24). "In a more appropriate sense the word *franchise* means a *royal privilege in the hands of a subject by which he either receives some profit or has the exclusive exercise of some right. In this sense a corporation cannot be called a franchise*(25). The mere fact of being a corporation does not seem to give its members any supremacy over civil government; then does such privilege result from the *design* of these associations?

(19) 1 Kyd on Corp.
(20) Ibid 2.
(21) Ibid.
(22) Haven vs. Rochester.—Strafford Supr. Ju. Co. Sept. T. 1814.
(23) 1 Kyd on Corp. 18.
(24) Ibid 14.
(25) Ibid 15.

Although it is believed no corporation secures to its members such powers as are contended for, still it will be found that the extent of their rights and privileges are very materially affected by the design of the institution. As we find some corporations are granted to individuals for their personal interest and emolument—These, although sometimes granted gratuitously with a view to some publick advantage also to be derived, but are usually established in consideration of some bonus or fee paid by the petitioners. Such are banks, insurance companies, turnpike roads and canal companies, &c. In these, individuals hold property or stock in shares, have in them an estate of inheritance and are benefited by certain tolls, interest or income.

Other corporations we may observe, which are established principally for publick purposes, but in which individuals as members may have a beneficial interest, but no estate of inheritance. Such are the incorporations of school districts, parishes, towns, cities and counties, where as members or inhabitants they may have corporate property or privileges, such as benefits from the corporate funds,' rights of common, &c.

In another division may be included those corporations for the appropriation of alms to purposes of a private nature; as to the poor of a particular parish, &c. The interest exists here in individuals, but usually not in the corporators who hold it in trust for those to whom it is appointed.

In a still more comprehensive class, may be embraced those corporations which are purely of a *publick nature*. The commonwealth may name individuals as corporators to perpetuate a corporate succession, the better to carry into effect objects of publick importance, and with no design to grant emoluments, or exclusive personal privileges to the individuals. If individuals acquire by such publick acts any personal advantage it must like other privileges *incidental* to publick laws yield to such modification as their *principal* design requires. Such are the universities in England, and institutions of a similar nature in this country. They are of a *civil* nature as they directly affect the welfare and prosperity of government, and as was observed in the argument of *Phillips* vs. *Bury* (26), fatal would be the consequences if they were to be exempted from legislative controul, " the great part of the nation would not be subject to the rules and government of the common law, for the rich men were got into guilds and fraternities, the men of learning into colleges and halls, the poor into hospitals, and those called religious into monasteries. Now in all these the nation have a publick interest, these are all places and people of publick interest and concern."

But whatever interest the publick may have in such institutions, and whatever necessity may exist for their reform and improve-

(26) 4 Mod. Rep. 117.

ment we are told by the plaintiffs that the legislature have no power to apply a remedy, but that resort must be had to some other tribunal or the evils however great must be submitted to.

It may here be generally observed, that unless the legislative power can remedy defects in the original charter establishing such institutions, no remedy can be applied; for whatever authority the courts of chancery or King's bench can exercise, must be confined to the existing statutes, and can make no provision to guard against evils in future or to secure advantages not already provided for (27).

In speaking of legislative power without reference to the restrictions of our constitution (which we shall presently consider) we could not have expected to hear the plaintiffs attempt upon English principles to support the position that it is inadequate to the correction or amendment of existing laws or charters. The undisputed text book of the English law in its comments upon the legislative power of Great-Britain is in this language:—" It hath sovereign and uncontroulable authority in making, confirming, enlarging, restraining, abrogating, repealing, reviving and expounding of laws concerning matters of all possible denominations, ecclesiastical or temporal, civil or military, maritime or criminal."—"All mischiefs and grievances, operations and remedies, that transcend the ordinary course of laws are within the reach of this extraordinary tribunal (28)."

It may be my misfortune not to have better understood the object of that part of the gentleman's argument in which he dwelt with so much eloquence upon the weakness and *wickedness* of our legislature. Whether it were intended to prove that no legislative power exists in our government or to shew the impropriety of that power being exercised by our general court, the force of it was equally lost upon my unbelief.—Our legislature (said the gentlemen) are illiterate, are ignorant, and " he cannot tell whether their language is of the English or Indian tongue."—" They are subject to passions and may be influenced by intrigue."—" Majorities are always wrong."—If these things be so, it is to be regretted that all the candour and reason of that part of the gentleman's argument should be lost upon a tribunal who have not power peaceably to change our form of government, and who probably cannot be persuaded to recommend rebellion. But from such gloomy reflections let us have a moment's relief in a specimen of that logick by which these misdemeanours are proved upon the legislature. " If " (said the gentleman) " certain individuals without authority had taken possession of the college buildings, they would have been guilty of trespass.—The legislature passed an act, in the execution of which they became authorized to take possession; therefore the legislature are trespassers, &c.—Had a similar mode of reasoning been

(27) 1 Blk. Comm. 481.—Bac. Ch. E.—2 Bro. Ch. Rep. 662.
(28) 1 Blk. Comm. 166.

applied to that gentleman's judicial proceedings, it might have brought him and his logick to a conclusion not altogether so agreeable.—For instance, if the sheriff of the county execute a person without authority, he is guilty of murder.—That gentleman and his associates upon the bench in the due course of judicial process gave the sheriff authority. Therefore, &c.

Again for the task he has assigned to us—After admitting that the king of Great Britain possesses much power, and saying that parliament is *omnipotent*, it is asserted that our defence cannot be supported but by shewing that our legislature possesses more power than king and parliament both. Now whatever might be the gentleman's doubts as to the national language of our legislature it is believed the legislature would be at no loss for the national character of such reasoning.

But we shall be content with that portion of parliamentary power which may be left to our legislature after abating from it all the restrictions of the constitution. For " an act of parliament is the exercise of the highest authority that this kingdom acknowledges upon earth. It hath power to bind every subject in the land and the dominions thereunto belonging, nay, even the king himself, if particularly named therein (29)." And yet while the very existence of government requires that the legislature should have power to pass laws which may affect the property, liberty or life of every citizen of the state, it is argued that an authority equal to the establishment of an ordinary municipal regulation would be unsafe in their hands upon a *presumption* of the *possibility* of its *abuse*.

Such was the gentleman's idea of their propensity to *abuse* power, that he could find for them no parallel on earth, but he has gone to the court of Pandemonium for illustration. Had the legislature committed all the outrages charged upon them, without such resort to heat his *imagination*, might not his *memory* have supplied him a reference of more recent authority ?—Might he not have pointed to a tribunal to which even Rhadamanthus would have surrendered his robe and seal.

The legislature forsooth so subject to " passion " and " intrigue " are to be denied jurisdiction over this corporation that the supreme controul of it may be vested in some half dozen trustees, whom, it must be taken for granted, no *passions* can ever move—no *intrigue* ever influence !

That the legislative power is amply sufficient for much greater things than ours has attempted in this case is not only true in theory but that it has long been exercised in practice we will shew by a series of cases both in Great Britain and the colonies. By the English doctrine so far are corporations of any kind from being above the legislative power, that they can be dissolved at

(29) 1 Blk. Comm. 186.

the pleasure of parliament; and *a fortiori* must be subject to every regulation which parliament may deem expedient (30).

This power was ever considered safely entrusted to parliament as the guardians of the community, whose interests as individuals or corporators were there represented.—A reason which could not apply to an extension of the same authority to the crown.—Nor is it pretended that the king can in all cases exercise the same jurisdiction.

What then is to be inferred from the authorities cited by the plaintiffs to shew that the crown has not the power, which we say the legislature has. Suppose they had produced the same number of authorities to prove that the crier of your honours' court does not possess such power!—We might perhaps be disposed to say he would not be less suitable than "his majesty" to exercise it—but by no means to suppose it disproved any position we have attempted to support. As it is not our intention to rely upon any parliamentary precedent, where our constitution shall be found to have abridged the legislative power, so we at once disclaim the application of precedents to shew the want of such authority in the crown—a power some of the prerogatives of which are possessed by our legislature, but which in itself is totally destitute of the authority with which the legislature are entrusted as the representatives of the people.

When the nation was dissatisfied with the operations of the land bank and south-sea scheme, no difficulty existed for want of power in parliament to take away their charters and even make the members individually liable for bills (31). In the time of Henry sixth a statute was passed by which all corporations and licences granted by that prince were declared to be void (32) Monopolies granted by charter are always abolished by parliament when thought proper (33). So the fee for admission into trading companies is altered almost yearly by parliament, although much against the inclination of the corporators; as also the qualifications and number of members.—In the 23d of Geo. II. a corporation was established for trade to Africa, with great detail in its rights, privileges, &c. and by statute the fort of Senegal with all its dependencies had been vested in it; still in the 5th of Geo. III. parliament thought proper, on much deliberation and after much opposition, to take from their jurisdiction that fort and a large extent of coast, vest it in the crown and declare the trade thither free to all his majesty's subjects.—Indeed for proof that parliament have controuled, altered, and even abolished corporations at their pleasure, it cannot be necessary to refer to particular cases, while no book upon the subject can be found that does not recognize the principle (34). But if examples of a *college*

(30) 2 Kyd. on Corp. 447.—1 Blk. Comm. 470.—Bac. Abr. Corp. A.
(31) 5 Rus. Mod. Eu. 14.
(32) Bac. Abr. Stat. F. 18.
(33) 1 Tm. W. M. 181.
(34) 2 Term. Rep. 533.—8 Term. Rep. 430.—Doug. Rep. 637.

are necessary, among many others, that of Manchester college may be noticed, where parliament took from a special visitor the power of visitation and vested it in the crown by the 2d of Geo. II.(35). Also the case of *Rex & Reg.* vs. *St. John's college*, where by statute of 1 W. & M. for abrogating the oaths of allegiance and supremacy, it was provided that the office of head or fellow of a college in either university should be vacated if the incumbent refused the new oath(36).

In this country too our provincial assemblies exercised the same power and often changed the whole organization of such institutions.—An act was passed in Connecticut in 1723 without petition or consent of the corporation "*For the more full and complete establishment of Yale College, and for enlarging its powers and privileges.*" By this act the number of trustees was enlarged, new offices created, and new regulations made with regard to the number which should constitute a quorum(37).

By an order of the general court of the province of Massachusetts, 1673, an addition was made to the members of the corporation of Harvard College, against the will of the corporation(38). In 1784, the charter of Trinity church in New-York, with regard to induction was repealed by the legislature(39). To these might be added many other instances, (as 3 John. Rep. 127—151, &c.) But I will here leave the question as to the subjection of corporations to the general legislative power with an offer to abandon the defence when one unequivocal authority shall be produced by the plaintiffs to shew that the exercise of such power by the legislature of Great-Britian was ever adjudged illegal.

The plaintiffs however choose not to rest the validity of these acts upon general legislative power, but say, that whatever right the parliament of Great-Britain or the provincial assemblies before our revolution might have had, to have passed the acts in question, that our legislature now has, not that power by the provisions of our constitution ; and therefore in the third place—

III. *They are contrary to the constitutions of New-Hampshire, and of the United States.*

As founder and visitor of eleemosynary corporations where no visitor is expressly appointed, our legislature succeeds to all the rights of the crown ; "and " (says Judge Spencer) " while acting within the pale of the United States and state constitutions has all the omnipotence of parliament(40).

" When the people (says chief justice Kent) create a single entire government, they grant at once all the powers of sovereignty. The powers granted are indefinite and incapable of enumeration. Every

(35) 4 Term Rep. 236–7—244.—2 Term Rep. 318.
(36) 4 Mod. Rep. 233.
(37) 2 Doug. Summary 183.
(38) 1 Hutch. Hist. 159.
(39) 9 Johns. Rep. 127.
(40) 7 Johns. Rep. 492.

thing is granted that is not expressly reserved in the constitutional charter(41).

Most, if not all the restrictions upon legislative power in our constitutions originated from the previous exercise or abuse of the power having been attended with evil.—And if we look at our constitutions, advised by the precepts of the learned commentator, for the interpretation of statutes, " by considering the reason and *spirit* of them, or the *cause* which moved the legislature to enact them,"(42) we shall not find by the existence of any evils resulting from this power, cause for any restriction upon it by the framers of the constitution.   Whatever might have been the complaints of corporations erected for private emolument, of encroachments upon their rights, there was no pretence that parliament should not have jurisdiction and controul over publick institutions, and that the same power should not continue in our legislature.   There might have been reason why security should have been provided for the rights of individuals in corporations of a private nature.   In those corporations where the members as such have personal privileges and interests—and no objection could exist against rendering them perpetual where the individual alone and not the publick was concerned.—But our fathers did not come to the work of framing our constitution with sorrow or regret that the sacred oracles of God had been rescued from darkness by the abolition of the monasteries. They did not come to that work with a wish that the obsolete systems of science and theology, which the ancient colleges were the last to abandon, should again be imposed upon the community at the pleasure of those institutions.   They approached the task with a belief upon which they acted, that those interests and institutions in which the publick were most concerned would always find sufficient protection in the wisdom and integrity of that department of government to whom the publick weal is confided.   It was therefore they confided to the legislature the *power* and made it their *duty* " to assemble for the redress of publick grievances and for making such laws as the publick good may require."(43)   And from time to time to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances and directions, either with penalties or without(44).

That it could not have been intended by the framers of the constitution to restrict the legislative power upon this subject we think is apparent from the *nature of the institution and its intimate connexion with government—as also from the general provisions of the constitution itself.*

It is a proper subject of legislation, as a *publick civil* institution. But the plaintiffs have insisted that " it is a *private eleemosynary*

(41) 9 Johns. Rep. 574.
(42) 1. Blk. Com. 61.
(43) N. H. Const. 5.
(44) Ibid. 7.

corporation," and that statement is attempted to be supported, in the first place, by confounding this institution with " Moor's Indian charity school" which Dr. E. Wheelock claimed as his, and over which no other jurisdiction has been exercised but at his request. Now no fact on record is more clearly stated, than that this institution and Moor's Indian charity school were entirely distinct and independent of each other in their origin and establishment; were ever governed separately, without the least connexion, until the school solicited the interference of the legislature and college. Their funds and property are now distinct and separate. For proof of this we need no more time than is necessary to read the record of a vote passed by the plaintiffs May 7, 1789—as follows : " Representations having been made to this board, that apprehensions have arisen in the minds of some persons, that monies collected in Great Britain by the Rev. Messrs. Whitaker and Occum for the use of Moor's charity school under the direction of the Rev. Dr. Wheelock, have been applied by this board to the use and benefit of Dartmouth College ;—*resolved*, that this board have never had any controul or direction of said monies, nor have they to their knowledge, at any time received or applied any sum or sums thereof to the use and benefit of said college, &c.    A letter of instruction to Dr. Wheelock from the honourable board of trust of that school in England, April 25, 1771, states that " the corporation of Dartmouth College in its nature and designs differs from the establishment of their school" and forbids Dr. Wheelock from subjecting the school or its funds to the disposition of that institution.    Therefore we will not trouble ourselves here to settle what kind of establishment Moor's school may be, or from whom it derived its funds, since *that* is not *this* institution.    The source whence this institution has derived its support is of a nature so publick that no difficulty occurs in pointing to it.    Among the publick grants for its establishment and support, was that of the township of Landaff, containing twenty-four thousand acres of land January 19, 1770, long before the board was organized under the charter; also a tract of three hundred acres in Hanover, the same upon which the buildings are located.—In the same charter was made a grant of two hundred acres adjoining to Dr. E. Wheelock's, in consideration of his services and expences to aid the institution —services and expences it would have seemed unnecessary for the government to remunerate, if they were devoted as the plaintiffs must pretend, to his private use and property.    The legislature in 1773, made a donation of 2000 dollars, and in 1787, granted a lottery to raise ——— dollars in aid of its funds;—in 1789, a tract of 42,000 acres of land—in 1805, 900 dollars—and in 1807, a tract of 23,000 acres of land; and from the state of Vermont in 1785, was received a grant of land containing 11,500 acres.

That this is a *private charity* has been urged too from the circumstance of its being called a *college*—That although universities

are *publick civil* corporations in England and throughout Europe, yet that *colleges* are there considered eleemosynary institutions. I do not understand the counsel to deny that universities are publick civil corporations—a principle indeed well established by all writers upon the subject (45).

What are called *colleges* in the universities in Europe; and by which from the resemblance in *name*, the learned counsel have attempted to prove this to be a *private charity*, are mere conditional appropriations of funds for the *support* of persons of certain descriptions called the masters, fellows and students, subject to the inspection and controul of the individual who makes the appropriation; and have no more power of conferring degrees, or of doing any other act which a university may do, than our parishes have, which are incorporated for the support of ministers. Although this institution is called by the name of college, still, says the authority before referred to, the *design* of the institution must determine the extent of its political rights.—And whether the act creating the corporation was a publick or private act or charter in its terms, could make no difference as it is the *extent* of the *object* which makes the corporation a publick one (46).

What then must have been the plaintiffs' desperation to have seized as the great point, on which to build so mighty an argument, the circumstances of this institution being called a *college*, while it differs in fact from a college in every particular of its design, privileges and powers. By predicating their argument upon the technical definition of a college establishment, do they intend to deny, that this institution was erected for the purposes, with the privileges and powers, and subject to the liabilities of an English university? This corporation, was erected for the promotion of learning—Its officers (says the charter, p. 11) may exercise their authority " as fully and freely as any like officers in any of our universities, colleges or seminaries of learning in our realm of Great-Britain, lawfully may or ought to do." It also has the power of conferring " any such degree or degrees " &c. " as are usually granted in either of the universities or any other college in our realm of Great Britain," &c. That this corporation has other objects and duties than mere colleges, which, (says a learned civilian) " were formally held to be ecclesiastical establishments," (47) is perfectly apparent from its own proceedings. The same shew that it has never doubted to use the privileges of a university.— " The power or faculty of teaching these [the sciences and professions] were bestowed by the state to the seminary, by the seminary to the individual, and hence in process of time, these branches of learning came to be called faculties, and the criterion or essential difference of an university was the power and licence of teach-

(45) 1 Blk. Com. 471.—2 Bro. Civ. Law 153. 156.
(46) Bac. Ch. Us.—2 Atk. 87.—10 Co. Rep. 101. Bac. Abr. Stat.
(47) 2 Bro. Civ. Law 156.
    VOL. LXV.   38

ing the four faculties, the supposed compass of universal knowl-
edge "—(48) the trustees of this institution have not only exer-
cised the powers of a university, but have used and even preferred
that *name* as the most appropriate until by some strange coinci-
dence it became obnoxious at the moment it became the legitimate
title by the act of the legislature—" Whereas the duties of presi-
dent of this university "—is the record of their memorable vote of
Nov. 1814; which being very important in its consequences was
undoubtedly prepared with all the precision and accuracy of the
honourable board.   By that name were they almost invariably
styled in their official acts, their memorials, records, catalogues,
&c.—That their practice in this respect was correct, and that the
term college and university are now frequently used for each
other, appears by the same authority before cited,—where it is
observed that " even independent of the special words of its char-
ter, Dublin is properly a university, so is Glasgow, though consist-
ing of but one college " (49).   "One of the most distinguishing
features of modern universities is the power of conferring de-
grees " (50).

As the *nature* of this institution, so its object and intimate con-
nexion with government require their care and controul.   And we
are not left to conjecture its object—Its charter declares it to be
the "spreading of christian knowledge "—and "that the best
means of education may be established in our province of New-
Hampshire."—Had the charter proceeded no further, hopeless as
might seem the effort, still the plaintiffs would have had some
more plausible pretence than at present, for making a question,
whether such be an object of *private benefit* only, or of *publick*
interest and concern.—But the charter in the same clause has
anticipated the only answer which could be given and·unequivo-
cally declares it to be "*for the benefit of said province.*"—Is such a
purpose then not within the proper sphere of legislation in a gov-
ernment like ours? and have the framers of our constitution so
decided?   Devest the subject of the specious garb in which the
learning and ingenuity of the counsel have enveloped it, and what
other is the naked question presented?—They deny that the legis-
lature has any constitutional right to interfere with the concerns
of this institution.—Its charter declares it to have been established
for the purpose of "spreading christian knowledge," and "that
the best means of education may be established in the province of
New-Hampshire for the benefit of said province."   What do they
then but deny the publick interest in these objects?   If such a
doctrine be introduced by the influence of this institution, then
indeed if the government have not power to *reform*, they should
have to annihilate it.—Nothing less than the solemn formality

(48) 2 Bro. Civ. Law. 152.
(49) 2 Bro. Civ. Law 152—3 note.
(50) Ibid.

with which the plaintiffs' counsel have attempted to prove that the " diffusion of knowledge " and the " means of education " are not proper subjects of legislation, could be deemed a sufficient apology for any remarks from us upon such a suggestion.—The painful emotions excited by the advancement of such a doctrine in a government like ours, before a court of justice, are in some degree mitigated by the reflection, that the existence of a court of justice—the very existence of government itself shews that the principle they contend for has not yet been adopted to any extent in practice.—And that it never will be, we trust to the wise provision of our laws, the intelligence and integrity of tribunals appointed for their interpretation, and that temperate but resolute spirit of patriotism and order which shall eventually enforce their observance.

But even the broad position assumed by the plaintiffs cannot require of me in the present state of society to discuss, particularly the connexion of the institutions of education with the existence of government—a point so long since settled in every place where such institutions have existed. I would rather read to them the preamble of a bill relative to literary institutions, some twenty years since, recommended to the legislature of Virginia by a JEFFERSON, PENDLETON and others, " in which " (said an eminent lawyer of that state) " the importance of the subject to the *publick* is most ably and eloquently announced."

The communications of every chief magistrate from the origin of our government, have urged its importance upon the national legislature. Examples of practical illustration are found in those sovereigns, who relax the bonds of slavery by disseminating the means of knowledge,—who, as they would shackle their subjects, restrict to individuals the use of those means. Even Alexander of Russia, enlightened by the principles and precepts of christianity, is adding fresh laurels to the wreath which Europe has bound upon his brow, by traversing his empire in person " to establish and regulate schools of learning." Such is the effect, that a distinguished philosopher of Europe has said " give me so much of the literature of any country, that I may dictate their domestick and national songs, and let whoever may enact their laws or wield the sword, I will govern."—But history silences all speculation upon this subject. The records of tyranny and oppression shew where the means of knowledge were confined to a few. The triumph of liberty, justice and equal rights proclaim the *publick* care and patronage of education. Institutions for this purpose are in fact to the moral and political Archimedes the " *where to stand* " —the fulcrum by which he would " *move the world.*"

The framers of our constitution have not left us to infer their opinion from the nature of the subject only,—but have declared that " knowledge and learning generally diffused through a community are essential to the preservation of a free government "—

and have rendered sacred the declaration by incorporating it in the same instrument by which is transmitted to us that form of government. And although they could not have anticipated that the *power* would ever be denied, yet as the *duty* might be neglected, they have expressly enjoined upon the legislature in all future periods of the government, to cherish the interests of literature and the sciences, and all seminaries and publick schools (51)." They have declared that the health, the existence of the political body depends on the pure streams of knowledge, yet we are now told that the legislature, the guardians of the commonwealth, should they see wicked hands mingling poison with the fountain, can only sit as silent spectators to witness the desolation which embraces themselves in its ruins. There is no other alternative, the government must controul these institutions, or they shall controul the government. Can it be believed, while the attention of the legislature is particularly directed by the constitution to the interests of literature, that the whole controul of its concerns is vested in an institution which may promote, or may prostrate its interests, entirely beyond the reach of government? It is not to be credited that those who established our system could *ignorantly* have so constituted it the destroyer of itself, or that they would *with malice aforethought* have made it politically a *felo de se*. If the plaintiffs' construction, however, be correct, the framers of our government have erected over the constitution a machine more formidable than *Juggernaught*, and chained themselves to the ground to be crushed by its wheels.

But, it is further contended should the nature and design of this institution and its connexion with the best interest of the community render it in that view a proper subject of legislation under our constitution, that still the *personal interests* of the *trustees* is such as to give them a right to exclaim "*procul este*" to every power.

This view of the subject will embrace a consideration of those particular clauses of the constitution which have been noticed; but permit me here on this suggestion of personal interest to refer the counsel to the deliberate declaration of their clients, and if the legislature on this point have erred let them not be reproached by these same trustees, who in a memorial to the legislature in 1804, solemnly averred "*they had no other interest than the members of the legislature themselves.*"—And well might they so declare for even trustees in a hospital receiving a lease of a building could set up no such pretence as the present, and (said lord Mansfield) have no more interest in the thing than the crier of a court of common pleas has when he is named as the last voucher in a common recovery (52)." But as a certain distinguished personage when reproached for using profane language, is said to have replied,

(51) N. H. Const. p. 20.
(52) 2 Bur. 1064.

that "he did it in his character of commander in chief of the army and not as bishop of Osnaburgh," so would the plaintiffs now pretend, that although as *trustees* they have disclaimed all interest but in common with every other citizen of the state, yet then they did not speak in their character of *visitors*, and that now in that capacity, they have a most undoubted and valuable interest.

Two very formidable objections to their supporting such a claim at once present themselves—that they possess no such character or office of visitor,—and that the office itself would give them no such personal interest as is contended for. To their claim to such an office the very absurd nature of the pretence would seem to be a sufficient answer. The office of *visitor* is to correct the abuses and misfeasance of the corporation, or trustees who in this case constitute the corporation.—" Corporations, being composed of indi-" viduals subject to human frailties, are liable as well as private " persons to deviate from the end of their institution, and for that " reason the law has provided proper persons to *visit*, enquire into " and correct all irregularities that arise in such corporations, &c. (53).

Now lest these *trustees* should mismanage, misapply or embezzle the funds of this institution, *they*, as visitors are to examine *their own* proceedings as *trustees*, to correct the " *human frailties*,"—to see that no fraud is done." If the law can tolerate so preposterous an idea, let us—"tell it not in Gath.'—The reason why publick corporations of this kind are said to have *no visitor*, is that the superintendence and vigilance over them, is exercised by the sovereign as the guardian of the commonwealth, who alone are *interested* in the correct management of the property.—And of course this visitatorial power of the legislature, who represent the sovereignty of this state, is not distinguished from its ordinary acts of legislation. "And this " (says sir Wm. Blackstone) " is what I understand to be the meaning of our lawyers when they say that these civil corporations are liable to no visitation, that is, that the law having by immemorial usage, appointed them to be visited and inspected by the king "—&c. "All corporations have their visitors," &c. " Those merely civil, by the king, unless they have been endowed by a subject, and derive *all their property* and subsistence from him" (54). " If the king and a private man join in endowing an eleemosynary corporation, the king alone shall be the founder of it (55). "And in general the king being the founder of all civil corporations," &c. (56)—" Of universities, being civil corporations the king is visitor" (57).

As all the power which the king as visitor could exercise over these corporations, resulted from their publick nature and the inter-

(53) 1 Blk. Com. 480.
(54) 2 Bro. Civ. Law. 155.
(55) 1 Blk. Com. 481.
(56) Ibid.
(57) 2 Bro. Civ. Law. 156.

est which the people had in their general design and object, and vested in him, as the guardian and protector of the rights of the people, it would be a doctrine unfit for this country, to say that our legislature did not stand in as near relation to the community, and that our constitution had not entrusted them with as ample authority in this particular as could be exercised by his majesty.

. But if the plaintiffs are desirous to make a fair estimate of the personal interests to be derived from the office of visitor, had they possessed it,—let us for a moment suppose the honourable board, *as trustees*, making up their accounts and closing the books, and the honourable board, *as visitors*, perhaps, by way of distinguishing the capacity in which they act, reversing their wigs, gravely opening the books to set about detecting the frauds, checking the abuses and correcting the "human frailties" of the honourable board of *trustees.*—Let them then be advised of their personal interest by the learned counsel in *Rex* vs. *The Bishop of Ely.* In that case where the visitor had the power of appointment to certain offices it is said "this power of appointment claimed by the visitor is not an interest." On the ground of interest "it is not an objection to a judge that he is a bare trustee." (58)

However, if *their* visitatorial power in this institution is only for the purpose of correcting the abuses of the trustees, it is not taken away, and probably will not be less likely to be exercised by an addition to the number.

The general spirit of the constitution appearing to protect these legislative proceedings, we find it necessary to inquire for that particular clause in either constitution which overrules such general construction;—which expressly denies the exercise of this authority and entitles eight trustees of Dartmouth College, to say to the supreme power of the state "stand thou off" we are mightier "than thou."

Some embarrassment might be anticipated in the attempt to designate such an article or section.—An embarrassment which even the plaintiffs' counsel seem to have encountered with no great success. For instead of putting their finger upon the page, they in effect have thrown to us the statute book, and left us to discover by conjecture, or accident upon which they most rely in the long catalogue by them cited of the second, twelfth, fifteenth, twentieth, twenty-third, and thirty-seventh articles of the New-Hampshire bill of rights, and tenth section of the first article of the United States constitution.—Unfortunately, however, the difficulty of discovering their application in this case is not entirely removed even by the ingenious argument upon this point.—To read at length the clauses cited, would seem to be a sufficient answer to a suggestion that they support or even countenance any of the plaintiffs' pretensions.

(58) 2 Term Rep. 318.—12 Mod. Rep. 686.—Doug. 139.—Bul. N. P. 284.

The second article of the bill of rights says—"All men have certain natural, essential and inherent rights—among which are the enjoying life and liberty, acquiring, possessing and protecting property, and in a word of seeking and obtaining happiness."

What *natural, essential* or *inherent* rights the plaintiffs have lost by these acts are not yet designated, or what *honest* mode of acquiring property is debarred to them does not appear.—We think it has been shewn that the object of this institution was not the private emolument of the trustees.   They were agents appointed for certain purposes under the act of incorporation, who as they have justly said of themselves in a memorial to the legislature, other than the one before referred to, are "*mere stake-holders for the publick*"—If the late board then, contrary to the intent of the charter, have contrived to create for themselves a personal interest and property, then it would be most conclusive, not only as to the propriety, but the necessity of legislative interference. There is no disposition with the defendant to fix upon the plaintiffs the inference so fairly established by the learned counsel in the case of *Nason* vs. *Thatcher & al.* when an objection was made to the admission, as witnesses, of the trustees of the Maine Missionary society on account of *interest*, property being devised to the society by the will in question, and it was observed "they were mere trustees to convey the testator's bounty to the objects of the institution, and to consider them *personally interested* was to impute to them *the most corrupt intentions*" (59).   The plaintiffs certainly are not accused while they may forbear an attempt to pervert this article to their purposes, or establish upon themselves the correctness of that imputation.

The twelfth article, with a provision similar to the former, and that every member of the community is bound to contribute his personal service when necessary, or an equivalent, also provides that "no part of a man's property shall be taken from him, and applied to publick uses without his own consent or that of the representative body of the people.   Nor are the inhabitants of this state controulable by any other laws than those to which they or their representative body have given their consent."

The declaration of independence renders apparent the oppression of the crown and government of Great Britain, in reference to which this provision was adopted.   They are there complained against for "suspending our own legislatures" and for "imposing taxes on us without our consent."

Have the plaintiffs cited this to prove by that clause which guards against appropriating private property to publick uses, that publick property may be used for private purposes?—That what is expressly appropriated for the benefit of the province of New-Hampshire" is intended exclusively for the use of eight individu

(59) 7 Mass. Rep. 398.

als of that and an adjoining province? Or by that clause which guards against the appropriation of private property except *by consent of the legislature*, to prove that publick agents cannot be governed even by the legislature? We would by no means grudge them any advantage to be derived by all legitimate inferences from this article of the bill of rights.

The fifteenth article provides that " no subject shall be held to answer for any crime or offence until the same is fully and plainly, substantially and formally described to him, or be compelled to accuse or furnish evidence against himself. And every subject shall have a right to produce all proofs that may be favourable to himself; to meet witnesses face to face and to be fully heard in his defence by himself and counsel. And no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers or the law of the land."

When the plaintiffs' counsel turned to this article, their natural benevolence and sense of justice must have overpowered the suggestions of their professional engagement in this cause, and they could have read it to the court in no other character than as advocates of the late venerable martyr of this institution. Had we appeared to proclaim his injuries, we would have read that article of the bill of rights and the plaintiffs' memorable record of September 1815.—But we come not, in the language of that clause, " to hold " the plaintiffs " to answer to any crime," and if otherwise, we would not violate its provisions by " *compelling* " them " to furnish evidence against themselves."

Should we for a moment suppose, that the plaintiffs, *per fas aut nefas*, had acquired some " property or immunities," for themselves in this corporation ; and should we further suppose, that they are " deprived or despoiled " of them by the acts in question, still could it be contended that any clause in that article renders void such act ?—Would it be said that the exception " but by the law of the land," was a declaration that such law would be of no validity ? Or shall we be told that the statutes enacted by our legislature are not " the law of the land ?" Elementary writers and courts of justice have given statutes precedence of the unwritten law ; but the reverse of that rule might be well insisted on by those who hold that the *will* of a few *individuals* is superior to both. The latter clause of this article is a literal translation from Magna Charta, and I ask them to take an interpretation of it from no less authority than the great oracle of the English law—" *Per legem terræ*."— " That is," (saith my lord Coke, 2 Inst. 45.) " by the common law, statute law, or custom of the realm."—The history of magna charta must be too familiar to need at this time the introduction of proofs to shew that its provisions were to guard against the arbitrary proceedings of the crown and were not intended as a restraint upon

parliament.—And in this state upon solemn argument it has been decided that a statute enacted by the legislature in due form, which does not conflict with any other provision of the constitution is " the law of the land " (60).—Even the plaintiffs' argument seems to admit that these acts might have been the *law* had *they* approved of them.   So far as the plaintiffs are interested in them it is in their character as citizens and members of the community (61), and so far they have *consented* by their representatives agreeably to the constitution.   The framers of the constitution seem to have guarded with a sufficient precaution the law making power ; and after giving the governour a negative upon the other two branches, probably did not contemplate requiring the *consent* of the trustees of Dartmouth College of any such fourth power, as necessary to the validity of a publick law.   There is no other power in our government than the legislative and executive to give any act validity as a law.

But the precedents which we have before cited of the proceedings of parliament, in such cases settle all question as to the application of this article to legislative power ; for it is to be recollected that parliament were under all the restraint of this article which our constitution imposes ; the same being a provision of magna charta.   Those precedents of course .confirm the correctness of Coke's exposition, as do also the proceedings of our own legislatures with regard to highways, turnpike roads, canals, &c.   Indeed upon any other construction, not a page in our statute book but is stained with some unconstitutional act.

The next article urged upon the court was the twentieth.   This provides that " in all controversies concerning property and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised, the parties have a right to a trial by jury and this method of proceeding shall be held sacred, unless in cases arising on the high seas and such as relate to mariners' wages, the legislatures shall think it necessary hereafter to alter it."—Surely no difficulty would have existed in judging of the propriety of their appealing to that article had the counsel proceeded one step further and cited the verdict in this cause as proof of their being deprived of the privilege secured by that provision.

The next in order on their list of grievances is the alleged violalation of the twenty-third article, which declares that " retrospective laws are highly injurious, oppressive and unjust.   No such laws therefore should be made either for the decision of civil causes or for the punishment of offences.   These acts invalidate no proceedings—punish no crimes done previous to their date.   Had they provided for the punishment of offences committed previous to their being passed, then indeed it would be proper to object.   But

(60) Mayo vs. Wilson, Ches. Co. May term, 1817.
(61) Vide their Mem. to Legis. 1803.

such is not their operation. They only guard against the occurrence of evil in future. The legislature most unquestionably took a *retrospective* view upon the operation of the laws as they then existed, in their deliberations to remedy the defects. And alarming as the idea may be in some cases of *looking back* upon past transactions, it is not believed that our constitution forbids recurrence to history in the exercise of deliberation, or proscribes the wisdom of experience. In any other sense, these are no more *retrospective* than the ordinary alterations of the militia and poor laws or those prescribing the mode of elections.

The thirty-seventh article closes their chapter upon the New-Hampshire Bill of Rights. This declares that "In the government of this state the three essential powers thereof, to wit, the legislative, executive and judicial ought to be kept as separate from and independent of each other as the nature of a free government will admit, or as is consistent with that chain of connexion that binds the whole fabrick of the constitution in one indissoluble bond of union."—The object of the counsel by introducing this article probably was not to destroy that large portion of his argument which consisted in urging *reasons* for the *repeal* of the acts in question, but its effect surely must be to shew the irrelevancy of such reasons when addressed to a tribunal whose duties are " to be kept separate" from the exercise of legislative power.

Such have been their references to our bill of rights, that the plaintiffs' counsel must pardon me for sometimes suspecting them of an intention to burlesque their client's pretensions in this cause.

The tenth section of the first article of the United States constitution cited by the plaintiffs declares among other prohibitions that "no state shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts."

It cannot be necessary at this time to consider the intent or meaning of the words *ex post facto law*, as it has long since been determined that they refer only to crimes and punishments, and have no bearings upon proceedings of a civil nature (62). "The restraint against making any ex post facto law, was not considered (said judge Chase) by the framers of the constitution, as extending to prohibit the depriving a citizen even of a vested right to property."

But at last it is insisted that these are "*laws impairing the obligation of contracts.*" Finding that the straws they have seized upon in the struggle cannot support their sinking claim, with the eagerness of desperation, they grasp at this shadow of a pretence. Yet it is believed, that section cannot by any force be so distorted as to extend even its *shadow* to a purpose so oblique and distant from its original intent. If any interpretation of that clause can be made applicable to the present case, all the benefits surely

(62) 3 Dal. Rep. 396.

should be awarded to the plaintiffs' counsel as the *first discoverers*. Most unquestionably by the survivors of the convention who framed that instrument, such an idea would now be deemed original.—The nature of the causes of that provision and of course the objects to which it alone can fairly be applied, had no relation whatever in principle or operation to cases like the present.

Previous to the constitution, it had been practised in different states to pass acts suspending suits on contracts, thereby impairing the obligation of immediate payment. Distinctions had been introduced where foreigners, or persons of different states were parties, &c. And cases existed of making debts, which were all due, payable by future instalments (63) In *Locke, admr.* vs. *Dane & al.* (64) the court say " the clause respecting the obligation of contracts as we all know was provided against paper money, instalment laws " &c.—" It would be carrying it much beyond its natural import, as well as its intended operation to construe it as prohibiting the legislature of the state to pass a law confirming the doings of the court or other publick body known to the law."

But how is this corporation a contract?

Who are the parties?

How are its obligations impaired?

A contract in its common acceptation, is an agreement between two parties. The agreement presupposes a conference as to its terms, and a *consideration* for its foundation. There is a mutuality in its stipulations.—These are general principles (65). The term is usually applied to negociations of a pecuniary nature, and is usually confined to transactions between individuals, or individuals and companies. The state when conferring property or civil privileges may be a party, and though in such case an action would not lie, this proves the confidence which our fundamental laws have safely placed in the legislative power.—But when the state pass a law, the object of which, is of a publick nature, it is indeed difficult to understand how individuals can make it a contract in the common and constitutional meaning of that term. In a case much stronger than the present it was considered by the counsel as well as the court (66) that " the *notion* of a contract between the government and corporation was *too fanciful* to need any observation" and the learned counsel in *Livingston* vs. *Van Ingen* spoke of such an idea as "a notion too refined to be acted upon,— that would lead to results the most extravagant and unjust. It is a doctrine too absurd to be sanctioned by a court of justice " (67). Individuals may acquire rights and privileges under publick laws, without holding them by virtue or in consideration of any contract,

(63) Adams vs. Story, 6 Am. Law. Jour. 474.—Fed. No. 44.—1 Black. Com. Tuck. N. 312.
(64) 9 Mass. Rep. 360.
(65) 1 Com. on Cont. 2.—2 Blk. Com. 443.—5 East. Rep. 116.
(66) 8 Mass. Rep. 448.
(67) 9 John. Rep. 541.

in its usual sense. As the officers of a town or county may hold their offices under the law creating a town or county, but should the legislature double the number of those officers, it would not heretofore have been thought that the United States constitution could interfere.—That scholastick subtlety and ingenuity by which the plaintiffs would raise a contract in this transaction, would prove quite too much for their purpose, for in some sense even government itself is a contract, and by the same reasoning every act and every law must be considered in the nature of *contract*, until the legislature would find themselves in such a labyrinth of contracts, with the United States constitution over their heads, that not a subject would be left within their jurisdiction.—The counsel have referred to the case of *Fletcher* vs. *Peck* (68) which is certainly very far from supporting their doctrine in this case. It shews that a grant of land to individuals for their personal benefit, on a valuable consideration, after the conveyance had been made, the interest vested, and subsequent sales under it, could not be revoked—Also the case of *New-Jersey* vs. *Wilson* (69) that a treaty or bargain with the Indians for valuable consideration, that certain lands should be exempt from taxation, could not be avoided. —As also the case of *Terrett* vs. *Taylor & al.* (70), and the case of *Pawlet* vs. *Clark* (71) that property appropriated for one purpose, could not, without compensation be taken and appropriated to a different use. The correctness of all which positions, we have no disposition or need to controvert.

The plaintiffs however say, an express contract exists here that they, and *they alone* shall be trustees of this institution. And why shall not the present sheriff resist the proposed law for a new division of counties on the ground that a contract would be violated by admitting other sheriffs upon his present territory? By a reference to the charter it will appear, that the corporation was created independent of the trustees; and that they were afterwards appointed in a different clause of the charter. The corporation is in fact so constituted, that had they all died, or all resigned their offices, the corporation would still have existed, and could have been reorganized with perfect security to all its rights and property.—The provision in the charter with regard to the number, was intended as a regulation to limit the board in their appointments, and not with a view to controul the legislature. No sacredness can be attached to that mere regulation, established by the crown, more than to a law under similar circumstances, which, however conclusive in its terms, would yield to the rule "leges *posteriores, priores contrarias, abrogant.*"

Who are the parties to all these contracts? can there be any

(68) 6 Cranch Rep. 87.
(69) 7 Cranch Rep. 164.
(70) 9 Cranch Rep. 43.
(71) 9 Cranch Rep. 292.

other either express or implied, than the *founder*, the *power creating* the corporation and *those for whose benefit* it is established. As a publick institution we believe the *crown* has been shewn to be the *founder*—Or even as an eleemosynary corporation, that the rights of foundation rest in the crown from the publick endowments. The crown also was the *power* that created it. The state since the revolution succeeds to the rights of the crown (72).—We have seen that not only the design and object, but the charter itself of the institution declares it to be " for the benefit of the province."

The state of New-Hampshire then is the founder.—The state of New-Hampshire is the power creating, and the state of New-Hampshire the only party in interest. All parties to the contract then, have assented to these alterations by the legislature, the representatives of the people and State of New-Hampshire.

As much importance has been given to that point, by an effort to shew that this is a private institution and that an individual as *founder* is party to some contract here, permit me a moment to direct the attention of the court to the fair result from that view of the subject. No such pretence is made for any other individual than the Rev. Eleazer Wheelock. For the purpose of giving their argument its utmost force, let us suppose their assumed premises in this particular to be correct, that this is a *private* institution, Dr. E. Wheelock the founder, and he a *party* to a *contract* with the state that no alteration should ever be made in any of the provisions of the charter, but by consent of the lawful visitor.

" The power of visitation exists in the founder and his heirs, which power they may grant and assign over to others,"&c. (73). In the last will of Dr. E. Wheelock after appointing Dr. John Wheelock his successor in the office of President, is the following clause;—" and to him I give and grant all my right, title and claim to said seminary and all the appurtenances, interests, jurisdiction, power and authority in and over the same belonging to me, &c.—It is well known that by virtue of this appointment, which Dr. E. Wheelock by the same charter was authorized to make, the late Dr. John Wheelock entered upon and executed the duties of the office of president more than thirty years.—Here then was the legal representative of the person, who the plaintiffs say was *founder*. And does he or his heirs complain of the legislature impairing the obligation of any contract with him, or those whose interests he represents? These very acts were passed by his solicitation and shewing to the legislature their necessity. He has accepted and holden the office of president of the institution by request of the board as organized by these acts. He has even made a bequest to the corporation to be holden on the condition of the enforcement and continuation of these acts.—

(72) 9 Cranch Rep. 43.
(73) 2 Bro. Civ. Law 156.

Where then are the complaints of violated contracts from any private *founder?*

We have chosen to consider this question upon the true ground of the publick character of the institution, because we are unwilling to surrender it to the dictation and controul of *any* individuals and not for the want of a perfect defence in this action even upon the principle of a private charity—for so far as it concerns the event of this suit, we might safely tender them an election to consider the institution the one or the other.

But however the direct or express contracts may be, it is contended that these acts violate other collateral and implied agreements. As that incidental to this institution are the establishments of professorships, &c. which may be affected by alterations of the original charter—That they may be so affected and justly too is certainly incident to their nature, for of these establishments Sir William Blackstone observes (74) "neither are they eleemosynary foundations, though stipends are annexed to particular magistrates and professors, any more than other corporations where the officers have standing salaries, for these are rewards *pro opera et labore,* not charitable donations only, since every stipend is preceded by service and duty:—they seem therefore to be merely civil corporations."—It is stated too that violence is done by compelling the former trustees to become members of a corporation different in its organization from the one it was *contracted* they should govern and direct. Now if the government chose to compel them so to serve, there is no doubt of the right so to do; but no such attempt is intended—The very nature and existence of government in some measure rests upon the principle, that the state has a right to the services of its citizens—a principle acknowledged in our constitution and expounded by a long catalogue of legislative acts. It cannot be necessary to refer to the numerous laws compelling persons to serve in town offices under severe penalties; or to the drafts of the militia, by which they may be compelled not only to devote their time and services, but even to expose their lives against their own consent. But the state has no wish to exercise that prerogative on this occasion.—Much as the publick may appreciate the plaintiffs' services there is no intention to obtain them by compulsion; and if they expose their lives in any battles connected with this question, they do it as *volunteers.* As the corporation was organized by the original charter, no one was obliged to serve as trustee, nor is it the case by the late alteration in its organization. Should the legislature think proper to enact that the Superior Court of Judicature should hereafter consist of five or seven judges instead of three, it is not believed that the judges would pretend they were compelled to continue members of the court, or that any contract was violated by adding to the number. Had they any object of *personal* prejudice or favouritism

(74) 1 Com. 471.

to gratify in the trial of causes, they might complain that their privilege in that respect was curtailed, by the diminution of their power individually, although no powers were taken from the court, but it probably would not have occurred to them to resist the acts of the legislature on the ground that their appointment implied a contract that none others should ever be added to the bench. And if their *only* object was the fair distribution of justice the diminution of their individual power could be no cause of complaint.

Should it however be found that those trustees or any other individuals were holding privileges or offices under the letters patent creating this corporation, which by any possibility could be considered in the nature of contract, and that those individuals in these alterations have not consented by themselves or their representatives;—Still we contend that in the origin of such contract there must have been reserved to the commonwealth the implied condition of altering, amending, or even revoking it altogether, when in the opinion of the commonwealth its welfare should require it.—For if any personal rights or privileges have accrued to individuals from the establishment of this institution, they must have been incidental to the main design and not the object of its creation. And if the object for which it was created requires amendment in its organization, then the collateral or accidental advantages which a few individuals may possess by its present arrangement cannot be placed above, but must yield to the publick object of the institution.—And this the constitution not only does not deny, but expressly authorizes, and in those same articles referred to by their counsel. A prohibition of the exercise of certain powers, *except by the legislature* we do not with the plaintiffs understand to be a denial of the right to that branch of government. And in the very case of *Terrett* vs. *Taylor* which the counsel have referred to, we find the unequivocal opinion of the supreme court of the United States, that the legislature may rightly exercise the power we contend for. " With respect also to publick corporations " (said the judge who delivered the opinion) " the legislature may have a right to change, modify, enlarge, or restrain them, &c."—Where the question was upon this article of the constitution, the learned judge observed that " some of the most necessary and important acts of legislation on the contrary are founded upon the principle that private rights must yield to public exigencies "—Without the possession of this power the operations of government would often be obstructed and society itself endangered. It is not sufficient to urge that the power may be abused, for such is the nature of all power—such is the tendency of every human institution, and it might as fairly be said that the power of taxation, which is only circumscribed by the discretion of the body by which it is vested, ought not to be granted (75)."

Agreeably to the principle we contend for, has been the whole

(75) 3 Dal. Rep. 400.

course of legislation and the continued series of judicial decisions from the adoption of our constitution; and in cases too where the privileges of individuals were much more like *vested rights* than any that are approached by these statutes. In the alteration of counties and towns, instances of which occur at every session of the legislature, those corporations have been subjected to new duties, received addition, or been compelled to part with territory over which they had controul, and officers living in sections so cut off, have not only been deprived of their offices, but rendered incapable of re-election. Those corporations and those officers not being created for the accommodation of the incumbents, but for the benefit of the community, they yield to such changes as the legislature deem that the publick good requires. So the immunity secured by the law of exemption from military duty is subject to the repeal of the law (76). As also the grant of exemption from taxes, as in the case of poll taxes on ministers, &c. (77). So penalties incurred under existing laws, by the repeal of those laws, even after the action commenced, the plaintiff is defeated and deprived of the right which had accrued to him (78). Banks though for private purposes, from their connexion and influence in the public weal, have been subjected against their will to legislative interference.—As banks incorporated subject to pay six per cent. only on debts, were made by statute liable to pay twenty-four per cent. additional interest in certain cases in suits on the contracts themselves (79). In 1784, the Massachusetts bank was incorporated without limitation of time, and in 1811, while the corporation were contending with all their force against the change, the legislature altered and abridged the charter so that the grant should extend only for a limited period. The legislature as the representative of the publick may discontinue a highway whatever right a town may have in it (80). So the law authorizing minors and indented apprentices to enlist and receive their wages without the consent of their masters, has been decided not to *impair the obligation of contracts* in the sense of the constitution (81).

School districts which have certain corporate powers, the legislature have not only altered at their pleasure, but have even subjected them to the alterations of towns. Selectmen, in whose hands money is placed by towns for the support of schools, probably would not have thought, before the action, of resorting to the United States constitution for protection against the legislature,

(76) 12 Mass. Rep. 445.
(77) N. H. Stat. June 1816.
(78) 6 Mass. Rep. 307—9.—2 Do. 125.—9 Do. 363. 153.—8 Do. 471   2. Gall. Rep.
(79) 8 Mass. Rep. 445.—12 Mass. Rep. 252.
(80) 2 Mass. Rep. 146.
(81) 10 Mass. Rep. 389, and Justice Story's opinion U. S. vs. Bainbridge, Cir. Co. Mass. May term 1816.

should they have enacted that a committee be joined to the select-men in the charge of such appropriations. The plaintiffs perhaps may admit that such a legislative act could be supported—but that such concerns are too unimportant to be cited to a case like the present.—May we not ask what interest the plaintiffs have in the funds of this institution, that selectmen have not in the funds of a school district? What right or pretence have the legislature to interfere with the concerns of a school district, but upon the prin-ciple of their vital importance to the public welfare? And are those subordinate *means* thus important and the superior agency of this institution indifferent to the community?

While these acts of the legislature are justified by principle and precedent, I rejoice also that the most distinguished literary insti-tution of the union, by its eminence and prosperity is a striking example of the *salutary influence* of these principles and prece-dents. The renowned university of Harvard, which has ever been subject to legislative controul, exhibits an illustrious proof, that the gloomy apprehensions of the plaintiffs in the present case, are altogether imaginary. To say that such seminaries would be in danger from a design in the legislature to defeat their object or effect their destruction, is to suppose an event that can never take place till the *whole* community shall have degenerated to that state of barbarism, when the light of such an institution could do no more than to make " darkness visible; " and its existence serve no other purpose than as a monument upon the ruins of all our other civil establishments.

Its dangers are from a very different source.—To avert those dangers, these legislative acts have been passed.—Soon may the opposition to them be disarmed by judicial decision, and Dart-mouth arise redeemed from the ruin which has been threatened by an effort to convert to private and personal interests, its pub-lick nature and design.

---

[" Mr. Webster closed the argument by a reply on the part of the plaintiffs ; but as his views of the case are more fully developed in his argument before the supreme court of the United States, it is here omitted." *Farrar's Report, p.* 206. What Farrar reports as the argument of the several counsel was written and fur-nished by them after the cause was decided at Washington, and is not entirely a verbatim report of what was said by them at the hearing. *Case of the Trustees of Dartmouth College against William H. Woodward, by Timothy Farrar, Advertisement ; Dart-mouth College Causes, by John M. Shirley, pp.* 174, 175, 186, 205, 294–298 ; *Private Correspondence of Daniel Webster,* Vol. I, *pp.* 303, 305, 307, 311 ; *Life of Daniel Webster, by George Ticknor Curtis,* Vol. I, *pp.* 167–171 ; *Life and Writings of Rufus Choate,* Vol. I, *pp.* 514–517. Mr. Webster's argument in the United States

supreme court, as reported by Farrar, is given here as the best report now attainable of the one made by him in the state court.]

---

MR. WEBSTER, for the plaintiffs in error.—The general question is, whether the acts of the 27th of June, and of the 18th and 26th of December, 1816, are valid and binding on the rights of the plaintiffs, *without their acceptance or assent.*

The charter of 1769 created and established a corporation, to consist of twelve persons, and no more; to be called the "Trustees of Dartmouth College." The preamble to the charter recites, that it is granted on the application and request of the Rev. Eleazer Wheelock: That Dr. Wheelock, about the year 1754, established a charity school, at his own expense, and on his own estate and plantation: That, for several · years, through the assistance of well disposed persons in America, granted at his solicitation, he had clothed, maintained, and educated a number of the native Indians, and employed them afterwards as missionaries and schoolmasters among the savage tribes: That his design promising to be useful, he had constituted the Rev. Mr. Whitaker to be his attorney, with power to solicit contributions, in England, for the further extension and carrying on of his undertaking; and that he had requested the Earl of Dartmouth, Baron Smith, Mr. Thornton, and other gentlemen, to receive such sums as might be contributed, in England, towards supporting his school, and to be trustees thereof, for his charity; which these persons had agreed to do. And thereupon Dr. Wheelock had executed to them a deed of trust, in pursuance to such agreement, between him and them, and for divers good reasons, had referred it to these persons, to determine the place in which the school should be finally established: And to enable them to form a proper decision on· this subject, had laid before them the several offers which had been made to him by the several governments in America, in order to induce him to settle and establish his school within the limits of such governments for their own emolument, and the increase of learning in their respective places, as well as for the ·furtherance of his general original design. And in as much as a number of the proprietors of lands in New Hampshire, animated by the example of the governour himself and others, and in consideration that without any impediment to its original design, the school might be enlarged and improved, to promote learning among the English, and to supply ministers to the people of that province, had promised large tracts of land, provided the school should be established in that province, the persons before mentioned, having weighed the reasons in favour of the several places proposed, had given the preference to this province, and these offers; that Dr. Wheelock therefore represented the necessity of a legal incorporation, and proposed that certain

gentlemen in America, whom he had already named and appointed in his will, to be trustees of his charity after his decease, should compose the corporation.  Upon this recital, and in consideration of the laudable original design of Dr. Wheelock, and willing that the best means of education be established in New-Hampshire, for the benefit of the province, the king grants  the charter, by the advice of his provincial council.

The substance of the facts thus recited, is, that Dr. Wheelock had founded a charity, on funds owned and procured by himself; that he was at that time the sole dispenser and sole administrator, as well as the legal owner of these funds; that he had made his will, devising this property in trust, to continue the existence and uses of the school, and appointed trustees; that, in this state of things, he had been invited to fix his school, permanently, in New-Hampshire, and to extend the design of it to the education of the youth of that province; that before he removed his school, or accepted this invitation, which his friends in England had advised him to accept, he applied for a charter, to be granted, not to whomsoever the king or government of the province should please, but to such persons as he named and appointed, viz. the persons whom he had already appointed to be the future trustees of his charity by his will.

The charter, or letters patent, then proceed to create such a corporation, and to appoint twelve persons to constitute it, by the name of the "Trustees of Dartmouth College;" to have perpetual existence, as such corporation, and with power to hold and dispose of lands and goods, for the use of the College, with all the ordinary powers of corporations.  They are in their discretion to apply the funds and property of the college to the support of the president, tutors, ministers, and  other  officers of the college, and such missionaries and schoolmasters as they may see fit to employ among the Indians.  There are to be twelve trustees forever, *and no more;* and they are to have the right of filling vacancies occurring in their own body.  The Rev. Mr. Wheelock is declared to be the founder of the college, and is, by the charter, appointed first president, with power to appoint a successor by his last will.  All proper powers of government, superintendence, and visitation, are vested in the trustees.  They are  to  appoint and remove all officers at their discretion; to fix their salaries, and assign their duties: and to make all ordinances, orders, and laws for the government of the students.  And to the end  that the persons who had acted as depositories of the contributions in England, and who had also been contributors themselves, might be satisfied of the good use of their contributions, the president was annually, or when required, to transmit to them an account of the progress of the institution and the disbursements of its funds, so long as they should continue to act in that trust.—These letters patent are to be good and effectual, in law, *against the king, his heirs and*

*successors forever*, without further grant or confirmation; and the trustees are to hold all and singular these privileges, advantages, liberties, and immunities to them and to their successors forever.

No funds are given to the college by this charter. A corporate existence and capacity are given to the trustees, with the privileges and immunities which have been mentioned, to enable the founder and his associates the better to manage the funds which they themselves had contributed, and such others as they might afterwards obtain.

After the institution, thus created and constituted, had existed, uninterruptedly and usefully, nearly fifty years, the legislature of New-Hampshire passed the acts in question.

The first act makes the twelve trustees under the charter, and nine other individuals to be appointed by the governour and council, a corporation, by a new name; and to this new corporation transfers all the *property, rights, powers, liberties and privileges* of the old corporation; with further power to establish new colleges and an institute, and to apply all or any part of the funds to these purposes: subject to the power and controul of a board of twenty-five overseers, to be appointed by the governour and council.

The second act makes further provisions for executing the objects of the first, and the last act authorizes the defendant, the treasurer of the plaintiffs, to retain and hold their property, against their will.

If these acts are valid, the old corporation is abolished, and a new one created. The first act does, in fact, if it can have any effect, *create a new corporation*, and transfer to it all the property and franchises of the old. The two corporations are not the same, in any thing which essentially belongs to the existence of a corporation. They have different names, and different powers, rights, and duties. Their organization is wholly different. The powers of the corporation are not vested in the same, or similar hands. In one, the trustees are twelve, and no more. In the other, they are twenty-one. In one, the power is in a single board. In the other, it is divided between two boards. Although the act professes to include the old trustees in the new corporation, yet that was without their assent, and against their remonstrance; and no person can be compelled to be a member of such a corporation against his will. It was neither expected nor intended, that they should be members of the new corporation. The act itself treats the old corporation as at an end, and going on the ground that all its functions have ceased, it provides *for the first meeting and organization of the new corporation.* It expressly provides, also, that the new corporation shall have and hold all the property of the old; a provision which would be quite unnecessary upon any other ground, than that the old corporation was dissolved. But if it could be contended, that the effect of these

acts was not entirely to abolish the old corporation, yet it is manifest that they impair and invade the rights, property, and powers of the trustees under the charter, *as a corporation*, and the legal rights, privileges, and immunities which belong to them, *as individual members* of the corporation.

The twelve trustees were the *sole* legal owners of all the property acquired under the charter. By the acts others are admitted, against *their* will, to be joint owners. The twelve individuals, who are trustees, were possessed of all the franchises and immunities conferred by the charter.—By the acts, *nine* other trustees, and *twenty-five* overseers are admitted against their will, to divide these franchises and immunities with them.

If either as a corporation, or as individuals, they have any *legal rights*, this forcible intrusion of others violates those rights, as manifestly as an entire and complete ouster and dispossession. These acts alter the whole constitution of the corporation. They affect the rights of the whole body as a corporation, and the rights of the individuals who compose it. They revoke corporate powers and franchises.—They alienate and transfer the property of the college to others. By the charter, the trustees had a right to fill vacancies in their own number. This is now taken away. They were to consist of twelve, and by express provision of no more. This is altered. They and their successors, appointed by themselves, were forever to hold the property. The legislature has found successors for them, before their seats are vacant. The powers and privileges, which the twelve were to exercise *exclusively*, are now to be exercised by others. By one of the acts, they are subjected to heavy penalties, if they exercise their offices, or any of those powers and privileges granted them by charter, and which they had exercised for fifty years. They are to be *punished* for not accepting the new grant, and taking its benefits. This, it must be confessed, is rather a summary mode of settling a question of constitutional right. Not only are new trustees forced into the corporation, but new trusts and uses are created. The college is turned into a university. Power is given to create new colleges, and, to authorize any diversion of the funds, which may be agreeable to the new boards, sufficient latitude is given by the undefined power of establishing an *Institute*. To these new colleges, and this *Institute*, the funds contributed by the founder, Dr. Wheelock, and by the original donors, the Earl of Dartmouth and others, are to be applied, in plain and manifest disregard of the uses to which they were given.

The president, one of the old trustees, had a right to his office, salary, and emoluments, subject to the twelve trustees alone. His title to these is now changed, and he is made accountable to new masters. So also all the professors and tutors. If the legislature can at pleasure make these alterations and changes, in the rights and privileges of the plaintiffs, it may, with equal propriety, abol-

ish these rights and privileges altogether. The same power which can do any part of this work, can accomplish the whole. And indeed, the argument on which these acts have been hitherto defended, goes altogether on the ground, that this is such a corporation as the legislature may abolish at pleasure; and that its members have no *rights, liberties, franchises, property or privileges,* which the legislature may not revoke, annul, alienate or transfer to others whenever it sees fit.

It will be contended by the plaintiffs *that these acts are not valid and binding on them, without their assent.* 1. Because they are against common right, and the constitution of New-Hampshire. 2. Because they are repugnant to the constitution of the United States.

I am aware of the limits which bound the jurisdiction of the court in this case and that on this record nothing can be decided, but the single question, whether these acts are repugnant to the constitution of the United States. Yet it may assist in forming an opinion of their true nature and character, to compare them with these fundamental principles, introduced into the state governments for the purpose of limiting the exercise of the legislative power, and which the constitution of New-Hampshire expresses with great fulness and accuracy.

It is not too much to assert, that the legislature of New-Hampshire would not have been competent to pass the acts in question, and to make them binding on the plaintiffs without their assent, even if there had been, in the constitution of New-Hampshire, or of the United States, no special restriction on their power; because these acts are not the exercise of a power properly legislative (1). Their object and effect is to take away, from one, rights, property, and franchises, and to grant them to another. This is not the exercise of a legislative power. To justify the taking away of vested rights, there must be a forfeiture; to adjudge upon and declare which, is the proper province of the judiciary. Attainder and confiscation are acts of sovereign power; not acts of legislation. The British parliament, among other unlimited powers, claims that of altering and vacating charters; not as an act of ordinary legislation, but of uncontroulled authority. It is theoretically omnipotent. Yet, in modern times, it has attempted the exercise of this power very rarely. In a celebrated instance, those who asserted this power in parliament, vindicated its exercise only in a case, in which it could be shewn, 1st, that the charter in question was a charter of political power; 2. That there was a great and over-ruling state necessity, justifying the violation of the charter. 3. That the charter had been abused, and justly forfeited (2). The bill affecting this charter did not pass. Its history is well known.

(1) Calder et ux. v. Bull, 3d Dallas 386.
(2) Annual Regr. 1784, p. 160.—Parlia. Regr. 1783.—Mr. Burke's Speech on
    Mr. Fox's E. I. Bill. Burke's Works—2 Vol. p. 414. 417. 467. 468. 486.

The act which afterwards did pass, passed *with the assent of the corporation*. Even in the worst times this power of parliament to repeal and rescind charters, has not often been exercised. The illegal proceedings in the reign of Charles II. were under colour of law. Judgments of forfeiture were obtained in the courts. Such was the case of the quo warranto against the city of London, and the proceedings by which the charter of Massachusetts was vacated.

The legislature of New-Hampshire has no more power over the rights of the plaintiffs than existed, somewhere, in some department of government, before the revolution. The British parliament could not have annulled or revoked this grant as an act of ordinary legislation. If it had done it at all, it could only have been in virtue of that sovereign power, called omnipotent, which does not belong to any legislature in the United States. The legislature of New-Hampshire has the same power over this charter, which belonged to the king, who granted it; and no more. By the law of England the power to create corporations is a part of the royal prerogative.(3) By the revolution, this power may be considered as having devolved on the legislature of the state, and it has accordingly been exercised by the legislature. But the king cannot abolish a corporation, or new model it, or alter its powers without its assent. This is the acknowledged and well known doctrine of the common law. "Whatever might have been the notion in former times," says lord Mansfield, "it is most certain now, that the corporations of the universities are lay corporations; and that the crown cannot take away from them any rights that have been formerly subsisting in them under old charters or prescriptive usage" (4). After forfeiture duly found, the king may regrant the franchises; but a grant of franchises already granted, and of which no forfeiture has been found, is void.

Corporate franchises can only be forfeited by trial and judgment (5). In case of a new charter or grant to an existing corporation, it may accept or reject it as it pleases (6). It may accept such part of the grant as it chooses, and reject the rest (7). In the very nature of things, a charter cannot be forced upon any body. No one can be compelled to accept a grant; and without acceptance, the grant is necessarily void (8). It cannot be pretended that the legislature, as successor to the king in this part of his prerogative, has any power to revoke, vacate or alter this charter. If, therefore, the legislature has not this power by any specific grant contained in the constitution; nor as included in its ordinary legislative pow-

(3) 1 Black. 472, 473.
(4) 3 Burr. 1656.
(5) 3 T. R. 244. King vs. Pasmore.
(6) King vs. Vice Chancellor of Cambridge, 3 Burr. 1656. 3 T. R. 240.— Lord Kenyon.
(7) Idem 1661, and King vs. Pasmore, ubi supra.
(8) Ellis vs. Marshall, 2 Mass. Rep. 277. 1 Kyd. on corporations 65 6.

ers ; nor by reason of its succession to the prerogatives of the crown in this particular; on what ground would the authority to pass these acts rest; even if there were no prohibitory clauses in the constitution and the bill of rights ?

But there *are* prohibitions in the constitution and bill of rights of New-Hampshire, introduced for the purpose of limiting the legislative power, and protecting the rights and property of the citizens. One prohibition is " *that no person shall be deprived of his property, immunities, or privileges, put out of the protection of the law, or deprived of his life, liberty, or estate, but by judgment of his peers or the law of the land.*"

In the opinion, however, which was given in the court below, it is denied that the trustees under the charter, had any property, immunity, liberty or privilege, in this corporation within the meaning of this prohibition in the bill of rights. It is said that it is a *publick corporation*, and *publick property*. That the trustees have no greater interest in it, than any other individuals. That it is not private property, which they can sell, or transmit to their heirs ; and that *therefore* they have no interest in it. That their office is a publick trust like that of the governour, or a judge; and that they have no more concern in the property of the college, than the governour in the property of the state, or than the judges in the fines which they impose on the culprits at their bar. That it is nothing to them, whether their powers shall be extended or lessened; any more than it is to their honours, whether their jurisdiction shall be enlarged or diminished. It is necessary, therefore, to inquire into the true nature and character of the corporation, which was created by the charter of 1769.

There are divers sorts of corporations; and it may be safely admitted that the legislature has more power over some than others (9). Some corporations are for government and political arrangement; such for example as cities, counties and towns in New-England. These may be changed and modified as publick convenience may require, *due regard being always had to the rights of property.* Of such corporations, all who live within the limits are of course obliged to be members, and to submit to the duties which the law imposes on them as such. Other civil corporations are for the advancement of trade and business, such as banks, insurance companies, and the like. These are created not by general law, but usually by grant. Their constitution is special. It is such as the legislature sees fit to give, and the grantees to accept.

The corporation in question is not a *civil*, although it is a *lay* corporation. It is an *eleemosynary* corporation. It is a *private charity*, originally founded and endowed by an individual, with a charter obtained for it at *his* request, for the better administration of *his charity*. " The eleemosynary sort of corporations, are such

(9) 1 Wooddeson 474.  1 Black. 467.

as are constituted for the perpetual distributions of the free alms or bounty of the founder of them, to such persons as he has directed. Of this are all hospitals for the maintenance of the poor, sick and impotent; and all colleges both in our universities and out of them." (10).—Eleemosynary corporations are for the management of private property according to the will of the donors. They are private corporations. A college is as much a private corporation, as an hospital; especially, a college, founded as this was, by private bounty. A college is a charity.—" The establishment of learning," says lord Hardwicke, " is a charity, and so considered in the statute of Elizabeth. A devise to a college, for their benefit, is a laudable *charity*, and deserves encouragement " (11).

The legal signification of *a charity* is derived chiefly from the statute 43 Eliz. ch. 4. " Those purposes," says sir William Grant, " are considered *charitable* which that statement enumerates " (12). *Colleges* are enumerated, as *charities* in that statute. The government, in these cases, lends its aid to perpetuate the beneficent intention of the donor, by granting a charter, under which his private charity shall continue to be dispensed, after his death. This is done either by incorporating the *objects* of the charity, as for instance, the scholars in a college, or the poor in an hospital; or by incorporating those who are to be governours, or trustees of the charity (13). In cases of the first sort the *founder* is, by the common law, *visitor*. In early times it became a maxim, that he who gave the property, might regulate it in future. *Cujus est dare, ejus est disponere.* This right of *visitation* descended from the founder to his heir, as a right of property, and precisely as his other property went to his heir; and in default of heirs, it went to the king, as all other property goes to the king for the want of heirs.—The right of visitation arises from the property. It grows out of the endowment. The founder may, if he please, part with it, at the time when he establishes the charity, and may vest it in others. Therefore if he chooses that governours, trustees or overseers should be appointed in the charter, he may cause it to be done, *and his power of visitation will be transferred to them*, instead of descending to his heirs. The persons thus assigned or appointed by the founder will be visitors, with all the powers of the founder, in exclusion of his heir (14). The right of visitation then accrues to them, as a matter of property, by the gift, transfer or appointment of the founder. This is a private right, which they can assert in all legal modes, and in which they have the same protection of the law as in all other rights. As visitors they may make rules, ordinances and statutes, and alter and repeal them, as far as per-

(10) 1 Black. 471.
(11) 1 Ves. 537.
(12) 9 Ves. Jun. 405.
(13) 1 Wood. 474.
(14) 1 Black. 471.

mitted so to do by the charter (15). Although the charter proceeds from the crown, or the government, it is considered as the will of the donor. It is obtained at his request. He imposes it as the rule which is to prevail in the dispensation of his bounty in all future times. The king, or government, which grants the charter is not thereby the founder, but he who furnishes the funds. The gift of the revenues is the foundation (16). The leading case on this subject is *Phillips* vs. *Bury*, [reported in 1 Lord Raymond 5. —Comb. 265.—Holt 715.—1 Show. 360.—4 Mod. 106.—Skinn. 447.] This was an ejectment, brought to recover the rectory house, &c. of *Exeter College*, in Oxford. The question was whether the plaintiff or defendant was legal rector. Exeter college was founded by an individual, and incorporated by a charter granted by *Queen Elizabeth.* The controversy turned upon the power of the visitor, and in the discussion of the cause, the nature of college charters and corporations was very fully considered. Lord Holt's judgment, copied from his own manuscript, is in 2 Term. Rep. 346. The following is an extract: "That we may the better apprehend the nature of a visitor, we are to consider, that there are in law two sorts of corporations aggregate; such as are for publick government, and such as are for private charity. Those that are for the publick government of a town, city, mystery, or the like, being for publick advantage, are to be governed according to the laws of the land; if they make any particular private laws and constitutions, the validity and justice of them is examinable in the king's courts; of these there are no particular private founders, and consequently no particular visitor; there are no patrons of these; therefore if no provision be in the charter how the succession shall continue, the law supplieth the defect of that constitution, and saith it shall be by election; as mayor, aldermen, common council, and the like. But *private* and particular corporations for charity, founded and endowed by private persons, are subject to the private government of those who erect them; and, therefore, if there be no visitor appointed by the founder, the law appoints the founder and his heirs to be visitors, who are to act and proceed according to the particular laws and constitutions assigned them by the founder. It is now admitted on all hands, that the founder is patron, and, as founder, is visitor, if no particular visitor be assigned. So that patronage and visitation are necessary consequents one upon another; for this visitatorial power was not introduced by any canons or constitutions ecclesiastical (as was said by a learned gentleman whom I have in my eye, in his argument of this case:) it is an appointment of law; it ariseth from the property which the founder had in the lands assigned to support the charity; and as he is the author of the charity, the law gives him and his heirs a visitatorial power, that is, an authority to inspect the actions and regulate the

(15) 2 Term Rep. 350–1.
(16) 1 Black. 480.

behaviour of the members that partake of the charity; for it is fit the members that are endowed, and that have the charity bestowed upon them, should not be left to themselves, but pursue the intent and design of him that bestowed it upon them. *Now indeed, where the poor, or those that receive the charity, are not incorporated, but there are certain trustees who dispose of the charity, there is no visitor; because the interest of the revenue is not vested in the poor that have the benefit of the charity, but they are subject to the orders and directions of the trustees.* But where they who are to enjoy the benefit of the charity are incorporated, there to prevent all perverting of the charity, or to compose differences that may happen among them, there is by law a visitatorial power; and it being a creature of the founder's own, it is reason that he and his heirs should have that power, unless by the founder it is vested in some other. Now there is no manner of difference between a college and an hospital, except only in degree; an hospital is for those that are poor, and mean, and low, and sickly: a college is for another sort of indigent persons; but it hath another intent, to study in, and breed up persons in the world, that have no otherwise to live; but still it is as much within the reasons as hospitals. And if in an hospital the master and poor are incorporated, it is a college having a common seal to act by, although it hath not the name of a college, (which always supposeth a corporation) because it is of an inferiour degree; and in the one case and in the other there must be a visitor, either the founder and his heirs, or one appointed by him; and both are eleemosynary." Lord Holt concludes his whole argument by again repeating, that that college was a *private corporation*, and that the founder had a right to appoint a visitor, and to give him such power as he saw fit (17).

The learned Bishop Stillingfleet's argument in the same cause as a member of the house of lords, when it was there heard, exhibits very clearly the nature of colleges and similar corporations. It is to the following effect. "That this absolute and conclusive power of visitors, is no more than the law hath appointed in other cases, upon commissions of charitable uses: that the common law, and not any ecclesiastical canons, do place the power of visitation in the founder and his heirs, *unless he settle it upon others:* that although corporations for publick government be subject to the courts of Westminster-Hall, which have no particular, or special visitors; yet corporations for charity, founded and endowed by private persons, are subject to the rule and government of those that erect them; but where the persons to whom the charity is given are not incorporated, there is no such visitatorial power, because the interest of the revenue is not invested in them; but where they are, the right of visitation ariseth from the foundation, and the founder may convey *it to whom and in what manner he pleases; and the visitor acts as founder, and by the*

(17) 1 Lord Ray. 9.

*same authority which he had, and consequently is no more account-*
*able than he had been :* that the king by his charter can make a
society to be incorporated so as to have the rights belonging to
persons, as to legal capacities : that colleges, although founded by
private persons, are yet incorporated by the king's charter; but
although the kings by their charter made the colleges to be such
in law, that is, to be legal corporations, yet they left to the par-
ticular founders authority to appoint what statutes they thought
fit for the regulation of them.   And not only the statutes, but the
appointment of visitors was left to them, and the manner of gov-
ernment, and the several conditions, on which any persons were
to be made or continue partakers of their bounty (18).   These
opinions received the sanction of the house of lords, and they seem
to be settled and undoubted law.   Where there is a charter, vest-
ing proper powers in *trustees*, or *governours*, they are *visitors;* and
there is no controul in any body else ; except only that the courts
of equity or of law will interfere so far as to preserve the revenues
and prevent the perversion of the funds and to keep the visitors
within their prescribed bounds.   "If there be a charter with
proper powers, the charity must be regulated in the manner pre-
scribed by the charter.   There is no ground for the controlling
interposition of the courts of chancery.   The interposition of the
courts therefore, in those instances in which the charities were
founded on charters or by act of parliament, and a visitor, or gov-
ernour and trustees appointed, must be referred to the general
jurisdiction of the courts in all cases in which a trust conferred
appears to have been abused, *and not to an original right to direct*
*the management of the charity, or the conduct of the governours or*
*trustees* (19)."—"The original of all *visitatorial* power is the prop-
erty of the donor, and the power every one has to dispose, direct
and regulate his own property; like the case of patronage ; *cujus*
*est dare, &c.   Therefore, if either the crown or the subject creates*
*an eleemosynary foundation, and vests the charity in the persons*
*who are to receive the benefit of it, since a contest might arise about*
*the government of it, the law allows the founder or his heirs, or the*
*person specially appointed by him to be visitor, to determine con-*
*cerning his own creature.   If the charity is not vested in the persons,*
*who are to partake, but in trustees for their benefit, no visitor can*
*arise by implication, but the trustees have that power* (20)."

"There is nothing better established," says lord commissioner
Eyre, "than that this court does not entertain a general juris-
diction, or regulate and controul charities *established by charter.*
There the establishment is fixed and determined ; and the court
has no power to vary it.   If the governours established for the
regulation of it, are not those who have the management of the

(18) See Appendix No. 3.   1 Burn's Eccles.   Law 443.
(19) 2 Fonb. 205—6.
(20) 1 Ves. 472.   Green vs. Rutherford, per Lord Hardwicke.

revenue, this court has no jurisdiction, and if it is ever so much abused as far as it respects the jurisdiction of this court, it is without remedy; but if those established as governours, have also the management of the revenues, this court does assume a jurisdiction of necessity, so far as they are to be considered as trustees of the revenue (21)."

" The foundations of colleges," says lord Mansfield, " are to be considered in two views, viz. as they are *corporations* and as they are *eleemosynary*. As eleemosynary, they are the creatures of the founder; he may delegate his power, either generally or specially; he may prescribe particular modes and manners, as to the exercise of part of it. If he makes a general visitor, (as by the general words *visitator sit*) the person so constituted has all incidental power; but he may be restrained as to particular instances. The founder may appoint a special visitor for a particular purpose and no further. The founder may make a general visitor; and yet appoint an inferiour particular power, to be executed without going to the visitor in the first instance " (22). And even if the king be founder, if he grant a charter, incorporating trustees and governours, *they are visitors*, and the king cannot visit (23). A subsequent donation, or engrafted fellowship, falls under the same general visitatorial power, if not otherwise specially provided (24).

In New England, and perhaps throughout the United States, eleemosynary corporations have been generally established in the latter mode; that is, by incorporating governours, or trustees, and vesting in them the right of visitation. Small variations may have been in some instances adopted; as in the case of Harvard College, where some power of inspection is given to the overseers, but not strictly speaking, a visitatorial power, which still belongs, it is apprehended to the fellows, or members of the corporation. In general, there are many donors. A charter is obtained, comprising them all, or some of them, and such others as they choose to include, with the right of appointing their successors. They are thus the visitors of their own charity and appoint others, such as they may see fit, to exercise the same office in time to come. All such corporations are private. The case before the court is clearly that of an eleemosynary corporation. It is, in the strictest legal sense a private charity. In *King* vs. *St. Catherine's Hall* (25), that college is called a *private eleemosynary lay corporation.* It was endowed by a private founder, and incorporated by letters patent. And in the same manner was Dartmouth College founded

(21) Attorney General vs. Foundling hospital. 2 Ves. Junr. 47.   Vide also 2 Kyd on Corporations, 195.   Cooper's Equity Pleading, 292.
(22) St. John's College, Cambridge vs. Tedington.   1 Burr.   200.
(23) Attorney General vs. Middleton, 2 Ves. 328.
(24) Green vs. Rutherford, ubi supra.   St. John's College vs. Todington, ubi supra.—Vide Appendix No. 4.
(25) 4 Term Rep. 233.

and incorporated.   Dr. Wheelock is declared by the charter to be its founder.   It was established by him, on funds contributed and collected by himself.

As such founder, he had a right of visitation, which he assigned to the trustees, and they received it by his consent and appointment, and held it under the charter (26).   He appointed these trustees visitors, and in that respect to take place of his heir ; as he might have appointed devisees, to take his estate instead of his heir.   Little, probably, did he think at that time, that the legislature would ever take away this property and these privileges, and give them to others. Little did he suppose, that this charter secured to him and his successors no legal rights.   Little did the other donors think so.   If they had, the college would have been, what the university is now, a thing upon paper, existing only in name.

The numerous academies in New-England have been established substantially in the same manner.   They hold their property by the same tenure, and no other.   Nor has Harvard college (27) any surer title than Dartmouth college.   It may, to-day, have more friends : but to-morrow it may have more enemies.   Its legal rights are the same.   So also of Yale College (28) ; and indeed of all the others.   When the legislature gives to these institutions, it may and does accompany its grants with such conditions as it pleases. The grant of lands by the legislature of New Hampshire to Dartmouth college, in 1789, was accompanied with various conditions. When donations are made, by the legislature, or others, to a charity already existing, without any condition, or the specification of any new use, the donation follows the nature of the charity.   Hence the doctrine, that all eleemosynary corporations are private bodies. They are founded by private persons, and on private property. The publick cannot be charitable in these institutions.   It is not the money of the publick, but of private persons, which is dispensed.   It may be publick, that is general, in its uses and advantages ; and the state may very laudably add contributions of its own to the funds ; but it is still private in the tenure of the property, and in the right of administering the funds.

If the doctrine laid down by lord Holt, and the house of lords in *Phillips* vs. *Bury*, and recognized and established in all the other cases, be correct, the property of this college was private property ; it was vested in the trustees by the charter, and to be administered by them, according to the will of the founder and donors as expressed in the charter.   They were also *visitors* of the charity, in the most ample sense.   *They* had therefore, as they contend, *privileges, property*, and *immunities*, within the true meaning of the bill of rights.   They had rights, and still have them, which they can assert against the legislature, as well as against other

(26) Black. ubi supra. .
(27) Vide Appendix No. 5.
(28) Vide Appendix No. 6.

wrong-doers.   It makes no difference, that the estate is holden for certain trusts.   The legal estate is still theirs.   They have a right in the property, and they have a right of visiting and superintending the trust; and this is an object of legal protection, as much as any other right.   The charter declares that the powers conferred on the trustees are privileges, advantages, liberties, and immunities;" and that they shall be forever holden by them and their successors.   The New-Hampshire bill of rights declares that no one shall be deprived of his " property, privileges or immunities," but by judgment of his peers, or the law of the land.   The argument on the other side is, that although these terms may mean something in the bill of rights, they mean nothing in this charter.   But they are terms of legal signification, and very properly used in the charter.   They are equivalent with *franchises.*   Blackstone says that *franchise* and *liberty* are used as synonymous terms.   And after enumerating other *liberties* and *franchises*, he says, " it is likewise a franchise for a number of persons to be incorporated and subsist as a body politick; with a power to mantain perpetual succession and do other corporate acts: *and each individual member of such corporation is also said to have a franchise or freedom* " (29).

*Liberties* is the term used in *magna charta* as including franchises, privileges, immunities, and all the rights which belong to that class.   Professor Sullivan says, the term signifies the "*privileges* that some of the subjects, whether single persons or bodies corporate, have above others by the lawful grant of the king; as the chattels of felons or outlaws, and the lands *and privileges of corporations* " (30).

The privilege, then, of being a member of a corporation, under a lawful grant, and of exercising the rights and powers of such member, is such a privilege, *liberty* or *franchise*, as has been the object of legal protection, and the subject of a legal interest, from the time of *magna charta* to the present moment.   The plaintiffs have such an interest in this corporation, individually, as they could assert and maintain in a court of law, not as agents of the publick, but in their own right.   Each trustee has a *franchise*, and if he be disturbed in the enjoyment of it, he would have redress, on appealing to the law, as promptly as for any other injury.   If the other trustees should conspire against any one of them to prevent his equal right and voice in the appointment of a president or professor, or in the passing of any statute or ordinance of the college, he would be entitled to his action, for depriving him of his franchise.   It makes no difference, that this property is to be holden and administered, and these franchises exercised for the purpose of diffusing learning.   No principle and no case establishes any such distinction.   The publick may be benefited by the use of this property.   But this does not change the nature of the property, or the rights of the

(29) 2 Black. Com. 37.
(30) Sull. 41st Lect.

owners.    The object of the charter may be publick good; so it is in all other corporations; and this would as well justify the resumption or violation of the grant in any other case as in this.    In the case of an advowson, the use is publick, and the right cannot be turned to any private benefit or emolument.    It is nevertheless a legal private right, and the *property* of the owner, as emphatically as his freehold.    The rights and privileges of trustees, visitors, or governours of incorporated colleges, stand on the same foundation.    They are so considered, both by lord Holt and lord Hardwicke (31).

To contend that the rights of the plaintiffs may be taken away, because they derive from them no pecuniary benefit, or private emolument, or because they cannot be transmitted to their heirs, or would not be assets to pay their debts, is taking an extremely narrow view of the subject.    According to this notion, the case would be different, if, in the charter, they had stipulated for a commission on the disbursement of the funds; and they have ceased to have any interest in the property, because they have undertaken to administer it gratuitously.

It cannot be necessary to say much in refutation of the idea, that there cannot be a legal interest, or ownership, in any thing which does not yield a pecuniary profit; as if the law regarded no rights but the rights of money, and of visible tangible property. Of what nature are all rights of suffrage?    No elector has a particular personal interest; but each has a legal right, to be exercised at his own discretion and it cannot be taken away from him.    The exercise of this right directly and very materially affects the publick; much more so than the exercise of the privileges of a trustee of this college.    Consequences of the utmost magnitude may sometimes depend on the exercise of the right of suffrage by one or a few electors.    Nobody was ever yet heard to contend, however, that on that account the publick might take away the right or impair it.    This notion appears to be borrowed from no better source than the repudiated doctrine of the three judges in the Aylesbury case (32).    That was an action against a returning officer for refusing the plaintiff's vote, in the election of a member of parliament.— Three of the judges of the king's bench held, that the action could not be maintained, because among other objections, "*it was not any matter of profit, either in presenti, or in futuro.*"    It would not enrich the plaintiff, *in presenti*, nor would it, *in futuro*, go to his heirs, or answer to pay his debts.    But lord Holt and the house of lords were of another opinion.    The judgment of the three judges was reversed, and the doctrine they held, having been exploded for a century, seems now for the first time to be revived.

Individuals have a right to use their own property for purposes of benevolence, either towards the publick, or towards other indi-

(31) Phillips vs. Bury.—Green vs. Rutherforth, ubi supra.—Vide also 2 Black. 21.
(32) Ashby vs. White, 2 Lord Ray. 938.

viduals.   They have a right to exercise this benevolence in such
lawful manner as they may choose; and when the government has
induced and excited it, *by contracting to give perpetuity to the stip-
ulated manner of exercising it*, to rescind this contract, and seize
on the property, is not law, but violence.   Whether the state will
grant these franchises, and under what conditions it will grant
them, it decides for itself.   But when once granted, the constitu-
tion holds them to be sacred, till forfeited for just cause.

That all property, of which the use may be beneficial to the
publick, belongs therefore to the publick, is quite a new doctrine.
It has no precedent, and is supported by no known principle.   Dr.
Wheelock might have answered his purposes, in this case, by exe-
cuting a private deed of trust.—He might have conveyed his prop-
erty to trustees, for precisely such uses as are described in this
charter.   Indeed it appears, that he had contemplated the estab-
lishing of his school in that manner, and had made his will, and
devised the property to the same persons who were afterwards
appointed trustees in the charter.   Many literary and other chari-
table institutions are founded in that manner, and the trust is
renewed, and conferred on other persons, from time to time, as
occasion may require.   In such a case, no lawyer would or could
say that the legislature might divest the trustees, constituted by
deed or will, seize upon the property, and give it to other persons,
for other purposes.   And does the granting of a charter, which
is only done to perpetuate the trust in a more convenient manner
make any difference?   Does or can this change the nature of the
charity, and turn it into a publick political corporation?—Happily
we are not without authority on this point.   It has been considered
and adjudged.   Lord Hardwicke says, in so many words, " the
charter of the crown cannot make a charity more or less publick,
but only more permanent than it would otherwise be (33).

The granting of the corporation is but making the trust perpet-
ual, and does not alter the nature of the charity.   The very object
sought in obtaining such charter, and in giving property to such a
corporation, is to make and keep it private property, and to clothe
it with all the security and inviolability of private property.   The
intent is, that there shall be a legal private ownership, and that
the legal owners shall maintain and protect the property, for the
benefit of those for whose use it was designed.   Who ever endowed
the publick?   Who ever appointed a legislature to administer his
charity?   Or who ever heard, before, that a gift to a *college*, or
*hospital*, or an *asylum*, was, in reality, nothing but a gift to the
state.

The state of Vermont is a principal donor to Dartmouth College.
The lands given lie in that state.   This appears in the special
verdict.   Is Vermont to be considered as having intended a gift
to the state of New-Hampshire in this case; as it has been said is

(33) 2 Atk. 87.   Attorney General vs. Pearce.

to be the reasonable construction of all donations to the college? The legislature of New-Hampshire affects to represent the *publick*, and therefore claims a right to controul all property destined to publick use.  What hinders Vermont from considering herself equally the representative of the *publick*, and from resuming her grants, at her own pleasure?  Her right to do so is less doubtful than the power of New-Hampshire to pass the laws in question.

In *University* vs. *Foy* (34) the supreme court of North-Carolina pronounced unconstitutional and void, a law repealing a grant to the University of North-Carolina; although that university was originally erected and endowed by a statute of the state.  That case was a grant of *lands*, and the court decided that it could not be resumed.  This is the grant of a power and capacity *to hold lands*.  Where is the difference of the cases, upon principle?

In *Terrett* vs. *Taylor* (35) this court decided, that a legislative grant or confirmation of lands, for the purposes of moral and religious instruction could no more be rescinded than other grants. The nature of the use was not holden to make any difference.  A grant to a parish or church, for the purposes which have been mentioned, cannot be distinguished, in respect to the title it confers, from a grant to a college for the promotion of piety and learning.  To the same purpose may be cited the case of *Pawlett* vs. *Clark.*  The state of Vermont, by statute in 1794, granted to the respective towns in that state, certain glebe lands lying within those towns *for the sole use and support of religious worship.*  In 1799, an act was passed to *repeal the act of* 1794; but this court declared, that the act of 1794, " so far as it granted the glebes to the towns, *could not afterwards be repealed by the legislature, so as to divest the rights of the towns under the grant*" (36).

It will be for the other side to shew, that the nature of the *use*, decides the question, whether the legislature has power to resume its grants.  It will be for those, who maintain such a doctrine, to shew the *principles and cases* upon which it rests.  It will be for them also to fix the limits and boundaries of their doctrine, and to shew, what are and what are not, such uses as to give the legislature this power of resumption and revocation.  And to furnish an answer to the cases cited, it will be for them further to shew, that a grant for the *use and support of religious worship*, stands on other ground than a grant for *the promotion of piety and learning.*

I hope enough has been said to shew, that the trustees possessed vested liberties, privileges, and immunities, under this charter; and that such liberties, privileges and immunities, being once lawfully obtained and vested, are as inviolable as any vested rights of property whatever.—Rights to do certain acts, such, for instance, as

(34) 2 Haywood's Rep.
(35) 9 Cranch 43.
(36) 9 Cranch 292.

the visitation and superintendence of a college and the appoint-
ment of its officers, may surely be *vested rights*, to all legal intents,
as completely as the right to possess property.   A late learned
judge of this court has said. when I say that a *right* is vested in a
citizen, I mean that he has the power to do *certain actions ;* or to
possess *certain things ;* according to the law of the land (37).

If such be the true nature of the plaintiffs' interests under this
charter, what are the articles in the New-Hampshire bill of rights
which these acts infringe?

They infringe the *second article ;* which says, that the citizens
of the state have a right to *hold and possess property.*   The plain-
tiffs had a legal property *in* this charter; and they had acquired
property *under* it.   The acts deprive them of both.   They impair
and take away the charter; and they appropriate the property to
new uses, against their consent.   The plaintiffs cannot now *hold*
the property acquired by themselves, and which this article says
they have a right to hold.

They infringe the *twentieth article.*   By that article it is declared,
that in questions of property, *there is a right to trial.*   The plain-
tiffs are divested, *without* trial or judgment.

They infringe the *twenty-third article.*   It is therein declared,
that *no retrospective laws shall be passed.*   This article bears
directly on the case.   These acts must be deemed to be *retrospec-
tive,* within the settled construction of that term.   What a retro-
spective *law* is, has been decided on the construction of this very
article, in the circuit court for the first circuit.   The learned judge
of that circuit, says, "every statute which takes away, or impairs,
vested rights, acquired under existing laws, must be deemed retro-
spective" (38).   That all such laws are retrospective, was decided
also in the case of *Dash* vs. *Van Kleek* (39) where a most learned
judge quotes this article from the constitution of New-Hampshire,
with manifest approbation, as a plain and clear expression of those
fundamental and unalterable principles of justice, which must lie
at the foundation of every free and just system of laws.   Can any
man deny that the plaintiffs had *rights*, under the charter, which
were legally *vested*, and that by these acts, those rights are
*impaired?*

"It is a principle in the English law," says chief justice Kent,
in the case last cited, "as ancient as the law itself, that a statute,
even of its omnipotent parliament, is not to have a retrospective
effect.   *Nova constitutio futuris formam imponere debet, et non
præteritis* (40).   The maxim in Bracton, was probably taken from
the civil law, for we find in that system the same principle, that
the lawgiver cannot alter his mind to the prejudice of a vested

(37) 3 Dal. 394.
(38) 2 Gal.   103. Society vs. Wheeler.
(39) 7 Johnson's Rep. 477.
(40) Bracton Lib. 4. fol. 228. 2nd Inst. 292.

right. *Nemo potest mutare concilium suum in alterius injuriam* (41). This maxim of Papinian is general in its terms, but Dr. Taylor (42) applies it directly as a restriction upon the lawgiver, and a declaration in the code leaves no doubt as to the sense of the civil law. *Leges et constitutiones futuris certum est dare formam negotiis, non ad facta præterita revocari, nisi nominatim, et de præterito tempore, et adhuc pendentibus negotiis cautum sit* (43). This passage, according to the best interpretation of the civilians, relates not merely to future suits, but to future, as contradistinguished from past contracts and vested rights (44). It is, indeed, admitted that the prince may enact a retrospective law, provided it be done *expressly;* for the will of the prince under the despotism of the Roman Emperors was paramount to every obligation. Great latitude was anciently allowed to legislative expositions of statutes; for the separation of the judicial from the legislative power was not then distinctly known or prescribed. The prince was in the habit of interpreting his own laws for particular occasions. This was called the *Interlocutio Principis;* and this, according to Huber's definition, was, *quando principes inter partes loquuntur et jus dicunt* (45). No correct civilian, and especially no proud admirer of the ancient republick, (if any such then existed) could have reflected on this interference with private rights and pending suits without disgust and indignation; and we are rather surprised to find that under the violent and irregular genius of the Roman government, the principle before us should have been acknowledged and obeyed to the extent in which we find it. The fact shews that it must be founded in the clearest justice. Our case is happily very different from that of the subjects of *Justinian.* With us, the power of the lawgiver is limited and defined; the judicial is regarded as a distinct, independent power: private rights have been better understood and more exalted in publick estimation, as well as secured by provisions dictated by the spirit of freedom, and unknown to the civil law. Our constitutions do not admit the power assumed by the Roman prince, and the principle we are considering is now to be regarded as sacred."

These acts infringe also the *thirty-seventh article* of the constitution of New-Hampshire; which says, that the powers of government shall be kept separate. By these acts, the legislature assumes to exercise a *judicial power.* It declares a *forfeiture,* and resumes franchises, once granted, without trial or hearing.

If the constitution be not altogether waste paper, it has restrained the power of the legislature, in these particulars. If it has any meaning, it is, that the legislature shall pass no act directly and manifestly impairing private property and private privileges. It

(41) Dig. 50. 17. 75.
(42) Elements of the Civil Law 168.
(43) Cod. 1. 14. 7.
(44) Perezii Prælect. h. t.
(45) Prælect Juris Civ. vol. 2. 545.

shall not judge, by *act*. It shall not decide, by *act*. It shall not deprive, by *act*. But it shall leave all these things to be tried and adjudged, by the law of the land.

The *fifteenth article* has been referred to before. It declares that no one shall be "deprived of his property, immunities or privileges, but by the judgment of his peers or the law of the land." Notwithstanding the light in which the learned judges in New-Hampshire viewed the rights of the plaintiffs under the charter, and which has been before adverted to, it is found to be admitted in their opinion, that those rights are *privileges* within the meaning of this *fifteenth* article of the bill of rights. Having quoted that article, they say: " that the right to manage the affairs of this college, is a privilege within the meaning of this clause of the bill of rights, is not to be doubted." In my humble opinion this surrenders the point. To resist the effect of this admission, however, the learned judges add—" But how a privilege can be protected from the operation of the law of the land by a clause in the constitution, declaring that it shall not be taken away, but by the law of the land, is not very easily understood."—This answer goes on the ground, that the acts in question *are laws of the land*, within the meaning of the constitution. If they be so, the argument drawn from this article is fully answered. If they be not so, it being admitted that the plaintiffs' rights are "*privileges*," within the meaning of the article, the argument is not answered, and the article is infringed by the acts. Are then these acts of the legislature, which affect only particular persons and their particular privileges, laws of the land? Let this question be answered by the text of Blackstone. "And first it (i. e. law) is a *rule:* not a transient sudden order from a superiour to or concerning a particular person; but something permanent, uniform, and universal. Therefore a particular act of the legislature to confiscate the goods of Titius, or to attaint him of high treason, does not enter into the idea of a municipal law: for the operation of this act is spent upon Titius only, and has no relation to the community in general; it is rather a sentence than a law" (46). Lord Coke is equally decisive and emphatic. Citing and commenting on the celebrated 29th chap. of *Magna Charta*, he says, "no man shall be disseized, &c. unless it be by the lawful judgment, that is, verdict of equals, or by the *law of the land*, that is, (to speak it once for all,) *by the due course and process of law* (47). Have the plaintiffs lost their franchises by "due course and process of law?" On the contrary, are not these acts, "particular acts of the legislature, which have no relation to the community in general, and which are rather sentences than laws?"

By the law of the land, is most clearly intended, the general law; a law, which hears before it condemns; which proceeds upon

(46) 1 Black. Com. 44.
(47) Coke 2 In. 46.

enquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society. Every thing which may pass under the form of an enactment, is not therefore to be considered the law of the land. If this were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees, and forfeitures in all possible forms, would be the law of the land.

Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void. It would tend directly to establish the union of all powers in the legislature. There would be no general permanent law for courts to administer, or for men to live under. The administration of justice would be an empty form, an idle ceremony. Judges would sit to execute legislative judgments and decrees; not to declare the law or to administer the justice of the country. " Is that the · law of the land," said Mr. Burke, "upon which, if a man go to Westminster Hall, and ask counsel by what title or tenure he holds his privilege or estate *according to the law of the land*, he should be told, that the law of the land is not yet known; that no decision or decree has been made in his case; that when a decree shall be passed, he will then know *what the law of the land is?* Will this be said to be the law of the land, by any lawyer who has a rag of a gown left upon his back, or a wig with one tie upon his head?"

That the power of electing and appointing the officers of this college, is not only a right of the trustees as a corporation, generally, and in the aggregate, but *that each individual trustee has also his own individual franchise in such right of election and appointment*, is according to the language of all the authorities. Lord Holt says, "it is agreeable to reason and the rules of law, that a franchise should be vested in the corporation aggregate, and yet the benefit of it to redound to the particular members, and to be enjoyed by them in their private capacity. Where the privilege of election is used by particular persons, *it is a particular right, vested in every particular man*" (48).

It is also to be considered, that the president and professors of this college have rights to be affected by these acts. Their interest is similar to that of *fellows* in the English colleges; because they derive their living, wholly or in part, from the founder's bounty. The president is one of the trustees, or corporators. The professors are not necessarily members of the corporation; but they are appointed by the trustees, are removable only by them, and have fixed salaries payable out of the general funds of the college.—Both president and professors have *freeholds*, in

(48) 2 Lord Ray. 952.

their offices; subject only to be removed, by the trustees, as their legal visitors, for good cause. All the authorities speak of fellowships in colleges as *freeholds*, notwithstanding the fellows may be liable to be suspended or removed, for misbehaviour, by their constituted visitors.

Nothing could have been less expected, in this age, than that there should have been an attempt, by acts of the legislature, to take away these college livings, the inadequate, but the only support of literary men, who have devoted their lives to the instruction of youth. The president and professors were appointed by the twelve trustees.—They were accountable to nobody else and could be removed by nobody else. They accepted their offices on this tenure. Yet the legislature has appointed other persons, with power to remove these officers, and to deprive them of their livings; and those other persons have exercised that power. No description of private property has been regarded as more sacred than college livings. They are the estates and freeholds of a most deserving class of men ; of scholars, who have consented to forego the advantages of professional and publick employments, and to devote themselves to science and literature, and the instruction of youth, in the quiet retreats of academic life.—Whether to dispossess and oust them ; to deprive them of their office, and to turn them out of their livings; to do this not by the power of their legal visitors, or governours, but by acts of the legislature ; and to do it without forfeiture, and without fault; whether all this be not in the highest degree an indefensible and arbitrary proceeding, is a question, of which there would seem to be but one side fit for a lawyer or a scholar to espouse.

Of all the attempts of James II. to overturn the law, and the rights of his subjects, none was esteemed more arbitrary or tyrannical, than his attack on *Magdalen College*, Oxford : And, yet, that attempt was nothing but to put out one president and put in another. The president of that college according to the charter and statutes, is to be chosen by the fellows, who are the corporators. There being a vacancy, the king chose to take the appointment out of the hands of the fellows, the legal electors of a president, into his own hands. He therefore sent down his mandate *commanding* the fellows to admit, for president, a person of his nomination ; and inasmuch as this was directly against the charter and constitution of the college, he was pleased to add a *non obstante* clause of sufficiently comprehensive import. The fellows were commanded to admit the person mentioned in the mandate, " *any statute, custom or constitution to the contrary notwithstanding, wherewith we are graciously pleased to dispense, in this behalf.*" The fellows refused obedience to this mandate, and Dr. Hough, a man of independence and character, was chosen president by the fellows, according to the charter and statutes. The king then assumed the power, in virtue of his prerogative, to send down cer-

tain *commissioners* to turn him out; which was done accordingly;
and Parker, a creature suited to the times put in his place.    And
because the president, who was rightfully and legally elected,
*would not deliver the keys, the doors were broken open.* "The
nation as well as the University," says Bishop Burnet, [Hist. of
his own times, Vol. 3. p. 119.] looked on all these proceedings
with just indignation.    It was thought *an open piece of robbery
and burglary, when men, authorized by no legal commission, came
and forcibly turned men out of their possession and freehold."*
Mr. Hume, although a man of different temper, and of other sen-
timents, in some respects, than Dr. Burnet, speaks of this arbitrary
attempt of prerogative, in terms not less decisive.    "The presi-
dent, and all the fellows," says he, "*except two, who complied,* were
expelled the college; and Parker was put in possession of the
office.    This act of violence of all those which were committed
during the reign of James, is perhaps the most illegal and arbi-
trary.    When the dispensing power was the most strenuously
insisted on by court lawyers, it had still been allowed, that the
statutes which regard *private property,* could not legally be infringed
by that prerogative.    Yet, in this instance, it appeared that even
these were not now secure from invasion.    The privileges of a
college are attacked; men are illegally dispossessed of their property
for adhering to their duty, to their oaths, and to their religion."

This measure king James lived to repent, after repentance was
too late.    When the charter of London was restored and other
measures of violence retracted, to avert the impending revolution,
the expelled president and fellows of Magdalen college were per-
mitted to resume their rights.    It is evident that this was regarded
as an arbitrary interference with *private property.*    Yet private
property was no otherwise attacked, than as a person was appointed
to administer and enjoy the revenues of a college, in a manner and
by persons *not authorized by the constitution of the college.*    A
majority of the members of the corporation would not comply with
the king's wishes.    A minority would.    The object was, there-
fore, to make this minority a majority.    To this end the king's
commissioners were directed to interfere in the case, and they
united with the *two complying fellows,* and expelled the rest; and
thus effected a change in the government of the college.    The
language in which Mr. Hume, and all other writers, speak of this
abortive attempt of oppression, shews that colleges were esteemed
to be, as they truly are private corporations, and the property and
privileges which belong to them, *private* property and *private* priv-
ileges.    Court lawyers were found to justify the king in dispens-
ing with the laws; that is, in assuming and exercising a legislative
authority.    But no lawyer, not even a court lawyer, in the reign
of king James the second, as far as appears, was found to say that
even by this high authority, he could infringe the franchises of the
fellows of a college and take away their livings.    Mr. Hume gives

the reason; it is that such franchises were regarded, in a most emphatic sense, *as private property* (49).

If it could be made to appear, that the trustees and the president and professors held their offices and franchises during the pleasure of the legislature, and that the property holden belonged to the state, then indeed the legislature have done no more than they had a right to do. But this is not so. The charter is a charter of *privileges* and *immunities;* and these are holden by the trustees expressly *against* the state forever.

It is admitted, that the state, by its courts of law can enforce the will of the donor, and compel a faithful execution of the trust. The plaintiffs claim no exemption from legal responsibility. They hold themselves at all times answerable to the law of the land, for their conduct in the trust committed to them. They ask only to hold the property of which they are owners, and the franchises, which belong to them; until they shall be found by due course and process of law, to have forfeited them.

It can make no difference, whether the legislature exercise the power it has assumed, by removing the trustees and the president and professors, directly, and by name, or by appointing others to expel them. The principle is the same, and in point of fact, the result has been the same. If the entire franchise cannot be taken away, neither can it be essentially impaired. If the trustees are legal owners of the property, they are *sole* owners. If they are visitors, they are *sole* visitors. No one will be found to say, that if the legislature may do what it has done, it may not do any thing and every thing, which it may choose to do, relative to the property of the corporation, and the privileges of its members and officers.

If the view which has been taken of this question be at all correct, this was an eleemosynary corporation; a private charity. The property was private property. The trustees were visitors, and their right to hold the charter, administer the funds, and visit and govern the college was a *franchise* and *privilege,* solemnly granted to them. The use being publick, in no way diminishes their legal estate in the property, or their title to the franchise. There is no principle, nor any case, which declares that a gift to such a corporation, is a gift to the publick. The acts in question violate property. They take away privileges, immunities, and franchises. They deny to the trustees the protection of the law; and they are retrospective in their operation. In all which respects they are against the constitution of New-Hampshire.

The plaintiffs contend, in the second place, that the acts in question are repugnant to the 10th section of the 1st article of the constitution of the United States. The material words of that

(49) Vide a full account of this case in state trials, 4 Edn. 4 Vol. page 262.

section are; "no state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

The object of these most important provisions in the national constitution has often been discussed, both here and elsewhere. It is exhibited with great clearness and force by one of the distinguished persons who framed that instrument. "Bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former, are expressly prohibited by the declarations prefixed to some of the state constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional fences against these dangers, ought not to be omitted. Very properly, therefore, have the convention added this constitutional bulwark in favour of personal security and private rights; and I am much deceived, if they have not, in so doing, as faithfully consulted the genuine sentiments, as the undoubted interests of their constituents. The sober people of America, are weary of the fluctuating policy which has directed the publick councils. They have seen with regret, and with indignation, that sudden changes, and legislative interferences in cases affecting personal rights, become jobs in the hands of enterprising and influential speculators; and snares to the more industrious and less informed part of the community. They have seen, too, that one legislative interference is but the link of a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding "(50).

It has already been decided in this court, that a *grant* is a contract, within the meaning of this provision; and that a grant by a state, is also a contract, as much as the grant of an individual. In *Fletcher* vs. *Peck* (51) this court says, "a contract is a compact between two or more parties, and is either executory or executed. An executory contract is one in which a party binds himself to do, or not to do, a particular thing; such was the law under which the conveyance was made by the government. A contract executed is one in which the object of contract is performed; and this, says Blackstone differs in nothing from a grant. The contract between Georgia and the purchasers was executed by the grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. If under a fair construction of the constitution, grants are comprehended under the term contracts, is a grant from the state excluded from the operation of the provision? Is the clause to be considered as inhibiting the state from impairing the obligation of contracts between two individuals, but as

(50) 44th No. of the Fed. by Mr. Madison.
(51) 6 Cranch 87.

excluding from that inhibition contracts made with itself? The words themselves contain no such distinction. They are general, and are applicable to contracts of every description. If contracts made with the state are to be exempted from their operation, the exception must arise from the character of the contracting party, not from the words which are employed. Whatever respect might have been felt for the state sovereignties, it is not to be disguised, that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States in adopting that instrument, have manifested a determination to shield themselves, and their property, from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the states, are obviously founded in this sentiment; and the constitution of the United States contains what may be deemed a bill of rights, for the people of each state."

It has also been decided, that a grant by a state before the revolution, is as much to be protected as a grant since (51). But the case of *Terrett* vs. *Taylor*, before cited, is of all others most pertinent to the present argument. Indeed the judgment of the court in that case seems to leave little to be argued or decided in this. " A private corporation," say the court, " created by the legislature may lose its franchises by a *misuser* or a *nonuser* of them; and they may be resumed by the government under a judicial judgment upon a *quo warranto* to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation. Upon a change of government, too, it may be admitted that such exclusive privileges attached to a private corporation as are inconsistent with the new government, may be abolished. In respect, also, to *publick* corporations which exist only for public purposes, such as counties, towns, cities, &c. the legislature may, under proper limitations, have a right to change, modify, enlarge or restrain them, securing however, the property for the uses of those for whom and at whose expense it was originally purchased. But that the legislature can repeal statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws, and by such repeal can vest the property of such corporations exclusively in the state, or dispose of the same to such purposes as they please, without the consent or default of the corporators, we are not prepared to admit; and we think ourselves standing upon the principles of natural justice, upon the fundamental laws of every free government, upon the spirit and letter of the constitution of the United States, and upon the decisions of most respectable judicial tribunals, in resisting such a doctrine."

This court, then, does not admit the doctrine, that a legislature can repeal statutes creating private corporations. If it cannot

(51) New Jersey vs. Wilson. 7. Cranch 164.

repeal them altogether, of course it cannot repeal any part of them, or impair them, or essentially alter them without the consent of the corporators.   If, therefore, it has been shewn that this college is to be regarded as a private charity, this case is embraced within the very terms of that decision.   A grant of corporate powers and privileges is as much a *contract* as a grant of land.   What proves all charters of this sort to be *contracts*, is, that they must be accepted to give them force and effect.   If they are not accepted they are void.   And in the case of an existing corporation, if a new charter is given it, it may even accept part and reject the rest. In *Rex* vs. *vice chancellor of Cambridge*, (52) lord Mansfield says, " there is a vast deal of difference between a new charter granted to a new corporation (who must take it as it is given ; ) and a new charter given to a *corporation* already in being, and acting either under a former charter, or under prescriptive usage.   The *latter*, a corporation already existing, are *not* obliged to accept the new charter *in toto*, and to receive either all or none of it : they may act *partly* under it, and *partly* under their old charter or prescription. The validity of these new charters must turn upon the *acceptance* of them."   In the same case Mr. Justice Wilmot says, " It is the *concurrence* and *acceptance* of the university that gives the *force* to the charter of the crown."   In the *King* vs. *Passmore*, (53) lord Kenyon observes :  " some things are clear ;  when a corporation exists capable of discharging its functions, the crown cannot obtrude another charter upon them ; they may either accept or reject it " (54).

In all cases relative to charters, the *acceptance* of them is uniformly alleged in the pleadings.   This shews the general understanding of the law, that they are grants, or contracts ; and that *parties* are necessary to give them force and validity.   In *King* vs. *Dr. Askew*, (55) it is said ;  " The crown *cannot oblige* a man to be a corporator, without his consent : he shall not be subject to the inconveniences of it, without *accepting* it and *assenting* to it." These terms, " *acceptance* " and " *assent*," are the very language of contract.   In *Ellis* vs. *Marshall* (56) it was expressly adjudged that the naming of the defendant among others, in an act of incorporation did not of itself make him a corporator ; and that his *assent* was necessary to that end.   The court speak of the act of incorporation as a *grant*, and observe ;  " that a man may refuse a *grant*, whether from the government or an individual, seems to be a principle too clear, to require the support of authorities."   But Justice Buller, in *King* vs. *Passmore*, furnishes if possible a still more direct and explicit authority.   Speaking of a corporation for government, he says : " I do not know how to reason on this point

(52) 3 Burr. 1656.
(53) 3 Term. Rep. 240.
(54) Vide also 1 Kyd on Cor. 65.
(55) 4 Burr. 2200.
(56) 2 Mass. Rep. 269.

better than in the manner urged by one of the relator's counsel; who considered the grant of incorporation to be *a compact* between the crown and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place." This language applies, with peculiar propriety and force to the case before the court. It was in consequence of the "privileges bestowed," that Dr. Wheelock and his associates undertook to exert themselves for the instruction and education of youth in this college; and it was on the same consideration that the founder endowed it with his property.

And because charters of incorporation are of the nature of contracts, they cannot be altered or varied but by consent of the original *parties*. If a charter be granted by the king, it may be altered by a new charter granted by the king, and accepted by the corporators. But if the first charter be granted by parliament, the consent of parliament must be obtained to any alteration. In *King* vs. *Miller*, (57) lord Kenyon says; "Where a corporation takes its rise from the king's charter, the king by granting, and the corporation by accepting another charter, may alter it, because it is done with the consent of all the parties who are competent to consent to the alteration." (58)

There are, in this case, all the essential constituent parts of a contract. There is something to be contracted about, there are parties, and there are plain terms in which the agreement of the parties, on the subject of the contract, is expressed. There are mutual considerations and inducements. The charter recites, that the founder, on his part, has agreed to establish his seminary, in New-Hampshire, and to enlarge it, beyond its original design, among other things, for the benefit of that province: and thereupon a charter is given to him, and his associates designated by himself, promising and assuring to them under the plighted faith of the state, the right of governing the college, and administering its concerns in the manner provided in the charter. There is a complete and perfect grant to them of all the power of superintendence, visitation, and government. Is not this a contract? If lands or money had been granted to him, and his associates for the same purposes, such grant could not be rescinded. And is there any difference in legal contemplation, between a grant of corporate franchises, and a grant of tangible property? No such difference is recognized in any decided case, nor does it exist in the common apprehension of mankind.

It is therefore contended, that this case falls within the true meaning of this provision of the constitution, as expounded in the decisions of this court; that the charter of 1769, is a contract, a stipulation or agreement; mutual in its considerations, express and

(57) 6 Term. Rep. 277.
(58) Vide also 2 Brown, Ch. Rep. 662. Ex parte, Bolton school.

formal in its terms, and of a most binding and solemn nature. That the acts in question *impair* this contract, has already been sufficiently shewn. They repeal and abrogate its most essential parts.

A single observation may not be improper on the opinion of the court of New-Hampshire, which has been published. The learned judges, who delivered that opinion, have viewed this question in a very different light, from that in which the plaintiffs have endeavoured to exhibit it. After some general remarks, they assume that this college is a publick corporation; and on this basis their judgment rests. Whether all colleges are not regarded as private, and eleemosynary corporations, by all law writers, and all judicial decisions; whether this college was not founded by Dr. Wheelock; whether the charter was not granted at his request, the better to execute a trust, which he had already created; whether he and his associates did not become visitors, by the charter; and whether Dartmouth College be not, therefore, in the strictest sense, a private charity, are questions which the learned judges do not appear to have discussed.

It is admitted in that opinion, that if it be a private corporation, its rights stand on the same ground as those of an individual. The great question, therefore, to be decided, is to which class of corporations do colleges thus founded belong? And the plaintiffs have endeavoured to satisfy the court, that according to the well settled principles, and uniform decisions of law, they are private eleemosynary corporations.

Much has heretofore been said on the *necessity* of admitting such a power in the legislature as has been assumed in this case. Many cases of possible evil have been imagined, which might otherwise be without remedy. Abuses, it is contended, might arise in the management of such institutions, which the ordinary courts of law would be unable to correct. But this is only another instance of that habit of supposing extreme cases, and then of reasoning from them, which is the constant refuge of those who are obliged to defend a cause, which, upon its merits, is indefensible. It would be sufficient to say, in answer, that it is not pretended, that there was here any such case of necessity. But a still more satisfactory answer is that the apprehension of danger is groundless, and therefore the whole argument fails. Experience has not taught us that there is danger of great evils or of great inconvenience from this source. Hitherto, neither in our own country nor elsewhere, have such cases of necessity occurred. The judicial establishments of the state are presumed to be competent to prevent abuses and violations of trust, in cases of this kind, as well as in all others. If they be not, they are imperfect, and their amendment would be a most proper subject for legislative wisdom. Under the government and protection of the general laws of the land, these institutions have always been found safe, as well as use-

ful. They go on, with the progress of society, accommodating themselves easily, without sudden change or violence, to the alterations which take place in its condition; and in the knowledge, the habits, and pursuits of men. The English colleges were founded in Catholic ages. Their religion was reformed with the general reformation of the nation; and they are suited perfectly well to the purpose of educating the protestant youth of modern times. Dartmouth college was established under a charter granted by the provincial government; but a better constitution for a college, or one more adapted to the condition of things under the present government, in all material respects, could not now be framed. Nothing in it was found to need alteration at the revolution. The wise men of that day saw in it one of the best hopes of future times, and commended it, as it was, with parental care, to the protection and guardianship of the government of the state. A charter of more liberal sentiments, of wiser provisions, drawn with more care, or in a better spirit, could not be expected at any time or from any source. The college needed no change in its organization or government. That which it did need was the kindness, the patronage, the bounty of the legislature; not a mock elevation to the character of a university, without the solid benefit of a shilling's donation to sustain the character; not the swelling and empty authority of establishing *institutes* and *other colleges*. This unsubstantial pageantry would seem to have been in derision of the scanty endowment and limited means of an unobtrusive but useful' and growing seminary. Least of all was there a necessity, or pretence of necessity, to infringe its legal rights, violate its franchises and privileges, and pour upon it these overwhelming streams of litigation.

But this argument from *necessity*, would equally apply in all other cases.—If it be well founded, it would prove, that whenever any inconvenience or evil should be experienced from the restrictions imposed on the legislature by the constitution, these restrictions ought to be disregarded. It is enough to say, that the people have thought otherwise.—They have, most wisely, chosen to take the risk, of occasional inconvenience from the want of power, in order that there might be a settled limit to its exercise, and a permanent security against its abuse. They have imposed prohibitions and restraints; and they have not rendered these altogether vain and nugatory by conferring the power of dispensation. If inconvenience should arise, which the legislature cannot remedy under the power conferred upon it, it is not answerable for such inconvenience. That which it cannot do, within the limits prescribed to it, it cannot do at all. No legislature in this country is able, and may the time never come when it shall be able, to apply to itself the memorable expression of a Roman pontiff; "*Licet hoc* DE JURE *non possumus, volumus tamen* DE PLENITUDINE POTESTATIS."

The case before the court is not of ordinary importance, nor of every day occurrence. It affects not this college only, but every college, and all the literary institutions of the country. They have flourished, hitherto, and have become in a high degree respectable and useful to the community. They have all a common principle of existence, the inviolability of their charters. It will be a dangerous, a most dangerous experiment, to hold these institutions subject to the rise and fall of popular parties, and the fluctuations of political opinions. If the franchise may be at any time taken away, or impaired, the property also may be taken away, or its use perverted. Benefactors will have no certainty of effecting the object of their bounty; and learned men will be deterred from devoting themselves to the service of such institutions, from the precarious title of their offices. Colleges and halls will be deserted by all better spirits, and become a theatre for the contention of politicks. Party and faction will be cherished in the places consecrated to piety and learning. These consequences are neither remote nor possible only. They are certain and immediate.

When the court in North Carolina declared the law of the state, which repealed a grant to its university, unconstitutional and void, the legislature had the candour and the wisdom to repeal the law. This example, so honourable to the state which exhibited it, is most fit to be followed on this occasion. And there is good reason to hope, that a state, which has hitherto been so much distinguished for temperate councils, cautious legislation, and regard to law, will not fail to adopt a course, which will accord with her highest and best interest, and in no small degree elevate her reputation.

It was for many and obvious reasons most anxiously desired, that the question of the power of the legislature over this charter should have been finally decided in the state court. An earnest hope was entertained that the judges of that court might have viewed the case in the light favourable to the rights of the trustees. That hope has failed. It is here, that those rights are now to be maintained, or they are prostrated forever. *Omnia alia perfugia bonorum, subsidia, consilia, auxilia, jura ceciderunt. Quem enim alium appellem? quem obtester? quem implorem? Nisi hoc loco, nisi apud vos, nisi per vos, judices, salutem nostram, quæ spe exigua extremaque pendet, tenuerimus; nihil est præterea quo confugere possimus.*

---

Afterwards at the November term in Grafton county, present all the judges, the opinion of the court was delivered by

Mr. C. J. RICHARDSON.[1]  This cause, which is trover for sundry

---

[1] The docket entries in the case are,—
May Term, 1817.  " Jus. Woodbury doth not sit."
November Term, 1817.  "Honable Judge Woodbury does not sit in this case."
The official report, 1 N. H. 111, makes no mention of Judge Woodbury's not sitting in the case, while Farrar, as above reprinted, and other publications of

articles alleged to be the property of the plaintiffs, comes before
the court upon a statement of facts, in which it is agreed by the
parties that the trustees of Dartmouth College were a body cor-
porate duly organized under a charter bearing date December 13,
1769; that the several articles, mentioned in the writ, were the
property of that body corporate, and that before the commence-
ment of this action the said articles being in the possession of the
defendant, he refused, although duly requested, to deliver them to
the plaintiffs. Upon these facts it is clear, that judgment must be
rendered for the plaintiffs, unless the facts, upon which the defend-
ant relies, constitute a legal defence.

By an act of this state passed June 27, 1816, entitled "An act
to amend the charter and enlarge and improve the corporation
of Dartmouth College," it is among other things enacted "that the
corporation heretofore called and known by the name of the
Trustees of Dartmouth College shall ever hereafter be called and
known by the name of the Trustees of Dartmouth University,
and the whole number of said trustees shall be twenty-one, a
majority of whom shall form a quorum for the transaction of busi-
ness, and they and their successors in that capacity as hereby con-
stituted, shall respectively forever have, hold, use, exercise and
enjoy all the powers, authorities, rights, property, liberties, privi-
leges and immunities which have hitherto been possessed, enjoyed
and used by the Trustees of Dartmouth College."—"And the
governor and council shall by appointment as soon as may be,
complete the present board of trustees to the number of twenty-
one as provided for by this act, and shall have power also to fill
all vacancies that may occur previous to, or during the first meet-
ing of said board of trustees." By an act of this state passed Dec.
18, 1816, entitled "An act in addition to and in amendment of an
act entitled an act to amend the charter, &c." it is declared "that
the governor with advice of council is "authorized to fill all vacan-
cies that have happened, or may happen in the board of said trus-
tees previous to their next annual meeting."

It is agreed by the parties, that in pursuance of the provisions
of these acts, the governor and council "completed the said board
of trustees to the number of twenty-one," by appointing nine new
trustees, who accepted the trust; and that previous to the com-
mencement of this action, at a meeting of the trustees of Dart-
mouth University held as the law requires, and composed of two
of the former trustees of Dartmouth College and the nine new
trustees appointed as aforesaid, being a sufficient number to consti-

the opinion printed shortly after it was read represent all the judges to have
been present at the decision. SHIRLEY, DART. COLL. CAUSES, p. 150. Judge
Woodbury had been appointed a trustee of Dartmouth University by the Gov-
ernor and Council July 3, 1816, and is said to have been present at a meeting of
the trustees at Hanover, August 26, 1816. SHIRLEY, p. 112. He was appointed
a member of the Court, December 9, 1816, and took his seat February Term,
1817, 1 N. H; *Records of the Governor & Council.*

tute a quorum of the whole board of twenty-one, the defendant was duly appointed treasurer and secretary of the trustees of Dartmouth University; and the articles mentioned in the plaintiffs' writ duly committed to his custody as the property of the University.

It is also agreed, that nine of the old trustees of Dartmouth College have individually and as far as by law they could, as a corporation, refused to accept the provisions of the acts of June 27, and Dec. 18, 1816, and still claim to be a corporation as constituted by the charter of 1769, and to have the same controul over the property which belonged to the College, as they had before these acts were passed. And this action is brought to enforce that claim. If those parts of the acts above mentioned, which authorize the appointment of new trustees, are valid and binding upon the trustees of Dartmouth College, without their consent, this action cannot be maintained: because in that case the corporation must now be considered as composed of twenty-one members, and any claim of a minority of the corporation to controul the affairs of the Institution in opposition to the majority is clearly without any legal foundation. But if on the other hand those acts are to be considered in that respect as unconstitutional and void, then the appointment and all the doings of the new trustees are invalid; the corporation remains as constituted by the charter of 1769; and the plaintiffs must prevail in this action. The decision of the cause must therefore depend upon the question, whether the legislature had a constitutional right to authorize the appointment of new trustees, without the consent of the corporation?

This cause has been argued on both sides with uncommon learning and ability, and we have witnessed with pleasure and with pride a display of talents and eloquence upon this occasion in the highest degree honourable to the profession of the law in this state. If the counsel of the plaintiffs have failed to convince us that the action can be maintained, it has not been owing to any want of diligence in research, or ingenuity in reasoning, but to a want of solid and substantial grounds on which to rest their arguments.

A complaint that private rights protected by the constitution have been invaded, will at all times deserve and receive the most deliberate consideration of this court. The cause of an individual whose rights have been infringed by the legislature in violation of the constitution, becomes at once the cause of all. For if a private right be thus infringed to-day, and that infringement be sanctioned by a judicial decision to-morrow, there will be next day a precedent for the violation of the rights of every man in the community; and so long as that precedent is followed, the constitution will be in fact to a certain extent repealed. An unconstitutional act must always be presumed to have been passed inadvertently or through misapprehension; and it is equally to be presumed that every honest legislator will rejoice when such an act is declared void, and the supremacy of the constitution maintained. But we

must not for a moment forget, that the question submitted to our decision in such cases, is always one of mere constitutional right;—sitting here as judges, we have nothing to do with the policy or expediency of the acts of the legislature. The legislative power of this state extends to every proper object of legislation, and is limited only by our constitutions and by the fundamental principles of all government and the unalienable rights of mankind. In giving a construction however to a doubtful clause in the constitution, we might with propriety weigh the conveniences and inconveniences which would result from a particular construction, because in such a case arguments drawn from those sources might have a tendency to shew the probable intention of the makers of the constitution. But when the constitutional right to pass a law is clear, the question of expediency belongs exclusively to the legislature. Nor is an act in any case to be presumed to be contrary to the constitution. The opposition between that instrument and the act should be such as to produce upon our minds a clear and strong conviction of their incompatibility with each other, before we pronounce the act void. A decent respect for the other branches of the government, ought to induce us to weigh well the reasons, upon which we found our opinions upon questions of this kind, and not to refuse to execute a law, till we are able to vindicate our judgment by sound and unanswerable arguments. For if we refuse to execute an act warranted by the constitution, our decision in effect alters that instrument, and imposes new restraints upon the legislative power, which the people never intended. On the other hand, if clearly convinced that an act of the legislature is unconstitutional, we should be unworthy of the station in which we are placed, if we shrunk from the duties which that station imposes.

In order to determine the question submitted to us, it seems necessary in the first place to ascertain the nature of corporations.— A corporation aggregate is a collection of many individuals united into one body under a special name, having perpetual succession under an artificial form, and vested by the policy of the law with the capacity of acting in several respects as an individual, and having collectively certain faculties, which the individuals have not. A corporation considered as a faculty, is an artificial, invisible body, existing only in contemplation of law: and can neither employ its franchises nor hold its property, for its own benefit. In another view, a corporation may be considered as a body of individuals having collectively particular faculties and capacities which they can employ for their own benefit, or for the benefit of others, according to the purposes for which their particular faculties and capacities were bestowed. In either view it is apparent, that all beneficial interests both in the franchises and the property of corporations, must be considered as vested in natural persons, either in the people at large, or in individuals; and that with

respect to this interest, corporations may be divided into *publick* and *private.*

*Private* corporations are those which are created for the immediate benefit and advantage of individuals, and their franchises may be considered as privileges conferred on a number of individuals, to be exercised and enjoyed by them in the form of a corporation. These privileges may be given to the corporators for their own benefit, or for the benefit of other individuals. In either case the corporation must be viewed in relation to the franchises as a trustee, and each of those, who are beneficially interested in them, as a *cestui que trust.* The property of this kind of corporations and the profits arising from the employment of their property and the exercise of their franchises, in fact belongs to individuals. To this class belong all the companies incorporated in this state, for the purpose of making canals, turnpike roads and bridges; also banking, insurance and manufacturing companies, and many others. Both the franchises and the property of these corporations exist collectively in all the individuals of whom they are composed; not however as natural persons, but as a body politick, while the beneficial interest in both is vested severally in the several members, according to their respective shares. This interest of each individual is a part of his property. It may be sold and transferred, may, in many cases, be seized and sold upon a fieri facias, and is assets in the hands of his administrator. This is by no means a new view of this subject. The supreme court of Massachusetts in the case of *Gray* vs. *The Portland Bank* (1), most evidently viewed corporations of this kind in the same light. In the case of the *Bank of the United States* vs. *Devaux* (2), the supreme court of the United States decided, that in determining a question of jurisdiction depending upon the citizenship of the parties, and a corporation being a party, they could look to the citizenship of the individual corporators as of the real litigants. The rejection of a corporator as a witness, in cases where the corporation is a party, on the ground of private interest is a matter of familiar practice in all our courts.

*Publick* corporations are those, which are created for publick purposes, and whose property is devoted to the objects for which they are created. The corporators have no private beneficial interest, either in their franchises or their property. The only private right which individuals can have in them, is the right of being, and of acting as members. Every other right and interest attached to them can only be enjoyed by individuals like the common privileges of free citizens, and the common interest, which all have in the property belonging to the state. Counties, towns, parishes, &c. considered as corporations, clearly fall within this description. A corporation, all of whose franchises are exercised

(1) 3 Mass. Rep. 379.
(2) 5 Cranch 61.

for publick purposes, is a publick corporation. Thus if the legislature should incorporate a number of individuals, for the purpose of making a canal, and should reserve all the profits arising from it to the state, though all the funds might be given to the corporation by individuals, it would in fact be a publick corporation. So if the state should purchase all the shares in one of our banking companies, it would immediately become a publick corporation. Because in both cases all the property and franchises of the corporations would in fact be publick property. A gift to a corporation created for publick purposes is in reality a gift to the publick. On the other hand, if the legislature should incorporate a banking company for the benefit of the corporators, and should give the corporation all the necessary funds, it would be a private corporation. Because a gift to such a corporation would be only a gift to the corporators. So, should the state purchase a part of the shares in one of our banks, it would still remain a private corporation so far as individuals retained a private interest in it. Thus it seems, that whether a corporation is to be considered as publick or private, depends upon the objects for which its franchises are to be exercised; and that as a corporation possesses franchises and property only to enable it to answer the purposes of its creation—a gift to a corporation is in truth a gift, to those who are interested in those purposes.

Whether an incorporated college, founded and endowed by an individual, who had reserved to himself a controul over its affairs as a private visitor, must be viewed as a publick or as a private corporation, it is not necessary now to decide, because it does not appear that Dartmouth College was subject to any private visitation whatever.

Upon looking into the charter of Dartmouth College we find that the king " being willing to encourage the laudable and charitable design of spreading christian knowledge among the savages of our American wilderness, and also that the best means of education be established in the province of New-Hampshire, for the benefit of said province " ordained that there should be a college created in said province by the name of Dartmouth College, " for the education and instruction of youth of the Indian tribes, in this land, in reading, writing and all parts of learning, which should appear necessary and expedient for civilizing and christianizing children of Pagans, as well as in all liberal arts and sciences, and also of English youth and any others;" and that there should be in the said Dartmouth College from thenceforth and forever, a body politick, consisting of trustees of Dartmouth College. He then " made, ordained, constituted and appointed " twelve individuals to be trustees of the College, and declared that they and their successors, should forever thereafter be a body corporate, by the name of the trustees of Dartmouth College; and that said corporation should be " able, and in law capable *for the use of said college*, to have, get, acquire, purchase,

receive, hold, possess and enjoy tenements, hereditaments, jurisdictions and franchises, for themselves and their successors, in fee simple or otherwise;"—and "to receive and dispose of any lands, goods, chattels and other things of what nature soever, *for the use aforesaid;* and also to have, accept and receive any rents, profits, annuities, gifts, legacies, donations or bequests of any kind whatsoever, *for the use aforesaid*" Such are the objects, and such the nature of this corporation, appearing upon the face of the charter. It was created for the purpose of holding and managing property for the use of the college; and the college was founded for the purpose of "spreading the knowledge of the great Redeemer" among the savages and of furnishing "the best means of education" to the province of New-Hampshire. These great purposes are surely, if any thing can be, matters of publick concern. Who has any private interest either in the objects or the property of this institution? The trustees themselves have no greater interest in the spreading of christian knowledge among the Indians, and in providing the best means of education, than any other individuals in the community. Nor have they any private interest in the property of this institution,—nothing that can be sold or transferred, that can descend to their heirs, or can be assets in the hands of their administrators. If all the property of the institution were destroyed, the loss would be exclusively publick, and no private loss to them. So entirely free are they from any private interest in this respect, that they are competent witnesses in causes where the corporation is a party, and the property of the corporation in contest. There is in Peake's cases at Nisi Prius, 154, an authority direct to this point. It is the case of Weller against the governors of the Foundling Hospital, and was assumpsit for work and labour. Most of the witnesses called on behalf of the defendants, were governors and members of the corporation. Lord Kenyon was of opinion that they were nevertheless good witnesses, because they were mere trustees of a publick charity, and had not the least personal interest. The office of trustee of Dartmouth College is, in fact, a publick trust, as much so as the office of governor, or of judge of this court; and for any breach of trust, the State has an unquestionable right, through its courts of justice to call them to an account. The trustees have the same interest in the corporate property, which the governor has in the property of the state, and which we have in the fines we impose upon the criminals convicted before this court. Nor is it any private concern of theirs, whether their powers, as corporators, shall be extended or lessened, any more than it is our private concern whether the jurisdiction of this court shall be enlarged or diminished. They have no private right in the institution, except the right of office,—the right of being trustees, and of acting as such. It therefore seems to us, that if such a corporation is not to be considered as a publick corporation, it would be difficult to find one that could be so considered.

It becomes then unnecessary to decide in this case, how far the legislature possesses a constitutional right to interfere in the concerns of *private corporations.* It may not however, be improper to remark, that it would be difficult to find a satisfactory reason why the property and immunities of such corporations should not stand, in this respect on the same ground with the property and immunities of individuals.

In deciding a case like this, where the complaint is that corporate rights have been unconstitutionally infringed, it is the duty of the court to strip off the forms and fictions with which the policy of the law has clothed those rights, and look beyond that intangible creature of the law, the corporation which in *form* possesses them, to the individuals and to the publick, to whom in *reality*, they belong, and who alone can be injured by a violation of them. This action, therefore, though *in form* the complaint of the corporation, must be considered as in *substance* the complaint of the trustees themselves.

The acts in question can only affect *publick* or *private* rights and interests. With regard to the rights and interests which the *publick* may have in this Institution,—no provision in the constitution of this state, nor of the United States, is recollected, which can protect them from legislative interference. We have been referred to no such provision in the argument. The clauses in those constitutions, upon which the plaintiffs' counsel have relied, were most manifestly, intended to protect private rights only. All publick interests are proper objects of legislation; and it is peculiarly the province of the legislature, to determine by what laws those interests shall be regulated. Nor is the expediency, or the policy of such laws, a subject for judicial decision. The constitution has given to the general court full power and authority to make and ordain all such laws "as *they* may judge for the benefit and welfare of this state." Should we assume the power of declaring statutes valid or invalid, according to our opinion of their expediency, it would not be endured for a moment, but would be justly viewed by all, as a wanton usurpation, altogether repugnant to the principles of our government. Nor are these plaintiffs competent to call in question the validity of these laws in a court of justice, on the ground that they are injurious to the publick interests. A law is only the publick will duly expressed. These trustees are the servants of the publick, and the servant is not to resist the will of his master, in a matter that concerns that master alone. If these acts be injurious to the publick interests, the remedy is to be sought in their repeal, not in courts of law. But if these acts infringe *private* rights, protected by the constitution, whether of the trustees themselves, or of others, whose rights they, from their situation are competent to vindicate, then the plaintiffs have proper grounds, upon which to submit their validity to our decision.

All private rights in this institution must belong, either to those who founded, or whose bounty has endowed it; to the officers and students of the college; or to the trustees.

As to those who founded or who have endowed it; no person of this description, who claims any private right, has been pointed out or is known to us. It is not understood that any person claims to be visitor of this college. An absolute donation of land or money to an institution of this kind, creates no private right in it. Besides, if the private rights of founders or donors have been infringed by these acts, it is their business to vindicate their own rights. It is no concern of these plaintiffs. When founders and donors complain, it will be our duty to hear and decide; but we cannot adjudicate upon their rights, till they come judicially before us. It has been strenuously urged to us, in the argument, that these acts will tend to discourage donations, and are therefore impolitick. Be it so. That was a consideration very proper to be weighed by those who made the acts, but is entitled to no weight in this decision.

The officers and students of the college. have, without doubt, private rights in the institution—rights which courts of justice are bound to notice—rights, which, if unjustly infringed, even by the trustees themselves, this court upon a proper application, would feel itself bound to protect. But for any injury done to their rights, they have their own remedy. It would be unjust to pre-judge their case on this occasion. They are not parties to this record, and cannot be legally heard in the discussion of this cause. If no form of action given them by law can be conceived; it is because these acts do no injury to their rights.

The real question then is, do these acts unconstitutionally infringe any private rights of these trustees? It is said that these acts in fact, attempt to dissolve the old corporation, to create a new one, and to transfer the property of the old corporation to the new; and are therefore void on the principle decided in *Territ & al.* vs. *Taylor* (3). But admitting this to be the attempt, we might with great propriety remark, in the language of Ashurst justice, in the case of the *King* against *Pasmore* (4), that "the members of the old body, have no injury or injustice to complain of, for they are all included in the new charter of incorporation, and if any of them do not become members of the new incorporation, but refuse to accept, it is their own fault." But it seems to us impossible to suppose, that the legislature intended by these acts, to dissolve the old corporation or to create a new one: nor do we conceive that the addition of new members, can in any case be considered as a dissolution of a corporation. The legislature of this state have not unfrequently annexed tracts of inhabited territory to towns, and thereby added new members to the corporation.

(3) 9 Cranch 43.
(4) 3 Durnford and East 244.

Yet who ever supposed that this was a dissolution of the old, and the creation of a new corporation? Our statute of Dec. 11, 1812 (5), makes the shares and interest of any person, in any incorporated company, liable to be seized and sold upon execution, and gives to the purchaser all the privileges appertaining thereto; and of course makes him a member of the corporation. But the thought probably never occurred to any man, that when a new member is added, by virtue of that act, the corporation is thereby dissolved, and a new one created. Yet that act has at least, as much dissolving, and as much creating force, as the acts now under consideration.

The plaintiffs, in taking this ground, seem not to have adverted to a material distinction, which, certainly exists between the rights and faculties relating to corporations, which can exist only in the corporators, as natural persons, and the corporate rights and faculties, which can exist only in the corporation. The right to the beneficial interest in the corporate property, can only exist in natural persons. But the legal title and ownership in corporate property, can in no case be considered as vested in the several corporators, as natural persons, either jointly or severally, but collectively in all, as one body politick, made capable by the policy of the law, of holding property as an individual. This artificial individual, which is said to be immortal, holds in all cases the legal title. Hence a corporation may maintain trespass against any of its members, who intermeddle with its property without its consent. Hence too, the legal title of a corporation in lands, will not pass by the deed of all its members. This faculty of holding property as an individual, which the policy of the law vests in a body of natural persons, that can be perpetuated by known rules of law, is one of the great ends and uses of an incorporation. But the natural persons who compose this artificial, immortal individual, in which the property is vested, must, in the nature of things, be continually fluctuating and changing; and yet the artificial individual remains in contemplation of law the same. It is therefore clear, that the legal identity of a corporation does not depend upon its being composed of the same natural persons, and that an addition of new members to a corporation, cannot in itself, make it a new and different corporation. The immortality of a corporation depends upon a continued accession of new members. The mode in which this accession is effected, is immaterial. A few of our corporations are perpetuated by a power of electing new members, placed in the corporations themselves. But most of our publick, and all our private corporations, are perpetuated by mere operation of law, without any corporate act whatever. Nor, by the addition of new members, is any part of the legal title to the corporate property, transferred from the old to the new members. That title remains unaltered in the corporation. The old mem-

(5) N. H. Laws, 184.

bers had not personally any such title that could be taken from them; and the new members have personally acquired none.   The error of the plaintiffs on this subject, probably originated in their supposing that the legal title to corporate property is vested in the corporators, in the same manner that the title to partnership property is vested in co-partners.   Indeed their counsel endeavored to illustrate this point, by comparing corporate to partnership property.   And if the comparison had been just, the inferences which the counsel made, would also have been just.   But the comparison does not hold, unless we are entirely mistaken as to the manner in which the legal title to corporate property is vested. The addition of new members by a legislative act, even to a private corporation, does not necessarily divest the old corporators, of any private beneficial interest, which they may individually have in the corporate property.   Suppose the legislature should enact, that the governor should be ex-officio a member of all the banking corporations in the state.   This might give him a personal influence in the management of their concerns, but would give him no beneficial interest whatever, in the corporate property.   The interest of the stock-holders would remain the same.   In the case of corporations, where all the benefit derived from them consists in the privileges incident to membership, as in incorporated library companies, it may be otherwise.   But in the property of publick corporations, there is no private beneficial interests that can be divested.    We are therefore of opinion, that these acts, if valid, do not dissolve the old corporation, nor create a new one ; nor do they operate in such manner as to change or transfer any legal title or beneficial interest in the corporate property, but the legal title remains in the corporation, and the beneficial interest in the publick, unaffected.

It has also been contended, that it depends altogether upon contract, whether the old trustees shall become members of the corporation as now organized; that there can be no contract without consent, and that therefore, these acts cannot bind the old trustees without their consent, and must in the nature of things, be invalid.   The whole amount of this argument is this : a statute, which attempts to compel the members of a corporation to become members of that corporation, differently organized, without their consent is invalid ; and as these acts make such an attempt, they are therefore invalid.   To this there are two decisive answers. 1. Neither of the propositions upon which the conclusion rests is true.   2. Admitting the premises to be correct, the legitimate conclusion to be drawn from them, is wholly irrelevant to the question in this case.   In the first place, the proposition that it depends altogether upon contract, whether individuals shall become members of particular corporations, is not universally true ; and so far as respects publick corporations, is never true.   The legislature has a most unquestionable right, to compel individuals to

become members of publick corporations.   Thus when a town is
incorporated, all the inhabitants become members of the corpora-
tion, and continue members so long as they reside within its limits,
whether they consent or not.   Nor is there any good reason to
doubt that the legislature possess the right to compel individuals
to accept the office of trustees of Dartmouth College, however the
corporation may be organized, any more than there is to doubt the
right of the legislature to compel individuals to serve as town
officers, as is done by our statute of Feb. 8, 1791 (6), or to be
enrolled in the militia and hazard their lives in defence of the
state.   It is a fundamental principle of all governments recognized
in the twelfth article of our bill of rights, that a state has a right
to the personal service of its citizens, whenever the publick neces-
sity requires it,—and the government has a right to judge of that
necessity.   There is a very strong case in 2 Modern Rep. 299.
*The Attorney general* vs. *Sir John Read.*   It was an information
against Read, for refusing to serve as high sheriff of Hertfordshire.
His defence was, that being under sentence of excommunication,
he could not receive the sacrament: and that by serving as high
sheriff without receiving it, he subjected himself to a penalty of
*L.*500, but the court held that he was punishable for not removing
the disability, it being in his power to get himself absolved from
the excommunication: and gave judgment against him.—Nor is
the proposition, that these acts attempt to compel the old trustees
to become members of this corporation as now organized, without
their consent, true.   They are left perfectly at liberty to continue
members of this corporation or not, according to their own pleas-
ure.   It is enacted, that the board shall hereafter consist of twenty-
one members; but it is not enacted that they shall continue
members of it against their consent.   They had, before these acts
were passed, a perfect right to resign when they pleased; and that
right is not impaired by these acts.

But in the second place, admitting the premises to be true, the
legitimate conclusion does not bear upon the question in this case.
The fair conclusion to be drawn from the premises, is, that these
acts, so far as they attempt to compel the old members to become
members of the corporation, as now organized, are invalid.   But
the question here is not, whether the legislature can compel the
old trustees to become members of the newly organized corpora-
tion, but whether it has a constitutional right to make a new organ-
ization of the corporation, by adding new members ?   And it is
very apparent, that although the legislature may not possess the
power to do the one, yet still it may have a constitutional right to
do the other.   There is a clear distinction between laws binding
corporate bodies, and laws attempting to bind individuals to con-
tinue members of corporate bodies.   Thus the legislature has an
undoubted right, at all times, to pass laws binding the whole body

(6) Laws 241.

politick of the state; but it is by no means clear, that the legislature has at all times a right to compel individuals to remain in the state, and be subject to those laws. So the legislature has a right to incorporate towns; but can it compel the inhabitants to remain in them, and continue members of such corporations?

But what is such a new organization of a corporation as cannot be made, without the consent of the corporators? If new members cannot be added, can any new duty be imposed upon a corporation; or can the corporate powers and faculties be in any way limited, without such consent? Our statute of June 21, 1814, (laws 284) makes it the duty of the several incorporated banks, to make a return of the state of their several banks, to the governor and council, annually, in June, under a penalty of $1000. If the doctrine of these plaintiffs be true, may not the stockholders say that they cannot be compelled to be members of corporations, subject to new and different duties, without their consent, and that therefore this act is void? And may not the same argument be used in regard to the acts of June 11, 1803, and June 17, 1807, which prohibit banks from issuing bills of a certain description? In fact, does not this doctrine amount to a denial of the right to legislate at all, on the subject of corporations, without their consent?

But, although an artificial individual, capable of holding the legal title to property, may be created by the policy of the law, and a kind of artificial will and judgment as to the management of its concerns, given to it by making the consent of a number of natural persons necessary in all its acts; yet still this artificial will and judgment is, after all, only the private will and judgment of natural persons, in some respects limited and restricted. In this point of view, a corporation may be considered as a body of natural persons, having power and authority vested in them, to manage the corporate concerns in such manner as a majority of a competent number of them may judge and determine to be best calculated to answer the ends of the incorporation. And it has been truly said, by the counsel of the plaintiffs, that by the charter of 1769 exclusive power and authority was given to the twelve trustees to manage the affairs of this corporation in such manner as a majority of any seven or more of them, duly convened for the purpose, might judge most expedient to answer the purposes of the institution; and that the right of the twelve, to exercise that exclusive power and authority is taken away by these acts, and others admitted to share that power and authority with them. Such is, without doubt, the operation of these acts; and it seems to us that this is the whole ground of complaint, which the plaintiffs can have. These acts compel the old trustees to sacrifice no private interest whatever, but merely to admit others to aid them, in the management of the concerns of a publick institution: and if they have no private views to answer, nor private wishes to

gratify, in the management of those concerns, (and it would be very uncharitable to suppose they can have, for it is extremely dishonourable to prostitute publick interest to private purposes) it is not very easy to see how this can furnish any very solid ground of complaint. Had the affairs and concerns of Dartmouth College been their own private affairs and concerns, such an interference would have had a very different complexion.

But the plaintiffs contend that these acts impair their right to manage the affairs of this institution, in violation of that clause in the fifteenth article in our bill of rights, which declares that "no subject shall be arrested, imprisoned, despoiled or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty or estate, but by the judgment of his peers or the law of the land." That the right to manage the affairs of this college, is a privilege within the meaning of this clause of the bill of rights, is not to be doubted. But how a privilege can be protected from the operation of a law of the land, by a clause in the constitution declaring that it shall not be taken away, but by the law of the land, is not very easily understood. This clause in our bill of rights, seems to have been taken from the 29th chapter of Magna Charta. "No freeman shall be taken or imprisoned, or be disseized of his freehold, or liberties, or free customs, or be out-lawed or exiled, or any otherwise destroyed, nor will we pass upon him nor condemn him, but by lawful judgment of his peers, or by the law of the land." The origin and history of Magna Charta is familiar to lawyers and politicians. Sullivan in his Lectures, 383–4, says that this chapter is the corner stone of English liberties, made in affirmance of the old common law; and that by the bare reading of it, we may learn the extravagances of king John's reign, which it was intended to redress. It is evident, from all the commentaries upon it by English writers, that it was intended to limit the powers of the crown, and not ·of parliament (7). Thus the franchises of a corporation are protected by this clause, in the great charter, and cannot be taken away by the king, unless by due process of law in his courts of justice for a forfeiture incurred. But parliament can dissolve a corporation by statute (8). The object of the clause in our bill of rights, now under consideration, seems always to have been understood in this state, to be the protection of private rights, from all interference of single branches of the government, and of individual magistrates, not warranted by law. Thus if the house of representatives or the senate, or the governour and council, or even a court should order an individual to be arrested, or his property to be seized in a case not warranted by the law of the land, it would be a violation of this clause in the bill of rights.—So if

(7) Sullivan's Lectures 383–408.   2 Institute 45.   4 Blackstone's Com-
    mentaries 423.
(8) 1 Blackstone's Commentaries 485.

an individual were arrested upon the warrant of a justice of the peace, the cause of which had not been previously supported by oath or affirmation, this clause in the bill of rights would be violated. At this term, in this county, we have decided, in the case of *Hutchins* vs. *Edson*, that an arrest upon an execution issuing from this court, but not under seal, which is required both by the constitution and by statute, was a violation of this clause in the bill of rights and altogether illegal and void. But all statutes, not repugnant to any other clauses in the constitution, seem always to have been considered as "the law of the land," within the meaning of this clause. Thus, our statute of December 24, 1799, authorizes selectmen and tythingmen, within their respective precincts, to stop persons suspected of travelling unnecessarily on the Sabbath ; and if no sufficient excuse be given, to detain them in custody, until a trial can be had ; and in the case of *Mayo* vs. *Wilson and others*, Cheshire, May 1817, we decided, after very mature consideration, that an individual who had been duly arrested and detained in pursuance of that statute, must be considered as having been deprived of his liberty "by the law of the land."

We have publick statutes, authorizing the selectmen of towns to take the lands of individuals for highways, and empowering firewards "to pull down, blow up or remove any house or buildings," when necessary to stop the progress of fire. We have private acts, giving to turnpike corporations authority to take the land of individuals for their roads. Under all these statutes, the property of individuals is often taken without their consent ; and yet it seems never to have been doubted that those statutes were "the law of the land," within the meaning of the constitution. By the statute of December 24, 1805, entitled, "an act respecting idle persons," judges of probate are authorized, in certain cases, to appoint guardians of idle persons, and thereby take from them all controul over both their real and personal estate. This act has been in our statute book nearly twelve years, as a part of "the law of the land," and no one has ever called its validity in question. By an act of December 11, 1804 (9), a part of the town of Wendell, in the county of Cheshire, is annexed to the town of New-London, in the county of Hillsborough, and by that act the exclusive power and authority of the former inhabitants of New-London, to manage their corporate concerns, is taken away in the same manner that the exclusive authority of these plaintiffs, to manage the affairs of Dartmouth College is taken away. The same thing has frequently been done to other towns. Yet it has never been made a question in our courts, whether those acts were "the law of the land," within the meaning of this clause in the bill of rights. Indeed, if this clause is to be construed to protect private property and rights from all legislative interference, what construction is to be given to that clause in the twelfth article in the bill of rights, which

(9) Laws 51.

declares that "no part of a man's property shall be taken from him, or applied to publick uses, without his own consent or that of the representative body of the people?" The cases in which a man's property may be taken from him, or applied to publick uses, with the consent of the representative body, are not specified; but it undoubtedly includes all those not expressly protected by other clauses of the constitution. No one of the acts just mentioned, seems to afford to the individuals, whose property and privileges may be affected by them, a less solid ground of complaint than the acts in question do to the plaintiffs. If the latter be repugnant to this clause in the constitution, so must be the former. There seems to be no substantial difference in the cases, on which a solid distinction can be founded If we decide that these acts are not "the law of the land," because they interfere with private rights, all other acts, interfering with private rights, may, for ought we see, fall within the same principle; and what statute does not either directly or indirectly, interfere with private rights? The principle would probably make our whole statute book a dead letter. We cannot adopt it; but are clearly of opinion that these acts, if not repugnant to any other constitutional provision, are "the law of the land," within the true sense of the constitution.

But it is said, that the charter of 1769 is a contract, the validity of which is impaired by these acts, in violation of that clause in the tenth section of the first article of the constitution of the United States, which declares that "No state shall pass any law, impairing the obligation of contracts." It has probably never yet been decided, that a charter of this kind is a contract within the meaning of the constitution of the United States. None of the cases cited, were like the present. In the case of *Fletcher* vs. *Peck*, (10) there was an express contract, a conveyance of lands to individuals, for their own use. In the case of *New-Jersey* vs. *Wilson* (11), there was also an express contract, a treaty, by which lands with a particular privilege annexed to the lands themselves, were granted to individuals for their own use, and upon a valuable consideration paid.

This clause, in the constitution of the United States, was obviously intended to protect private rights of property, and embraces all contracts relating to private property, whether executed or executory, and whether between individuals, between states, or between states and individuals. The word "contracts" must however be taken, in its common and ordinary acceptation, as an actual agreement between parties, by which something is granted or stipulated, immediately for the benefit of the actual parties. But this clause was not intended to limit the power of the states, in relation to their own publick officers and servants, or to their own civil institutions, and must not be construed to embrace contracts,

(10) 6 Cranch 87.
(11) 7 Cranch 164.

which are in their nature, mere matters of civil institution; nor grants of power and authority, by a state to individuals, to be exercised for purposes merely publick. Thus, marriage is a contract; but being a mere matter of civil institution, is not within the meaning of this clause. A law, therefore, authorizing divorces, though it impairs the validity of marriage contracts, is not a violation of the constitution of the United States. Thus too many of our penal statutes give a part of the penalties and forfeitures incurred under them, to particular individuals, and whenever a penalty or forfeiture is incurred, such individuals have a vested right to sue for and recover such forfeitures and penalties. But a repeal of those acts, at any time before an actual recovery, has always been held to divest this right (12). Such repeal, therefore, clearly impairs the validity of the grant; but no one ever supposed that such grant was a contract within the meaning of this clause. In the case of the *Commonwealth* vs. *Bird* (13), it was decided, that the legislature had a constitutional right to take away from individuals an exemption from military duty, acquired under existing laws; and it seems never to have occurred, either to counsel or the court, that the laws granting the exemption, were a contract within the meaning of this clause in the constitution. The legislature, both in this state and in Massachusetts, have always claimed and exercised the right of dividing towns; of enlarging or diminishing their territorial limits; of imposing new duties or limiting their powers and privileges, as the publick good seemed to require; and this without their consent. Yet this right seems never to have been called in question, on the ground that their charters were contracts, within the meaning of this clause. All our judges, justices of the peace, sheriffs, &c. hold their offices under grants from the governour and council, in pursuance of statutes. But who ever supposed that these grants were contracts within the meaning of this clause of the constitution of the United States. The distinction we have here endeavored to lay down, between the contracts which are, and which are not intended by that instrument, seems to us to be clear and obvious. If the charter of a publick institution, like that of Dartmouth College, is to be construed as a contract, within the intent of the constitution of the United States, it will, in our opinion, be difficult to say what powers, in relation to their publick institutions, if any, are left to the states. It is a construction, in our view, repugnant to the very principles of all government, because it places all the publick institutions of all the states beyond legislative controul. For it is clear that congress possesses no powers on the subject. We are therefore clearly of opinion, that the charter of Dartmouth College is not a contract, within the meaning of this clause in the constitution of the United States.

(12) 1 Gallison 177.—5 Cranch 281.—And *Lewis* vs. *Foster*, Cheshire, May 1817.
(13) 12 Mass. Rep. 443.

But admitting that charter to have been such a contract ; what was the contract ?   Can it be construed to be a contract on the part of the king with the corporators, whom he appointed, and their successors, that they should forever have the controul of the affairs of this institution, and be forever free from all legislative interference, and that their number should not be augmented or diminished, however strongly the publick interest might require it ?   Such a contract, in relation to a publick institution, would, as we conceive, be absurd and repugnant to the principles of all government.   The king had no power to make such a contract, and thus bind the sovereign authority on a subject of mere publick concern.   Nor does our legislature possess the power to make such a contract.   Had it been provided in the act of June, 1816, that the twenty-one trustees should forever have the exclusive controul of this institution, and that no future legislature should add to their number, does any one suppose such a provision would have been binding upon a future legislature?   Or suppose the legislature should enact that the number of judges of this court should never be augmented : is it possible to suppose that such an act could abridge the power of a succeeding legislature on the subject ?   We think not.   A distinction is to be taken between particular grants, by the legislature, of property or privileges to individuals, for their own benefit, and grants of power and authority to be exercised for publick purposes.   The former is in its nature, special legislation, in relation to private rights ; the latter is general legislation, in relation to the common interests of all.   Chief Justice Marshall, in the case of *Fletcher* vs. *Peck* (14), adverts to this distinction, where he says " the correctness of this principle, that one legislature cannot abridge the powers of a succeeding legislature so far as respects general legislation, can never be controverted.   But if an act be done under a law, a succeeding legislature cannot undo it.   The past cannot be recalled by the most absolute power.   Conveyances have been made ; those conveyances have vested legal estates, and if those estates may be seized by the sovereign authority, still that they originally vested, is a fact and cannot cease to be a fact."   We are therefore of opinion, that if this charter can be construed to be a contract within the meaning of the constitution of the United States ; yet still it contains no contract binding on the legislature, that the number of trustees shall not be augmented, and that the validity of the contract is not impaired by these acts.

I have looked into this case with all the attention, of which I am capable, and with a most painful anxiety to discover the true principles, upon which it ought to be decided.   No man prizes more highly than I do, the literary institutions of our country, or would go farther to maintain their just rights and privileges.   But

(14) 6 Cranch 135.

I cannot bring myself to believe, that it would be consistent with sound policy, or ultimately with the true interests of literature itself, to place the great publick institutions, in which all the young men, destined for the liberal professions, are to be educated, within the absolute controul of a few individuals, and out of the controul of the sovereign power—not consistent with sound policy, because it is a matter of too great moment, too intimately connected with the publick welfare and prosperity, to be thus entrusted in the hands of a few. The education of the rising generation is a matter of the highest publick concern, and is worthy of the best attention of every legislature. The immediate care of these institutions must be committed to individuals, and the trust will be faithfully executed so long as it is recollected to be a mere publick trust, and that there is a superintending power, that can and will correct every abuse of it. But make the trustees independent, and they will ultimately forget that their office is a publick trust —will at length consider these institutions as their own—will overlook the great purposes for which their powers were originally given, and will exercise them only to gratify their own private views and wishes, or to promote the narrow purposes of a sect or a party. It is idle to suppose that courts of law can correct every abuse of such a trust. Courts of law cannot legislate. There may be many abuses, which can be corrected by the sovereign power alone. Nor would such exemption from legislative controul be consistent with the true interests of literature itself, because these institutions must stand in constant need of the aid and patronage of the legislature and the publick; and without such aid and patronage, they can never flourish. Their prosperity depends entirely upon the publick estimation in which they are held. It is of the highest importance that they should be fondly cherished by the best affections of the people, that every citizen should feel that he has an interest in them, and that they constitute a part of that inestimable inheritance, which he is to transmit to his posterity in the institutions of his country. But these institutions, if placed in a situation to dispute the publick will, would eventually fall into the hands of men, who would be disposed to dispute it; and contests would inevitably arise, in which the great interests of literature would be forgotten. Those who resisted that will, would become at once the object of popular jealousy and distrust: their motives, however pure, would be called in question, and their resistance would be believed to have originated in private and interested views, and not in regard to the publick welfare. It would avail these institutions nothing that the publick will was wrong, and that their right could be maintained in opposition to it, in a court of law. A triumph there might be infinitely more ruinous than defeat. Whoever knows the nature of a popular government, knows that such a contest could not be thus settled by one engagement. Such a triumph would only protract the destructive

contest. The last misfortune which can befall one of these institutions, is to become the subject of popular contention.

I am aware that this power in the hands of the legislature may, like every other power, at times be unwisely exercised; but where can it be more securely lodged? If those, whom the people annually elect to manage their publick affairs, cannot be trusted, who can? The people have most emphatically enjoined it in the constitution, as a duty upon " the legislators and magistrates, in all future periods of the government, to cherish the interests of literature and the sciences and all seminaries and publick schools." And those interests will be cherished, both by the legislature and the people so long as there is virtue enough left to maintain the rest of our institutions. Whenever the people and their rulers shall become corrupt enough to wage war with the sciences and liberal arts, we may be assured that the time will have arrived, when all our institutions, our laws, our liberties must pass away,— when all that can be dear to freemen, or that can make their country dear to them, must be lost, and when a government and institutions must be established, of a very different character from those under which it is our pride and happiness to live.

In forming my opinion in this case, however, I have given no weight to any considerations of expediency. I think the legislature had a clear constitutional right to pass the laws in question. My opinion may be incorrect, and our judgment erroneous, but it is the best opinion, which upon the most mature consideration, I have been able to form. It is certainly, to me, a subject of much consolation, to know that if we have erred, our mistakes can be corrected, and be prevented from working any ultimate injustice. If the plaintiffs think themselves aggrieved by our decision, they can carry the cause to another tribunal, where it can be re-examined, and our judgment be reversed, or affirmed, as the law of the case may seem to that tribunal to require.

Let judgment be entered for the defendant.